**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**IN THE UNITED STATES DISTRICT**
**EASTERN DISTRICT OF ARKANSAS**

JUN 22 2010

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**JOHN B. STACKS**                                      **PLAINTIFFS**

vs.                        CASE NO. CV 2010-**4·10-CV-0718**JLH

**BLUEJAY HOLDINGS, LLC, TEN X**
**HOLDINGS, LLC, RICHARD F.**
**BESTON, JR., JOHN W. BRANCH**
**And JASON MAPLES**

This case assigned to District Judge *Holmes*
and to Magistrate Judge ___ *Young*

**DEFENDANTS**

## COMPLAINT

Comes now the plaintiff, John B. Stacks and for his cause of action against the defendants,

Bluejay Holdings, LLC, Ten X Holdings, LLC, Richard F. Beston, Jr., John W. Branch and Jason

Maples, alleges and states:

1.      That this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1332 because the

matter in controversy exceeds the sum of Seventy-five Thousand Dollars ($75,000.00) exclusive of

interest and cost, and complete diversity of citizenship exist between the plaintiff and all defendants.

Pursuant to 28 U.S.C. § 1391(a)(2), venue is proper is in this court because the plaintiff resides in

the Eastern District of Arkansas and the occurrences complained of herein took place in the Eastern

District of Arkansas.

2.      That the plaintiff, John B Stacks, is a resident of Van Buren County, Arkansas.

3.      That the defendant, Bluejay Holdings, LLC, is an Illinois limited liability company.

On information and belief, Bluejay Holdings, LLC is owned by Jason Maples and by the defendants,

Richard F. Beston, Jr. and John W. Branch.  The percentages of ownership are unknown to this

plaintiff.

4.      That Ten X Holdings, LLC is another Illinois limited liability company.   On information and belief, Ten X Holdings, LLC is owned and controlled by the defendants, Richard F. Beston, Jr. and John W. Branch.

5.      That the defendant, Richard F. Beston, Jr., is a resident of Chicago, Illinois, and can be served with process in this matter at 200 South Michigan Avenue, 21st Floor, Chicago, Illinois, 60604.

6.      That the defendant, John W. Branch, is a resident of the State of Illinois and can be served with process in this matter at 6501 Warrenville Road, Suite 103, Lisle, Illinois 60532.

7.      That the defendant, Jason Maples, is a resident of the State of Illinois and can be served with process in this matter at 3932 Blue Jay Lane, Naperville, Illinois 60564.

8.      That the acts and occurrences giving rise to this action took place in Arkansas. The defendants and each of them does business in Arkansas and did business in Arkansas at times material to this action

9.      That this Court has jurisdiction over the parties and subject matter of this action.

10.      That on and prior to March 26, 2010, the plaintiff, John B. Stacks, was the owner of three limited liability companies known and styled as MoutainPure, LLC, an Arkansas limited liability company; Mountain Pure MS, LLC, a Mississippi limited liability company; and Mountain Pure TX, LLC, a Texas limited liability company.   These companies are collectively called the "water companies." These limited liability companies were engaged in the business of bottling, marketing, and selling bottled water and juices.

11.      That on January 19, 2010, the plaintiff, John Stacks, entered into a certain Membership Interest Purchase Agreement with RainMaker Financial Group, Inc., an Illinois

2

corporation, by the terms of which RainMaker Financial Group, Inc. or its assigns agreed to purchase a portion of the membership interest of the plaintiff in the water companies.   A true copy of such Membership Interest Purchase Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

12.     Rainmaker Financial Group, Inc. assigned its interest in the Membership Interest Purchase Agreement to the defendant, Bluejay Holdings, LLC, on February 24, 2010, and that a true copy of such Assignment is attached hereto as Exhibit "B" and incorporated herein by reference.

13.     The contract of January 19, 2010, was amended by a written document dated February 26, 2010, and that a true copy of such Amendment is attached hereto as Exhibit "C" and incorporated herein by reference.

14.     That in material part the contracts and amendments between the parties provided for the sale by the plaintiff of sixty-five percent (65%) of his interest in the water companies to Bluejay Holdings, LLC for a total purchase price of $5,700,000.00 plus or minus certain prorations and credits and for the purchaser to indemnify the plaintiff against certain liability to third parties; and for the purchaser to inject $6,000,000.00 of capital into a newly formed holding company which would own the water companies described in paragraph 8 above.   The contracts further contained provisions to sell to the purchaser the plaintiff's remaining interest in the water companies as such interest was passed through to the holding company under a formula that would have generated to the plaintiff an additional approximate $20,000,000.00.   Further, the contracts provided for the payment to the plaintiff of $1,300,000.00 at the time of closing.   The total consideration to be paid to the plaintiff was to be approximately $28,000,000.00 during the life of the contract.

15.     That as the time for the closing of the transaction reflected in the Exhibits attached

3

to this complaint drew near, and despite representations to the contrary more fully described in subsequent paragraphs of this complaint, the individual defendants, on behalf of themselves and the corporate defendants told the plaintiff that they needed "only a few days" for the purchase price to become available to them and that the purchase price would be immediately available at such time as there were signed closing documents delivered to the defendants for the defendants to submit to companies from whom they were acquiring the financing to conclude the transaction. Based upon such representation, the parties executed a certain Closing Memorandum on March 26, 2010, and that a true copy of such Closing Memorandum is attached hereto as Exhibit "D" and incorporated herein by reference. The Closing Memorandum attached as Exhibit "D" provided for the buyers' part of the purchase price and the capital contribution required by the agreement of January 19, 2010, to be provided on an interim basis by certain Promissory Notes dated March 26, 2010, one of such notes being in favor of the plaintiff in the amount of $5,700,000.00. A true copy of such Promissory Note is attached hereto as Exhibit "E" and incorporated herein by reference. Notwithstanding the delivery of the promissory notes, however, the Closing Memorandum provided for the cash funding of the purchase price to occur no later than April 30, 2010.

16.    That on March 26, 2010, and in reliance on the representations of the defendants that the cash to fund the transaction would be made immediately available upon receipt of such closing documents, the closing documents were executed and delivered to the defendants, individually on behalf of the corporate defendants for the express purpose of allowing the defendants to acquire the cash funding to consummate the transaction reflected in the contracts attached to this complaint.

17.    That during the communications and negotiations leading up to the contract of January 19, 2010, the Amendment of February 26, 2010, and the Closing Memorandum of March

26, 2010, the plaintiff repeatedly made it abundantly clear to the defendants, individually and on behalf of the corporate entities, that the ready availability of cash was critical to the transaction; that the water companies had made investments, opened new plants, undertaken debt, contracted for supplies and material, and otherwise extended themselves financially so that there was an immediate need for cash in the water companies. The immediate availability of cash to the defendants was critically important to the plaintiff in entering this transaction and such fact was made painfully clear to the defendants, and each of them.

18.     That the plaintiff repeatedly inquired of the defendants, individually, and as representatives of the corporate defendants, as to whether cash was available for the closing of the transaction set out in the attached Exhibits. The defendants, individually, and as representatives of the corporate defendants, repeatedly assured the plaintiff that there was "no limit" from the defendants' ability to fund this transaction; that cash was available to disburse on closing; that there was $110,000,000.00 committed by the defendant, Ten X Holdings, LLC, for the acquisition of water companies and that this transaction was only the first of such acquisitions; and that upon receiving the executed closing documents, the purchase price would be paid to the plaintiff and the capital contribution would be made to Mountain Pure Holdings, LLC. Such representations were made by the defendants, individually, and as representatives of the corporate defendants, with an intent to have the plaintiff rely upon them; that the plaintiff did rely upon such representations; that the plaintiff's reliance was justified and reasonable under the circumstances; that the representations were of a material fact; and that such representations were made either maliciously or under circumstances in which malice may be inferred.

19.     That neither Bluejay Holdings, LLC, Ten X Holdings, LLC, Richard F. Beston, Jr.,

John W. Branch, or Jason Maples had, at any point in this process, ready access to cash sufficient to conclude this transaction. Representations to the contrary were simply fraudulent and misleading. On information and belief, the defendant, Ten X Holdings, LLC, had some sort of funding commitment from a third party which involved money not then (or now) in the United States of America, said money being "off shore." The money subject to such funding commitment could not, under rules and regulations of the Department of Homeland Security, be brought into the United States of America without complying with a lengthy and time consuming process through the Department of Homeland Security. The defendants, and each of them individually, and as representatives of the corporate defendants, either knew or should have known of such restriction on the availability of money. Failure to disclose this fact to the plaintiff is itself alleged to be a misrepresentation of a material fact.

20.      That the time for payment of the Promissory Note attached as Exhibit "E" has now passed and the plaintiff has made demand upon the defendants for payment of such Promissory Note.

**Count I – Action On Promissory Note**
**(Against Defendants, Bluejay Holdings, LLC and Ten X Holdings, LLC)**

21.      The allegations of the preceding paragraphs of this complaint are incorporated herein by reference.

22.      That there is presently due and owing to the plaintiff upon the Promissory Note attached as Exhibit "E" the principal sum of $5,700,000.00 plus interest as is called for in such Promissory Note and that the plaintiff is entitled to judgment against the defendants, Bluejay Holdings, LLC and Ten X Holdings, LLC, for such sum of money plus his attorney's fees and cost of this action.

## Count II – Breach of Contract
### (Against Defendant Bluejay Holdings, LLC)

23.     The allegations of the preceding paragraphs of this complaint are incorporated herein by reference.

24.     That the plaintiff substantially performed his obligations under the contracts attached hereto as Exhibits.

25.     That the defendant, Bluejay Holdings, LLC, failed to perform its obligations under the contracts attached hereto as exhibits and that such failure to perform proximately caused damages to the plaintiff in an amount to be determined by a jury empaneled to try the issues of fact in this case.

## Count III – Violation of the Arkansas Deceptive Trade Practices Act
### (Against All Defendants)

26.     That the allegations of the preceding paragraphs of this complaint are incorporated herein by reference.

27.     That the conduct of the defendants herein, both individually, and as representatives of the corporate defendants, constitute an unconscionable, false, or deceptive act or practice in business, commerce, or trade and is in violation of the Arkansas Deceptive Trade Practices Act. That, as a consequence of the defendants' violation of the Arkansas Deceptive Trade Practices Act, the plaintiff has sustained damages, proximately caused by such violation of the Arkansas Deceptive Trade Practices Act as are to be determined by a jury empaneled to try the issues of fact in this case.

## Count IV – Deceit
### (Against All Defendants)

28.     The allegations of the preceding paragraphs of this complaint are incorporated herein

7

by reference.

29.     That the representations and misrepresentations set out in the preceding paragraphs of this complaint were made and uttered by the individual defendants, Richard F. Beston, Jr., John W. Branch and Jason Maples, in their individual capacities and on behalf of the corporate defendants with whom the individual defendants stood in a principal/agency relationship.   Thus, the corporate defendants are liable under the doctrine of *respondeat superior* for such misrepresentations.

30.     That the misrepresentations were of a material fact, were justifiably relied upon by the plaintiff and proximately caused the plaintiff damages in a sum to be determined by a jury empaneled to try the issues of fact in this case.

31.     That, excepting for the misrepresentations set out herein, the plaintiff would not have entered the agreements set out in the Exhibits attached to this complaint.

32.     That the plaintiff has sustained damages, proximately caused by such misrepresentations and that such damages continue to increase as a consequence of the inability of the water companies to expand its businesses as a consequence of the unavailability of cash.

### Count V – Punitive Damages
### (Against All Defendants)

33.     The allegations of the preceding paragraphs of this complaint are incorporated herein by reference.

34.     That the misrepresentations set out herein were made maliciously or under circumstances from which malice can be inferred.   The tort of deceit is an intentional tort and, for such misrepresentations, the plaintiff is entitled to punitive damages to be determined by a jury empaneled to try the issues of fact in this case.

8

## DEMAND FOR JURY TRIAL

35.    The plaintiff requests that the issues of fact in this case be tried to a jury.

WHEREFORE, the plaintiff prays for judgment on the Promissory Note attached as Exhibit "E" against the defendants, Bluejay Holdings, LLC and Ten X Holdings, LLC, in the amount of $5,700,000.00 plus interest, attorney's fees and costs; against Bluejay Holdings, LLC for breach of contract for his damages caused by such breach, such sum to be determined by a jury empaneled to try the issues of fact in this case but not less than the minimum amount required for federal court diversity jurisdiction; for judgment against all defendants for violation of the Arkansas Deceptive Trade Practices Act in a sum to be determined by a jury empaneled to try the issues of fact in this case but not less than the minimum about required for federal court diversity jurisdiction; for judgment against all defendants for deceit for his damages proximately caused by such deceit, said sum to be determined by a jury empaneled to try the issues of fact in this case but not less than the minimum amount required for federal court jurisdiction; and for punitive damages for such deceit; and for his cost and fees herein and for such other and further relief as he may prove himself entitled.

JOHN B. STACKS, Plaintiff

BY:_____

John C. Everett, #70022
Everett & Wales
1944 East Joyce Blvd.
P. O. Box 8370
Fayetteville, AR 72703
Phone: (479) 443-0292
Fax:    (479) 443-0564

9

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (the "Agreement") is made and entered into this 19th day of January, 2010, by and between John B. Stacks (hereinafter referred to as "Seller"), and RainMaker Financial Group, Inc., an Illinois corporation, or its assigns (hereinafter referred to as "Buyer").

### RECITALS:

WHEREAS, the Seller owns all the issued and outstanding limited liability membership interests identified in Schedule 4.5 ("Interests") in each of the following limited liability companies: Mountain Pure LLC, an Arkansas limited liability company; Mountain Pure MS, LLC, a Mississippi limited liability company; and Mountain Pure TX, LLC, a Texas limited liability company (each hereinafter referred to individually as a "Company" and collectively as the "Companies"); and

WHEREAS, Seller and the Companies are engaged in the operation of a commercial water and juice bottling business (the "Business") from facilities at the following locations: 6921 Interstate 30, Little Rock, Arkansas 72209; 130 Coby Drive, Magee, Mississippi 39111; and 777 Willow Creek Drive, Palestine, Texas 75801 (hereinafter referred to as the "Premises"); and

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, that number of the Interests representing sixty-five percent (65%) of all issued and outstanding Interests in each of the Companies (the "Purchased Interests"), in accordance with the terms, and subject to all of the conditions, of this Agreement;

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated and made a part of this Agreement, and the mutual covenants and agreements set forth



EXHIBIT

A

herein, the sufficiency of which is acknowledged, the parties agree as follows:

## ARTICLE I

### Certain Definitions

As used in this Agreement, and in addition to any other defined terms used herein, each of the following terms shall have the following meaning:

1.1     **Affiliate**. "Affiliate" of a Person shall mean a Person that directly or indirectly through one or more intermediaries controls (through greater than 50% ownership), is controlled by, or is under common control with, the first Person.

1.2     **Associate**. "Associate" of a Person shall mean (i) an Affiliate of such Person; or (ii) a relative or spouse of such Person, or a relative of such spouse; or (iii) any trust or other estate in which such Person (or any relative or spouse of such Person) has a substantial beneficial interest or as to which such Person (or any relative or spouse of such Person, or a relative of such spouse) serves as a trustee or in a similar fiduciary capacity.

1.3.    **Closing**. "Closing" shall mean the delivery of the documents and materials described in Sections 3.3 and 3.4.

1.4     **Closing Date**. "Closing Date" has the meaning set forth in Section 3.1.

1.5     **Employment Agreement**.  "Employment Agreement" shall mean that certain employment agreement to be executed at Closing by and between Mountain Pure LLC and John B. Stacks, in connection with employment of Stacks in the Business to be conducted from the Premises, and in substantially the form of the copy attached as **Exhibit 1.5**.

1.6     **ERISA**. "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

1.7    **Financial Statements**. "Financial Statements" shall have the meaning set forth in Section 4.6.

1.8    **Indebtedness**. "Indebtedness" shall mean (i) all obligations of the Companies for borrowed money, whether current or funded, secured or unsecured; (ii) all obligations of the Companies on the deferred purchase price of any property or services; (iii) all obligations of the Companies created or arising under any conditional sale or other title retention agreement with respect to property acquired by the Companies (even though the rights and remedies of the seller or lender under such agreement in the event of a default may be limited to repossession or sale or such property); (iv) all obligations of the Companies secured by a purchase money mortgage or other Lien to secure all or part of the purchase price of property subject to such mortgage or Lien; (v) all obligations under leases which shall have been or should be, in accordance with generally accepted accounting principles, recorded as capital leases in respect of which Seller or the Companies are liable as lessee; (vi) any obligation of the Companies in respect of bankers' acceptances or letters of credit; (vii) any obligations secured by Liens on property acquired by the Companies, whether or not such obligations were assumed by the Companies at the time of acquisition of such property; (viii) all obligations of a type referred to in clause (i), (ii), (iii), (iv), (v), (vi) or (vii) above which is directly or indirectly guaranteed by the Companies or which they have agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a credit against loss; (ix) any accrued and unpaid interest or other charges on any of the foregoing obligations; (x) present, future or contingent payment obligations under any qualified or non-qualified welfare, benefit or other plan, agreement or arrangement with any former or present employee or Associate of such employee; (xi) Taxes; and (xii) all other forms of obligations except

3

trade accounts payable, purchase orders, and accrued expenses incurred in the ordinary course of the Companies' Business.

1.9     **Intellectual Property**. "Intellectual Property" shall mean trademarks, service marks, trade names, trade dress, copyrights, and similar rights, including registrations and applications to register or renew the registration of any of the foregoing, patent and patent applications, and inventions, processes, designs, formulae, trade secrets, know-how, confidential information, and all similar intellectual property rights, and licenses of any of the foregoing.

1.10     **Lien**. "Lien" shall mean any mortgage, trust deed, pledge, security interest, claim, charge or encumbrance of any kind.

1.11     **Person**. "Person" shall mean any individual, business corporation, municipal or not-for-profit corporation, trust, general or limited partnership, limited liability company, joint venture, unincorporated association, joint stock company, or any other entity or organization of any kind, and any governmental entity, including any agency or political subdivision thereof.

1.12     **Remainder Interests.** "Remainder Interests shall mean all of the Interests outstanding as of the Closing which are owned by Seller and are not included as part of the Purchased Interests.

1.13     **Sales Threshold**. "Sales Threshold" shall mean total annual sales revenues of the Companies in the amount of Twenty Seven Million Five Hundred Thousand Dollars ($27,500,000.00).

1.14     **Securities Act**. "Securities Act" shall mean the Securities Act of 1933.

1.15     **Tax Returns**. "Tax Returns" shall mean all returns, amended returns, declarations, statements, reports, information statements, declarations of estimated taxes, backup withholding returns or reports and other documents required to be filed in respect of Taxes.

4

1.16    **Taxes**.  "Taxes" shall mean all federal, state, municipal, local and foreign taxes, customs, duties, fees, levies, assessments or charges of any kind whatever including, but not limited to, income, alternative minimum income, franchise, profits, windfall profits, gross receipts, excise, sales, use, license, lease, service, service use, transaction, occupation, severance, stamp, premiums, energy, environmental, withholding, payroll, employment, unemployment, Social Security, worker's compensation, ad valorem, real or personal property, and capital taxes, and any interest, penalties, additions to tax or other additional amounts with respect thereto.

1.17    **Termination Date**.  "Termination Date" shall mean the earlier of (i) the date either party terminates this Agreement pursuant to Article 9, or (ii) February 28, 2010.

## ARTICLE II

### Purchase Price

2.1    **Purchase Price.**  Buyer agrees to pay to Seller, and Seller agrees to accept, as the aggregate purchase price hereunder for the Purchased Interests, an amount equal to Five Million Seven Hundred Thousand Dollars ($5,700,000.00), plus or minus Closing prorations and credits hereunder (the "Purchase Price").

2.2    **Payment of Purchase Price.**  The Purchase Price shall be paid as follows:

(a) Earnest Money Deposit.  Two Hundred Thousand Dollars ($200,000.00) to be deposited with Seller's legal counsel in such counsel's IOALTA  trust account and held thereafter to the Closing, as earnest money under this Agreement, subject to return to Buyer upon written request by Buyer in the event the transactions contemplated herein do not close as a result of:

(i) Seller's failure to perform its obligations hereunder or Seller's representations and warranties set forth in Article IV are not true and correct in all material respects as of the Closing Date;

(ii) the conditions set forth in Section 8.3(a)-(e) are not satisfied, or this Agreement is terminated as provided in Section 9.1, and as a result the transactions described herein do not Close as provided herein; or

(iii) the parties are unable to reach agreement by January 31, 2010 on the following related documents: Employment Agreement for John Stacks; Operating Agreement for the Companies and/or Mountain Pure Holdings, LLC, the leases for the Premises; and Seller's delivery and Buyer's review and acceptance of all Exhibits and Schedules referenced in this Agreement.

(b) <u>Cash at Closing</u>. Five Million Five Hundred Thousand Dollars ($5,500,000.00) to be paid, in cash or by certified check or wire transfer payable to or to the order of Seller, at the Closing.

2.3 **Post-Closing Payments and Purchases.**

(a) If the Business operations of the Companies following Closing achieve annual levels of earnings before interest, taxes, depreciation and amortization ("EBITDA") as determined pursuant to this Section 2.3, Buyer shall purchase up to an additional one hundred fifty (150) units (representing fifteen percent (15%) of the Interests in the Companies) from Seller for the consideration and in the manner provided in this Section 2.3. EBITDA shall be determined on an annual basis within sixty (60) days following the end of each fiscal year of the Companies' business operations. Except as mutually agreed by Buyer and Seller, for purposes of determining EBITDA, salaries and overhead

6

charges (as a percent of gross sales) in excess of the amounts customarily incurred by the Companies consistent with past operating history and practices shall not be taken into account. If EBITDA for any such year exceeds Four Million Five Hundred Thousand Dollars ($4,500,000.00) (the "EBITDA Threshold") and the total sales of the Companies equals or exceeds the Sales Threshold, Seller shall be entitled to receive and Buyer shall pay to Seller in cash an amount equal to fifty percent (50%) of the amount by which EBITDA exceeds the EBITDA Threshold (the "Post-Closing Payment").

(b) EBITDA and the amount of any Post-Closing Payment due for such year, if any, shall be determined by the Companies' certified public accounting firm in accordance with generally accepted accounting principals applied on a consistent basis for the relevant period. If, within thirty (30) days following delivery of the computation of EBITDA to Seller, Seller has not given Buyer notice of its objection thereto, then the EBITDA calculation will be considered binding and conclusive. If Seller gives such notice of objection, Seller and Buyer will work cooperatively together to resolve any differences; however, if their efforts are unsuccessful after thirty (30) days, then the issues in dispute will be submitted to an independent certified public accountant selected by the parties (the "Independent Accountant"), for resolution to determine the EBITDA for such period. If issues in dispute are submitted to the Independent Accountant for resolution, (i) each party will furnish to the Independent Accountant such workpapers and other documents and information relating to the disputed issues as the Independent Accountant may request and are available to that party (or its independent public accountants), and will be afforded the opportunity to present to the Independent Accountant any material relating to the determination and to discuss the determination with the Independent Accountant; (ii) the determination by the Independent Accountant, as set forth in a notice delivered to both parties by the Independent Accountant, will be binding and conclusive on

7

the parties; and (iii) the Companies shall pay the fees of the Independent Accountant for such determination.

(c) Post-Closing Payments, if any, shall be paid within thirty (30) days following the initial accounting firm's' determination, or if an objection is made in the manner described in Section 2.3 (b), within ten (10) days of the Independent Accountant's determination.

(d) For each One Million Dollars ($1,000,000.00) in cumulative Post-Closing Payments made to Seller, Seller shall convey to Buyer, seven and one-half (7.5) units (representing three quarters (3/4) of one percent (1%) of the total issued and outstanding units) of the Remainder Interests. Seller shall not be entitled to any additional Post-Closing Payments following the date Seller has received Post-Closing Payments in the cumulative amount of Twenty Million Dollars ($20,000,000.00) and Buyer shall not be entitled to purchase in excess of a total of 150 units (the "Post-Closing Purchased Units") representing 15% of the total outstanding units of the Companies in exchange for the Post Closing Payments. Notwithstanding the foregoing, if the Buyer, in its sole option, elects to waive the EBITDA Threshold and the Sales Threshold on a Post-Closing payment by Post- Closing payment basis, in any multiple of $1,000,000 as determined by Buyer, (hereinafter referred to as "Elective Payment") and pays to Seller the Elective Payment, Seller shall accept the Elective Payment as payment for the Remainder Interests as if such payment was a Post – Closing Payment. Should the Post-Closing Payments and or Elective Payments, when added together with all prior Post-Closing Payments and Elective Payments made prior to 24 months after the Closing, total Fourteen Million Eight Hundred Thousand Dollars ($14,800,000.00), then Seller shall transfer to Buyer the balance of the Post-Closing Purchased Units (up to 150 Units representing up to 15% of the Company), and the Buyer shall be relieved of any obligation to make any additional Post-Closing

8

Payment under this Section 2.3. The parties acknowledge and agree that Buyer shall not be entitled to make and Seller shall not be obligated to participate in any post-Closing purchases as part of the Post-Closing Payments or Elective Payments made by Buyer to Seller pursuant to this Section 2.3 which would reduce Seller's ownership interest in the Companies below twenty percent (20%).

(e)     As Buyer makes additional purchases of Seller's Remainder Interests, Buyer shall use its best efforts to cause Seller's guaranty of any indebtedness of the Companies to be reduced such that the percentage of such indebtedness guaranteed by Seller does not exceed Seller's percentage ownership interest in the Companies.

2.4     **Capital Contribution.** Buyer shall cause the sum of Six Million Dollars ($6,000,000.00) to be paid, in cash or by certified check or wire transfer payable to or to the order of the Companies, at the Closing, as a capital contribution, subject to allocation among the Companies and subsequent accounting entries thereafter as an irrevocable contribution to capital (the "Capital Contribution") to be allocated sixty-five percent (65%) to Buyer and thirty-five percent (35%) to Seller, to be used for working capital needs and expansion of the Business.     Such capital contribution shall be irrevocable and non-distributable for a period commencing with the Closing Date and terminating on the occurrence of the first of the following events (excluding the initial formation of Mountain Pure Holdings, LLC as a holding company for the Companies as contemplated in Section 6.12): a merger, consolidation, reorganization, dissolution or sale or other disposition of all or substantially all of the assets of the Companies, or the first anniversary of the Closing Date.

2.5.     **Remainder Interests Options.**     Seller hereby grants to Buyer and Buyer hereby

accepts from Seller a call option right ("Call") with regard to all of the remainder of the Remainder Interests, and Buyer hereby grants to Seller and Seller hereby accepts from Buyer a put option right ("Put") with regard to the remainder of the Remainder Interests, each such Call and Put to be non-transferrable and exercisable solely in the manner described in this Section 2.5. Beginning with the year ended December 31, 2012, a Call may be exercised by Buyer, and a Put may be exercised by Seller, at any time during the sixty (60) day period beginning with the date upon which the Companies' EBITDA and the amount of Post-Closing Payments, if any, for the immediately preceding fiscal year of the Companies' business operations, has become conclusive and binding in the manner provided in Section 2.3. A Call or Put shall be exercised by written notice by one party to the other within said sixty (60) day period and shall be waived if not exercised during said period. A Call or Put shall be exercised only to the extent of the entire balance of the Remainder Interests then outstanding. The price to be paid for such Remainder Interests pursuant to the exercise of any Call or Put shall be determined by multiplying the percentage Remainder Interests being purchased and sold by an amount equal to five (5) times the three year weighted average EBITDA of the Companies as set forth in the conclusive and binding determination issued in the manner provided in Section 2.3 (b) for the preceding three years with the most recent year being weighted three, the next preceding year weighted two and the next preceding year weighted one in the average (the "Put/Call Price"). Notwithstanding the foregoing restriction on the exercise of the Call until the year ended December 31, 2012, Buyer may, at its sole option, elect to exercise its Call at any time prior to that date provided Buyer has completed the purchase of the Post-Closing Purchased Units and provided further Buyer pays to Seller an amount equal to the greater of (i) the Put/Call Price, or (ii) the sum of Seven Million Five Hundred Thousand Dollars ($7,500,000.00) in exchange for the Remainder

Interests. The purchase price payable upon an exercise of a Call or Put shall be paid in full in cash within sixty (60) days following the date of the written notice of exercise. Both the Put and the Call Option shall expire on December 31, 2019.

### ARTICLE III

### The Closing

3.1     **Time and Place of Closing**. The Closing shall take place at the offices of Seller, 6921 Interstate 30, Little Rock, Arkansas 72209, at 11:00 A.M. Central Standard Time, on or before February 15, 2010, or at such other time, date or place as may be mutually agreed by the parties ("Closing Date").

3.2     **Purchase and Sale of the Purchased Interests**. At the Closing, Seller shall sell, convey, assign, transfer and deliver the Purchased Interests to Buyer in the manner hereinafter provided, and Buyer will purchase, acquire, accept and pay for the Purchased Interests in the manner herein provided.

3.3     **Deliveries by Seller to Buyer**. At the Closing, Seller will deliver to Buyer the following:

(a)     Certificates and transfer powers duly executed by Seller in favor of Buyer and representing all of the Purchased Interests;

(b)     Certificate of Good Standing for each of the Companies;

(c)     Resignations of existing managers and officers of each Company;

(d)     Other documents contemplated by Sections 8.3 and 8.4;

(e)     Evidence that Buyer has been designated as a named insured under Companies' liability insurance policies that are in force on the Closing Date;

11

(f)      Consent of lessor under the Lease for the Premises, and any other lessor under any other Lease relating to any Company's assets or Business, duly executed by such lessor in favor of Buyer, to the extent required under any such Lease;

(g)      Employment Agreement, in substantially the form of the copy attached hereto as **Exhibit 1.5**, duly executed by Seller;

(h)      Corporate, Tax, financial and Business records of the Companies;

(i)      Keys, passwords, protocols and other means of access to the Ppremises and Business assets of the Companies including, but not limited to, those related to all computer or other electronic media, storage, retrieval and security systems and devices.

(j)      Loan documents referenced in Section 6.11 duly signed by Bank, the Companies and Buyer as appropriate;

(k)      Operating Agreement, in substantially the form of the copy attached hereto as **Exhibit 6.12**, duly executed by Seller;

(l)      Lease Agreement , in substantially  the form of the copy attached hereto as Exhibit "4.8",duly executed by Seller; and

(m)     All Schedules and Exhibits referenced in this Agreement.

3.4     **Deliveries by Buyer**.  At the Closing, Buyer will deliver to Seller (or the Companies as applicable) the following:

(a)      Payments in the amounts and delivered in the manner described in Section 2.2;

12

(b)      Certified Corporate Resolution of the Shareholders and Directors of Buyer authorizing the purchase of Purchased Interests and related transactions contemplated hereby;

(c)      Certificate of Good Standing for Buyer;

(d)      Other documents contemplated by Sections 8.2 and 8.4;

(e)      Employment Agreement, in substantially the form of the copy attached hereto as **Exhibit 1.5**, duly executed by Mountain Pure, LLC;

(f)      Loan documents referenced in Section 6.11, duly executed by Bank, the Companies and Buyer as appropriate;

(g)      Operating Agreement, in substantially the form of the copy attached hereto as **Exhibit 6.12**, duly executed by Buyer;and

(h)      Lease Agreements, in substantially the form of the copy attached hereto as Exhibit "4.8", duly executed by the Companies.

## ARTICLE IV

### Representations and Warranties of Seller

As a material inducement to Buyer's execution and performance of this Agreement, each Seller represents and warrants to Buyer that each of the following statements is true and correct as of the date of this Agreement and shall be true and correct as of the Closing:

4.1    **Title to Purchased Interests**. Seller owns, beneficially and of record, all of the Purchased Interests, free and clear of any Liens and Indebtedness. Upon delivery of and payment for the Purchased Interests at Closing as provided in this Agreement, Buyer will acquire good and valid title thereto, free and clear of any Liens and Indebtedness.

13

4.2    **Organization; Qualification**. Each of the Companies is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its organization. Each of the Companies has the all power and authority to own all of its properties and assets and to carry on the Business. To the best knowledge of Seller, none of the Companies is required to be qualified as a foreign corporation in any other jurisdiction. None of the Companies does owns any shares of stock or other equity security of any other Person. Seller has delivered to Buyer complete and accurate copies of the articles of organization, operating agreement, minutes and resolutions of each Company.

4.3    **Authority Relative to this Agreement**. Seller has full and complete power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery by Seller of this Agreement, and any and all related agreements and documents, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized and, except only for the lessor consents to be delivered pursuant to Section 3.3, no other consents or corporate proceedings on the part of Seller or Company are necessary with respect thereto. When executed and delivered, this Agreement, and all related agreements and documents, shall have been duly and validly executed and delivered by Seller and will not violate, constitute or cause a default, or result in any loss of a material right under, any provision of law or the Company's articles of organization and operating agreement, or any rule, regulation, order, judgment, decree, contract, instrument or agreement to which Seller or Company is subject, or to which either is a party, and will not result in any termination, acceleration or maturity of any liability, Indebtedness or obligation of Seller or Company other than the Bank loan

14

documents. This Agreement constitutes, and when executed and delivered each of the related agreements and documents shall constitute, a valid and binding obligation of Seller.

4.4    **Governmental Authorization and Compliance**. Schedule 4.4 sets forth a complete and accurate list of all licenses, franchises, permits and other governmental authorizations relating to the Companies' assets and Business operations. None of the Companies has failed to comply with any law, ordinance, regulation or order applicable to the Company's assets or Business operations, and neither Seller nor any Company has received notice alleging any such noncompliance in any manner that would have a material adverse effect on the Business. The licenses, franchises, permits and other governmental authorizations set forth in Schedule 4.4 are valid and sufficient to permit Buyer's continued use of the Companies' assets and Business operations. There are no violations of any such license, franchise, permit and other governmental authorization, nor are there any proceedings pending or threatened to revoke or limit any such license, franchise, permit, or other governmental authorization. There is no requirement applicable to Seller or any Company to make any filing with, or to obtain any permit, authorization, consent or approval of, any public body as a condition to: (a) the lawful consummation of the transactions contemplated by this Agreement; or (b) Buyer's authority to offer and to sell or provide the products and services that Seller and the Companies have been selling and providing prior to Closing.

4.5    **Capitalization**. The authorized capital, and the number of units representing Interests outstanding, of each Company is set forth in Schedule 4.5. As of the date hereof, all issued and outstanding Interests are duly authorized, validly issued, fully paid and non-assessable. There are no outstanding preemptive rights, subscriptions, warrants, options, contracts, calls or other rights of any kind with regard to any Interests or any other equity or debt security of any Company of any

kind, and there are no capital appreciation rights,  securities with profit participation rights or features, or similar obligations or commitments of any Company.

4.6   **Financial Statements**.  Seller has previously furnished Buyer a complete and accurate copy of Company's balance sheet for the years ended December 31, 2007 and 2008, and for the interim period ended November 30, 2009, and the related statements of income and retained earnings for said periods (the "Financial Statements").  The Financial Statements present fully and accurately the financial position of the Companies as of the respective dates, and the results of its operations and changes in financial position for the periods covered thereby, and have been prepared in accordance with generally accepted accounting principles consistently applied.. Except as and to the extent reflected or reserved against on the balance sheet, the Companies had no material liabilities, Indebtedness or obligations, secured or unsecured (whether accrued, absolute, contingent or otherwise, and whether or not determined or determinable) of a nature which is required to be included in the Financial Statements in accordance with generally accepted accounting principles.

4.7   **Title to and Location of Business Assets**.  Each Company has good and marketable title to all of its assets, real and personal, tangible and intangible, including those capitalized on or included in the Financial Statements, except only for properties and assets disposed of since November 30, 2009 in the ordinary course of business, subject only to Liens disclosed or reflected in the Financial Statements and ongoing payables incurred in the ordinary course of business consistent with past practices. No Company uses any furniture, fixtures, machinery or equipment in its Business operations which it does not own or lease.  All furniture, fixtures, machinery and equipment used by the Companies in their Business operations are in the possession, or under the control, of the Companies and are located on the Premises.

16

4.8    **Leases**.  Schedule 4.8 lists all real and personal property leases ("Leases") to which any Company is a party or by which any Company is bound including, but not limited to, those referenced in Section 6.10.  Each Company has a valid leasehold estate in all leased property, free and clear of all Liens, except only those created by or set forth in the Leases.  No Company is in default in any material respect under the terms of any Lease.  Each Lease is valid, binding and enforceable, in accordance with its terms, against each party thereto. Each Company is in good standing under all such Leases, is in compliance with and not in default in any material respect under, and has not received any written notice of default or any notice of noncompliance with respect to, any applicable state, federal or local laws and regulations relating thereto.  No Company has received any notice from any government entity or authority alleging any material violation of any zoning, building, fire, use restriction, air, water, or other pollution control, environmental protection, waste disposal, safety, or health codes, ordinances, laws, rules, or regulations, with respect to the Premises, or any part thereof, or any other leased asset.  There is not now pending or threatened any condemnation or other governmental proceeding relating to the Premises or any part thereof.

4.9    **Material Contracts**.  Schedule 4.9 lists all contracts, agreements, instruments, and commitments arising from or relating to the Business assets and operations of the Companies to which Seller or any Company is a party or by which either is bound which are not terminable upon thirty (30) days prior written notice including, but not limited to, the loan documents referenced in Section 6.11.  Except as listed on Schedule 4.9, neither Seller nor any Company is a party to or is bound by any material contract, agreement, instrument, or commitment arising from or relating to the assets and Business operations of any Company, and of the following types:

17

(a)    loan agreement, promissory note, indenture, guarantee, or other agreement or instrument for or relating to the borrowing of money or extensions of credit or reimbursement agreement with respect to letters of credit;

(b)    mortgage, pledge agreement, security agreement, factoring agreement, subordination agreement, indemnification agreement, or similar agreement;

(c)    agreement for the future purchase of materials, supplies, services, merchandise, or equipment in excess of Ten Thousand and No/100 Dollars ($10,000.00) under any one agreement or series of related agreements;

(d)    agreement for the lease of personal property with rental payments in excess of Ten Thousand and No/100 Dollars ($10,000.00) per year under any one lease;

(e)    license, royalty, or franchise agreement;

(f)    non-competition or similar agreement;

(g)    agreement or arrangement for the sale of any asset, other than in the ordinary course of business or for the grant of any preferential right or option to purchase any asset, property, or right;

(h)    agreement which requires the consent of any other Person in order to remain in full force and effect as a result of the transactions contemplated by this Agreement;

(i)    agreement or commitment for capital expenditures in excess of Ten Thousand and No/100 Dollars ($10,000.00) for any single project;

(j)    agreement with any labor union or similar organization;

(k)    agreement for the retention, employment, consultation with or leasing of any employee, agent, representative, advisor or consultant;

(l)    agreement with any governmental agency or any other Person relating to the assessment or remediation (or payment of costs incurred for either of the foregoing) of the environmental condition of any property, including any consent orders or decrees or cost-allocation agreements; and

(m)    agreement which is material to the Business assets, operations or prospects of any Company.

All contracts, agreements, instruments, and other commitments described in this Section 4.9 are in full force and effect. Each Company and the other parties to such contracts, agreements, instruments and other commitments have complied with the provisions thereof, are not in default under any of the material terms thereof, and no event has occurred that with the passage of time or the giving of notice or both would constitute such a default.

4.10    **Intellectual Property**. Schedule 4.10 sets forth all right, title and interest of Seller and the Companies in, to and under all Intellectual Property owned or used by Seller or the Companies in Business operations. To Seller's knowledge, no other Person possesses any right, title or interest in, to or under such Intellectual Property. There is no pending or threatened claim or litigation against Seller or any Company contesting the right, title or interest of Seller or any Company with respect to any such Intellectual Property and to Seller's knowledge such Intellectual Property does not infringe, violate or require the use of any consent, trademark, trade name, license, copyright, trade secret, or other proprietary asset of any other Person.

19

4.11  **Labor Relations**. There are no controversies pending between any Company and any of its present or former employees which: (a) affect, or can reasonably be expected to affect, adversely and materially, such Company's assets or Business operations; or (b) relate to any effort to prevent, restrict or delay consummation of any of the transactions contemplated by this Agreement. No Company and its employees are parties to any collective bargaining agreement.

4.12  **Employment Agreements**. Except for the Employment Agreement, no Company has any written or oral employment agreements with any of its employees.

4.13  **Employee Benefit Plans**. No Company has any employee benefit plans within the meaning of Section 3(3) of ERISA.

4.14  **Maintenance of Tangible Assets**. The assets of each Company have been and will be, from the time of their acquisition by such Company until the Closing Date, maintained in good and operable condition. Schedule 4.14 contains a list of all of each Company's furniture, fixtures, machinery and equipment and other tangible personal property.

4.15  **Accounts Receivable**. Each Company's accounts receivable are fully and accurately reported in the Financial Statements, arose from bona fide transactions.

4.16  **Litigation**. Except to the extent described on Schedule 4.16, there are no actions, suits, claims, investigations or proceedings (legal, administrative or arbitrative) pending or, to the best knowledge of Seller, threatened, against Seller, any Company or any manager, officer, or member of any Company, whether at law or in equity and whether civil or criminal in nature, before or by any federal, state, municipal or other court, arbitrator, governmental department, commission, agency or instrumentality, nor are there any judgments, decrees or orders of any such court, arbitrator, governmental department, commission, agency or instrumentality outstanding against

20

Seller, any Company or any manager, officer, or member of any Company which: (a) relate to the assets or Business operations of any Company and which have or could reasonably be expected to have a material adverse affect on the assets or Business operations of any Company; or (b) seek to prohibit, restrict or delay consummation of the transactions contemplated hereby or fulfillment of any of the conditions of this Agreement.

4.17   **Absence of Changes**.  Since November 30, 2009, Seller has operated each Company in the ordinary course, and to Seller's knowledge there has been no: (a) material adverse change in the operations, properties or condition (financial or otherwise) of any Company; (b) damage, destruction or loss (whether or not covered by insurance) materially and adversely affecting the assets or Business operations of any Company or that could reasonably be expected to affect, materially and adversely, the assets or Business operations of any Company; (c) general increase in the compensation of employees of any Company (including, without limitation, any increase pursuant to any savings, deferred compensation, vacation, severance pay, bonus, incentive, insurance, pension, profit-sharing or other plan or commitment); (d) increase (other than normal increases consistent with past practice) in any such compensation payable to any such employee; (e) mortgage or pledge or security interest granted in any of the assets of any Company; (f) material deterioration of business relations with employees, suppliers or customers supplying or purchasing in excess of Ten Thousand and No/100 Dollars ($10,000.00) annually to or from any Company; or (g) agreement for any Company to take any of the actions described in clauses (c) through (e) above.

4.18   **Insurance**.  Schedule 4.18 is a complete and accurate list of all currently effective policies of insurance of which each Company is the owner or insured or covering any of such Company's assets or Business operations, indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, and expiration date.  All such policies are in full force and effect,

all premiums due thereon have been paid, and each Company has complied in all material respects with the provisions of such policies. There is no default with respect to any provision contained in any such policy, and there has not been any failure to give any notice or present any claim under any such policy in a timely fashion or in the manner or detail required by the policy. No notice of cancellation or non-renewal with respect to or disallowance of any claim under any such policy has been received by any Company. All products liability insurance and general liability insurance policies maintained by or for the benefit of each Company are "occurrence" policies and not "claims made" policies.

    4.19    **Taxes**. All Tax Returns required to be filed by or on behalf of each Company have been duly filed on a timely basis and such Tax Returns are complete and accurate. All Taxes due and payable have been paid in full on a timely basis. Each Company has withheld and paid over all Taxes required to have been withheld and paid over in connection with amounts paid or owing to any employee, creditor, independent contractor, or other Person. The liability for unpaid Taxes of each Company for all periods ended on or prior to the date of this Agreement included in the Financial Statements does not exceed the liability accruals for Taxes (excluding reserves for deferred Taxes) reflected for each Company in such Financial Statements. No waiver or extension of any statute of limitations is in effect with respect to any Taxes or Tax Returns of any Company. No power of attorney has been executed or filed by or on behalf of any Company with the IRS or any other taxing authority. No Tax Return filed by or on behalf of any Company is under audit by the IRS or any taxing authority. There are no disputes with a taxing authority with respect to Taxes payable by or on behalf of any Company, and neither Seller nor any Company has received any notice of deficiency, proposed adjustment, or underpayment of Taxes or is subject to any proceedings for the assessment or collection of Taxes. No Company has been included in any affiliated, consolidated,

combined, or unitary group for purposes of filing Tax Returns or paying Taxes at any time. Each Company has no liability for Taxes of any Person (other than itself) under Section 1.1502-6 of the U.S. income tax regulations or as a transferee of any Person or under any other provision of law, and neither Seller nor any Company is a party to or bound by or has any obligation under any tax sharing or similar agreement or arrangement. Buyer will not be required to deduct from or withhold, under Section 1445 or other provision of the Internal Revenue Code, upon the consummation of the transactions contemplated hereby, and Seller will cause the necessary documents to be provided to Buyer at the Closing to support such non-deduction and non-withholding. Neither Seller nor any Company has filed a consent to have the provisions of Section 341(i) of the Internal Revenue Code apply.

4.20    **Disclosure**. No representation or warranty of Seller contained in this Agreement, or any statement contained in any document delivered to Buyer by Seller in connection with the transactions contemplated hereby, contains or will contain any misstatement of material fact, or fails or will fail to contain any material facts necessary in order to make the statements made therein not misleading.

4.21    **Environmental Matters**. (a) Each Company has been, and at the Closing will be, in compliance in all respects and with all federal, state and local statutes, laws, ordinances, orders, rules, regulations, and moratoria relating to operation and occupancy of such Company's assets and Business operations including, but not limited to, the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, the Safe Drinking Water Act, as amended, the Resource Conversation and Recovery Act, as amended ("RCRA"), the Toxic Substances Control Act, as amended, the Emergency Planning and Community Right-To-Know Act of 1986, the Hazardous Material Transportation Act, as amended, and the Comprehensive Environmental Response,

23

Compensation and Liability Act, as amended ("CERCLA"). Neither Seller nor any Company has at any time received any notice alleging any non-compliance with or potential liability pursuant to any of such statutes, laws, ordinances, orders, rules, regulations, or moratoria.

(b)  No suit, action, or other proceeding (including enforcement actions, administrative proceedings, arbitrations, or governmental investigations) relating to operation of any Company's Business is pending or is threatened or contemplated against such Company.

(c)  No hazardous wastes, as defined in Subtitle C of RCRA or under applicable state law, and no hazardous substances, as defined in CERCLA or under applicable state law, have ever been generated, treated, stored, or disposed of by any Company at any location. No underground storage tanks, as defined in RCRA or under applicable state law, are present on the Premises or are operated by any Company at any location, and, to the knowledge of Seller, no such tanks were previously abandoned or removed. There is no hazardous waste, substance, chemical, or other condition or use of any Company's assets or their vicinity, whether natural or man-made, which poses a present or potential threat of damage to the health of persons, to property, to natural resources, or to the environment.

(d)  No Company has any liability, responsibility or obligation, whether fixed, unliquidated, absolute, contingent or otherwise, under any federal, state or local environmental laws or regulations, including any liability, responsibility, or obligation for fines or penalties, or for investigation, expense, removal, or remedial action to effect compliance with or discharge any duty, obligation, or claim under any such laws or regulations, and, to the knowledge of Seller, there is no reason to believe that any such claims, actions, suits, proceedings, or investigations under such laws or regulations exist or may be brought or threatened. There has not been, and is not occurring, at the Premises, or any location to which any Company may ever have sent any materials, any release or

24

threatened release, as those terms are defined in CERCLA, of any hazardous substance, nor does Seller have any reason to believe such a release is occurring or has occurred at any time in the past. Neither Seller nor any Company or any Persons for whose conduct they may be liable, have sent, arranged for disposal or treatment, arranged with a transporter for transport for disposal or treatment, transported, or accepted for transport any hazardous substance to a facility, site or location, which, pursuant to CERCLA or any similar state or local law (i) has been placed or is proposed to be placed, on the National Priorities List or its state equivalent or (ii) which is subject to a claim, administrative order, or other request to take removal or remedial action by any Person.

4.22    **Securities Matters**.  The Purchased Interests have not been registered under the provisions of the Securities Act or any state securities law and have been issued in reliance upon registration exemptions available thereunder.  There have been, and are now existing, no violations of federal or state securities laws or regulations in connection with the offering, issuance or transfer of any equity or other security of any Company.

4.23    **Transfer Laws**.  Neither Seller or Buyer, nor the Purchased Interests, any Company or any assets or Business operations of any Company, are, as a consequence of this sale, assignment and transfer of the Purchased Interests, subject to any Lien or liability under any state or local Tax or bulk transfer law or ordinance, and neither Seller, Buyer nor any Company is required under any such state or local Tax or bulk transfer law or ordinance to procure or deliver any clearance letters, releases or waivers under such local Tax or bulk transfer law or ordinance.

4.24    **Schedules**.  All of the Schedules attached to this Agreement are complete and accurate in all material respects.

25

## ARTICLE V

### Representations and Warranties of Buyer

As a material inducement to Seller's execution and performance of this Agreement, Buyer represents and warrants to each Seller that each of the following statements is true and correct as of the date of this Agreement and shall be true and correct as of the Closing:

5.1 **Organization: Qualification**. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois. Buyer has the corporate power and authority to own all of its properties and assets and to carry on its business as now being conducted.

5.2 **Authority Relative to this Agreement**. Buyer has the corporate power and authority to execute and deliver this Agreement, and any related agreements to which it is a party and to consummate the transactions contemplated hereby and thereby. This Agreement has been and, when executed and delivered the related agreements to which it is a party shall have been, duly and validly executed and delivered by Buyer and this Agreement constitutes, and, when executed and delivered each of the related agreements to which it is a party shall constitute, a valid and binding obligation of Buyer.

## ARTICLE VI

### Other Agreements of the Parties

6.1 **Conduct of Operations**. During the period from the date of this Agreement to the Closing Date, Seller has conducted and will cause to be conducted the Companies' Business operations in the manner in which Seller has customarily and ordinarily conducted such Business operations in the past, preserve intact the Companies' assets and Business operations and report regularly to Buyer as to the general status thereof and as to any material event affecting the

26

Companies' assets and Business operations. During the period from the date of this Agreement to the Closing Date, Seller has not and will not, other than in the normal course of business, take, without the prior written consent of Buyer, any action which could reasonably be expected to materially adversely affect the assets or Business operations of the Companies.

6.2    **Investigation of Condition**. Buyer may, before the Closing Date, make or cause to be made such investigation of the assets and Business operations of the Companies including, but not limited to, the financial, operational and legal condition thereof, as it deems necessary, provided that such investigation shall not interfere with the normal Business operations of the Companies. Such investigation may be conducted by Buyer's officers, accountants, counsel and representatives and Seller will provide, and will cause the Companies to provide, such representatives full access to the Premises and the Companies' assets, books, records, financial and operating data, and other information as Buyer shall, from time to time, reasonably request upon prior scheduling. No such investigation shall affect the representations and warranties of Seller contained herein and each such representation and warranty shall survive any such investigation except as is expressly contemplated by this Agreement.

6.3    **Cooperation**. From and after the Closing Date, Buyer shall cooperate (at the expense of Seller and without unreasonably interfering with the operations of Buyer) with Seller, and Seller shall cooperate (at the expense of Buyer and without unreasonably interfering with the operations of Seller) with Buyer in connection with the administration of employee matters, the filing of Tax Returns and other reports required by governmental authorities and the defense of any claim or litigation made or instituted against either party in respect of Seller's operations before the Closing Date, which cooperation shall include, but not be limited to, making available employees for the purposes of providing technical or expert testimony and advice; provided that the provisions of this

27

Section 6.3 shall not be applicable to any matters to the extent covered by the indemnification provisions of Article X.

6.4    **Expenses**.  Whether or not the transactions contemplated are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby will be paid by the party incurring such costs and expenses, provided that Seller shall pay any and all costs and expenses incurred in connection with the transfer of title to the Premises out of the Companies and to Seller or an Affiliate of Seller, as well as any and all transfer, income, excise or other taxes, duties and assessments arising therefrom or relating thereto.

6.5    **Best Efforts**.  Subject to the terms and conditions of this Agreement, each of the parties will use its best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective as soon as practicable the transactions contemplated by this Agreement.

6.6    **Further Assurances**.  From time to time, without further consideration, Seller, at its own expense, will execute and deliver, or cause to be executed and delivered, such documents as Buyer may reasonably request to more effectively consummate the transactions contemplated hereby and to vest in Buyer good title to the Purchased Interests.  From time to time, without further consideration, Buyer, at its own expense, will execute and deliver, or cause to be executed and delivered, such documents as Seller may reasonably request to more effectively  consummate the transactions contemplated hereby.

6.7    **Negotiations with Others**.  During the period from the date of this Agreement to the Termination Date, Seller will not, directly or indirectly, engage in discussions or negotiations with any person or entity (other than Buyer) concerning any possible proposal regarding a sale or transfer of all or any part of the Purchased Interests or the assets or Business operations of the Companies.

Seller agrees to disclose to Buyer the existence and content of any communication it receives concerning any such possible proposal as soon as practicable after receipt of the communication.

6.8 **Brokers**. Seller and Buyer each represent and warrant to the other that each pay or discharge, and will each indemnify and hold the other harmless from and against, any and all claims or liabilities for all brokerage fees, commissions and finder's fees incurred by reason of any action taken by such party.

6.9 **Sales and Transfer Taxes and Fees**. Any sales and transfer Taxes and fees directly incurred in connection with this Agreement and the transactions contemplated hereby will be borne by Seller including, but not limited to, those arising from or relating to the transfer and leaseback transaction referenced in Section 6.10. Seller will file all necessary Tax Returns and other documentation, if any, with respect to all such sales, transfer and recording Taxes and fees relating to Seller including, but not limited to, those arising from or relating to the transfer and leaseback transaction referenced in Section 6.10.

6.10 **Transfer and Leaseback.** At or before Closing, Seller shall cause the Companies to transfer title to the Premises to Seller or an Affiliate of Seller, subject to Leases in favor of the Companies, as tenants, providing among other things, for annual rents not to exceed One Million Two Hundred Thousand Dollars ($1,200,000.00) in the aggregate for all Premises during the first five (5) years of an initial lease term of ten (10) years and providing for three (3) extension terms of five (5) years each, subject to rent adjustment at the beginning of year six (6) and at the beginning of each extension term so as to fix rent during the succeeding five year (5) period at a rent equal the that applicable during the immediately preceding five (5) years and adjusted upward or downward based on the relative applicable regional CPIs as of the beginning and ending of the immediately preceding term, but with no adjustment to be greater than five percent (5%) upward or downward. Each Lease

shall be triple net and shall grant the tenant an option to purchase the Leased Premises at any time after the initial five years of the lease term and upon ninety (90) days notice to Seller at a price equal to the fair market value of such Premises, as determined by mutual agreement of the parties or if the parties are unable to reach agreement then by reference to a valuation completed by a qualified appraiser mutually acceptable to the parties. If the parties are unable to agree on an appraiser, then each party shall select an appraiser and those two appraisers shall select an appraiser who determination of value shall be final and conclusive. In the event this option is exercised, Buyer will cooperate with Seller to allow Seller to structure the sale as a tax free exchange under section 1031 of the Internal Revenue Code. The terms and conditions of any such Lease shall be subject to Buyer's review and approval prior to Closing, and within Buyer's sole discretion.

6.11 **Refinancing.** At of before Closing, the Companies shall have reached a written agreement with Metropolitan Bank and Trust and First Community Bank in Batesville, Arkansas ("Bank") evidencing Bank's extension of the maturity dates of the Companies' credit facilities with Bank (presently aggregating approximately Eighteen Million Dollars ($18,000,000.00) in outstanding principal and interest) for a period of at least five (5) years and with an interest rate, and upon such additional terms and conditions, as presently apply under existing credit facilities documentation, subject to proportionate guarantees of Seller and Buyer based upon their ownership interests in the Companies as the same may change from time to time. The terms and conditions of any such agreement with Bank shall be subject to Buyer's review and approval prior to Closing, and within Buyer's sole discretion. Buyer agrees to promptly provide Buyer and Bank with all financial and credit information requested by Bank as part of its credit review of Buyer.

6.12 **Formation of Holding Company.** The parties intend to own their interests in the Companies through a newly formed holding company. Accordingly, on or before Closing, a new

30

Arkansas limited liability holding company shall be formed under the name "MOUNTAIN PURE HOLDINGS, LLC" ("MPH"). Buyer and Seller shall assign and transfer all of the Purchased Interest and the Remainder Interests to MPH for a like number of membership units in MPH. In addition, at Closing, the parties will each enter into an operating agreement for MPH in the form attached hereto as **Exhibit 6.12.**

6.13    **Confidentiality and Nonsolicitation.**    The Seller shall continue to be bound by the confidentiality agreement previously executed by the parties which the parties specifically acknowledge includes the confidentiality of the terms of this Agreement. In addition, if the event Closing has not occurred by February 28, 2010, Buyer and its Affiliates will not directly or indirectly use any of the confidential information provided by Seller in connection with this transaction or obtained by Buyer during its due diligence to compete with the Companies or solicit any customers, vendors or employees or contractors from the Companies.

## ARTICLE VII

## Employee Matters

7.1    **Employees.**  Seller shall deliver to Buyer not less than five (5) days prior to Closing a list of each Company's employees and their compensation as of the most recent date for which information is available and shall advise Buyer of any changes in such information through the Closing Date.

7.2    **Workers' Compensation.**    The Companies shall be liable for all workers' compensation claims made by any Company's employees which relate to events occurring after the Closing Date. Seller shall remain liable for all workers' compensation claims made by any Company's former employees which relate to events occurring on or before the Closing Date and

31

shall hold harmless and indemnify Buyer from and against such claims. Seller shall provide Buyer with satisfactory evidence of workers' compensation insurance coverage through the Closing Date.

## ARTICLE VIII

### Closing Conditions

8.1    **Conditions to Each Party's Obligations**. The respective obligations of each party to effect the transactions contemplated hereby shall be subject to the fulfillment at or before the Closing Date of the condition that neither Seller nor Buyer shall be subject to any order, decree or injunction of a court of competent jurisdiction which prevents or delays any of the transactions contemplated by this Agreement.

8.2    **Conditions to the Obligations of Seller**. The obligations of Seller to effect the transactions contemplated hereby shall be further subject to the fulfillment at or before the Closing Date of the following conditions, any one or more of which may be waived by Seller:

(a)    **Compliance by Buyer**. Buyer shall have performed and complied in all material respects with the provisions contained in this Agreement required to be performed and complied with by it at or before the Closing Date.

(b)    **Representations and Warranties**. The representations and warranties of Buyer set forth in this Agreement were true and correct in all material respects as of the date of this Agreement and shall also be true and correct in all material respects as of the Closing Date as though made at and as of the Closing Date (except as otherwise contemplated by this Agreement), and Seller shall have received certificates to that effect signed by the President of Buyer.

(c) **Additional Transactions.** The transfer-leaseback and refinancing transactions described in Sections 6.10 and 6.11 shall have been concluded to the mutual satisfaction of Seller and Buyer.

(d) **Authority; Consents; Permits.** Buyer shall have delivered to Seller evidence satisfactory to Seller that Buyer shall have obtained any and all permits, authorizations, lessor consents and approvals of any Person or public body or authority required effectively to transfer the Purchased Interests to Buyer and to enable Buyer to continue the Companies' Business operations substantially similar to the operations conducted by the Companies immediately prior to Closing.

8.3 **Conditions to the Obligations of Buyer.** The obligations of Buyer to effect the transactions contemplated hereby shall be further subject to the fulfillment at or before the Closing Date of the following conditions, any one or more of which may be waived by Buyer.

(a) **Compliance by Seller.** Seller shall have performed and complied in all material respects with the provisions contained in this Agreement required to be performed and complied with by it at or before the Closing Date.

(b) **Representations and Warranties.** The representations and warranties of Seller set forth in this Agreement shall have been true and correct in all material respects as of the date of this Agreement and shall also be true and correct in all material respects as of the Closing Date as though made at and as of the Closing Date (except as otherwise contemplated by this Agreement), and Buyer shall have received a certificate to that effect signed by Seller.

33

(c) **Additional Transactions.** The transfer-leaseback and refinancing transactions described in Sections 6.10 and 6.11 shall have been concluded to the mutual satisfaction of Seller and Buyer.

(d) **Authority; Consents; Permits**. Seller shall have delivered to Buyer evidence satisfactory to Buyer that Seller shall have obtained any and all permits, authorizations, lessor consents and approvals of any Person or public body or authority required effectively to transfer the Purchased Interests to Buyer and to enable Buyer to continue the Companies' Business operations substantially similar to the operations conducted by the Companies immediately prior to Closing.

(e) **Due Diligence.** As a result of Buyer's due diligence, Buyer decides to terminate this Agreement. Buyer must make an election to terminate under this sub paragraph (e) on or before January 26, 2010 or five (5) business days after Buyer's receipt of the last requested documentation or information from Seller including, but not limited to, all Exhibits and Schedules to this Agreement.

8.4 **Other Documents**. Each of the parties will furnish to the other party such certificates of such party's shareholders, officers, directors, employees, Associates or Affiliates, or such other documents, as may be reasonably necessary to evidence fulfillment of the conditions set forth in this Article VIII as the other party may reasonably request.

# ARTICLE IX

## Termination

9.1.    **Termination**.  This Agreement may be terminated at any time prior to the Closing Date:

(a)    By the written agreement of Seller and Buyer;

(b)    By either Seller or Buyer by written notice to the other hereto after 5:00 p.m. Central Standard Time on February 28, 2010 if the transactions contemplated hereby shall not have been consummated pursuant hereto, unless such date is extended by the mutual written consent of Seller and Buyer; or

(c)    By either Buyer or Seller if: (i) the representations and warranties of Seller or Buyer, respectively, shall not have been true and correct in all respects as of the date when made; (ii) Seller or Buyer, respectively, shall have failed to perform and comply with, in all material respects, all agreements and covenants required by this Agreement to have been performed or complied with by such parties prior to the time of such termination and such failure to perform or comply shall be incurable or shall not have been cured within a reasonable period of time but not less than ten (10) days in duration following notice of such failure, provided that the terminating party shall have performed and complied with, in all material respects, all agreements and covenants required by this Agreement to have been performed or complied with by such terminating party prior to such time; or (iii) any event shall have occurred or any fact or condition shall exist that shall have made it impossible to satisfy a condition precedent to the terminating party's obligations to consummate the transactions contemplated by this Agreement, unless the occurrence of such event or existence of such fact or condition shall be due to the failure of the party seeking to terminate this Agreement or any of its Associates or Affiliates to perform or comply with any of the covenants, agreements, or

conditions hereof to be performed or complied with by such party or any of its Associates or Affiliates prior to the Closing.

9.2.    **Effect of Termination**. In the event of the termination of this Agreement pursuant to the provisions of Section 9.1, this Agreement shall become void and have no effect, without any liability on the part of any party hereto, or any of its managers, members, directors, officers, employees, agents, consultants, representatives, advisers, shareholders, Associates or Affiliates.

**ARTICLE X**

**Indemnification**

10.1    **By Seller**. Seller shall indemnify and hold harmless Buyer against:

    (a)    any damages, losses, obligations, liabilities, claims, actions or causes of action sustained or suffered by Buyer and arising from a breach of any representation or warranty of Seller contained in or made pursuant to this Agreement;

    (b)    any damages, losses, obligations, liabilities, claims, actions or causes of action sustained or suffered by Buyer and arising from a breach of any agreement of Seller contained in or made pursuant to this Agreement;

    (c)    any damages, losses, obligations, liabilities, claims, actions or causes of action sustained or suffered by Buyer and arising from an occurrence of personal injury or property damage before the Closing Date or from a product sold or service provided by Seller or a Company before the Closing Date; and

    (d)    all reasonable costs and expenses including, but not limited to, reasonable attorneys', accountants' and other professional fees and court costs, incurred

36

by Buyer in connection with any action, suit, proceeding, demand, assessment or judgment incident to any of the matters indemnified against under this Section 10.1.

10.2    **By Buyer.**  Buyer shall indemnify and hold harmless Seller against:

(a)    any damages, losses, obligations, liabilities, claims, actions or causes of action sustained or suffered by Seller and arising from a breach of any representation or warranty of Buyer contained in or made pursuant to this Agreement;

(b)    any damages, losses, obligations, liabilities, claims, actions or causes of action sustained or suffered by Seller and arising from a breach of any agreement of Buyer contained in or made pursuant to this Agreement;

(c)    any damages, losses, obligations, liabilities, claims, actions or causes of action sustained or suffered by Seller and arising from an occurrence of personal injury or property damage after the Closing Date; provided, however, Buyer's indemnity shall not include damages, losses, obligations, liabilities, claims or causes of action arising from products sold or services provided by Seller or a Company before the Closing Date; and

(d)    all reasonable costs and expenses including, but not limited to, reasonable attorneys', accountants' and other professional fees and court costs, incurred by Seller in connection with any action, suit, proceeding, demand, assessment or judgment incident to any of the matters indemnified against under this Section 10.2.

10.3    **Conditions of Indemnification**.  The respective obligations of Seller and Buyer under this Article X to indemnify the other shall be subject to the following terms and conditions:

(a)    **Notice and Procedure**.  In order for the party from whom indemnity may be sought (the "Indemnitor") to be fully informed at all times concerning its possible obligations to give indemnity to the claimant thereof under the provisions of this Article X (the "Indemnitee") and to permit the amount thereof to be minimized, if the Indemnitee suffers or is threatened with or incurs any loss, damage or expense for which it would be entitled to be indemnified, the Indemnitee shall promptly give written notice to Indemnitor (together with a copy of any claim, process or other legal pleading) after obtaining knowledge of any claim, and if such indemnity shall arise from the claim of a third party, shall permit Indemnitor to assume the defense of any such claim or any litigation resulting from such claim with counsel of the Indemnitor's own choosing, provided that Indemnitee shall not be required to permit Indemnitor to assume the defense of any third party claim which if not first paid, discharged or otherwise complied with would result in the interruption or cessation of the conduct or operation of the Company's Business or any material part thereof or otherwise materially adversely affect any Company's Business or assets.  Notwithstanding the foregoing notice requirement, the right to indemnification hereunder shall not be affected by any delay by Indemnitee in giving such notice unless, and then only to the extent that, the rights and remedies of Indemnitor shall have been prejudiced as a result of the delay in giving such notice.  Failure of the Indemnitor to

give notice to the Indemnitee of Indemnitor's election to assume the defense of any such claim or action by a third party within ten (10) days after notice thereof (accompanied by the information required by this Section) shall have been given to Indemnitor, shall be deemed a waiver of its right to defend such claim or action.

(b) **Obligation of Indemnitor**. If Indemnitor assumes the defense of such claim by a third party or litigation resulting therefrom, the obligations of Indemnitor hereunder as to such claim shall include taking all steps necessary in the defense or settlement of such claim or litigation resulting therefrom, and holding the Indemnitee harmless from and against any and all claims caused by or arising out of any settlement claim or litigation resulting therefrom. Without the prior written consent of the Indemnitee, Indemnitor shall not, in the defense of such claim or any litigation, consent to the entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnitee of a release, in form reasonably satisfactory to the Indemnitee, from all liability in respect of such claim or litigation. Notwithstanding the foregoing, the Indemnitee will be entitled to participate in the defense of such claim or litigation at its own expense. If the defendants in any such action include both the Indemnitee and Indemnitor and the Indemnitee shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the Indemnitor the Indemnitee shall have the right, at its expense,

39

to select separate counsel to assume such legal defenses and to otherwise participate in the defense of such action on behalf of Indemnitee.

(c)    **Failure to Assume**. If Indemnitor does not assume the defense of any such claim by a third party or litigation resulting therefrom, the Indemnitee may defend against such claim or litigation in such manner as it deems appropriate and, unless Indemnitor shall deposit with Indemnitee a sum equivalent to the total amount demanded in such claim or litigation plus the Indemnitee's reasonable estimate of the cost of defending the same, the Indemnitee may settle such claims or litigation on such terms as it deems appropriate and Indemnitor shall reimburse the Indemnitee for the amount of such settlement and for all losses and expenses incurred by Indemnitee in connection with the defense against or settlement of such claim or litigation.

(d)    **Cooperation**. Each party will cooperate with the other in resolving or attempting to resolve any claim and will permit the other party access to all books and records which might be useful for such purpose, during normal business hours and at the place where the same are normally kept, with full right to make copies thereof or extracts therefrom at the cost of the copying party.

(e)    **Suspension of Payments**. If Buyer notifies Seller that it is claiming a right to indemnity from Seller pursuant to the provisions of this Agreement, other than a right based on an unliquidated claim of a third party, from and after the date of such notice, Buyer and/or its assigns may suspend payments due under this Agreement and the Employment Agreement until such time as

40

such claim has been fully resolved, without cost, expense or liability to Buyer or its assigns, either by: (i) the claimant or plaintiff providing to Buyer a release of Buyer, in form and substance reasonably satisfactory to Buyer, from all liability of any kind or nature with respect to such claim or litigation; (ii) a court of final jurisdiction shall have determined that neither Buyer nor its assigns has any liability or obligation of any kind or nature to the claimant or plaintiff and no appeals from such determination are available to the claimant or plaintiff; or (iii) a court of final jurisdiction shall have determined that Buyer and/or its assigns is not entitled to indemnification against such claim under the provisions hereof; provided however, the payments so suspended shall not exceed a sum equivalent to the total amount for which Buyer seeks indemnification from Seller.

(f)     **Set-off**. If Seller shall fail to perform any of its obligations hereunder, Buyer and/or its Associates may set-off any damages or expense Buyer or its Associates may suffer or incur by reason thereby against amounts payable to Seller under this Agreement and the Employment Agreement.

(g)     No request for indemnification shall be made by either party until the amount in controversy, with regard to a single matter or cumulatively with regard to multiple matters, exceeds Twenty Thousand Dollars ($20,000.00).

## ARTICLE XI

### Miscellaneous Provisions

11.1    **Entire Agreement**.  This Agreement is to be read together with the Employment Agreement including, but not limited to, the setoff rights granted to Buyer hereunder and under the

41

Employment Agreement, and any default under this Agreement or the Employment Agreement shall constitute a default under the other. This Agreement, together with the Employment Agreement, sets forth the entire agreement between the Buyer and Seller and supersedes all prior agreements and understandings between the parties with respect thereto.

11.2    **Amendment and Modification**.  This Agreement may be amended, modified or supplemented only by written agreement signed by each of the parties.

11.3    **Waiver of Compliance; Consents**.  Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefit thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Whenever this Agreement requires or permits the consent of any party, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 11.3.

11.4    **Investigations; Survival of Representations and Warranties**.  Except to the extent provided in Sections 10.1(d) and 10.2(d), each and every representation and warranty of Seller and Buyer contained herein or in any Exhibit, Schedule, certificate, or other document delivered before or at the Closing shall expire with, and be terminated and extinguished on the first anniversary date of the Closing Date and thereafter neither Seller or Buyer nor any officer or director of Buyer shall be under any liability whatsoever with respect to any such representation or warranty. This Section 11.4 shall have no effect upon any other obligation of the parties, whether to be performed before or after the Closing Date.

11.5  **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given if: (a) delivered personally; or (b) mailed by certified mail (return receipt requested), postage prepaid; or (c) sent by overnight courier; or (d) transmitted by telefacsimile; to the parties at the following addresses (or at such other address for a party as shall be specified by like notice, provided that notices of a change of address shall be effective only upon receipt thereof):

| | | |
|---|---|---|
| (a) | If to Seller, to: | Mr. John B. Stacks<br>6921 Interstate 30<br>Little Rock, Arkansas 72209<br>Telephone Number:<br>Facsimile Number: |
| | With a copy to: | Thomas C. Vaughan, Esq.<br>Lax, Vaughan, Forston, Jones & Rowe, P.A.<br>11300 Cantrell Road, Suite 201<br>Little Rock, Arkansas  72212<br>Telephone Number: 501-376-6565<br>Facsimile Number: 501-376-6666 |
| (b) | If to Buyer, to: | Mr. Richard F. Beston, Jr.<br>RainMaker Financial Group, Inc.<br>200 S. Michigan Ave., 21st Floor<br>Chicago, Illinois 60604<br>Telephone Number: 312- 286-4826<br>Facsimile Number:  630-922-3011 |
| | With a copy to: | Ronald P. Duplack, Esq.<br>Rieck and Crotty, P.C.<br>Suite 3390<br>55 West Monroe Street<br>Chicago, Illinois 60603<br>Telephone Number: 312-726-4646<br>Facsimile Number: 312-726-0647 |

11.6  **Assignment**.  Except to the extent of any assignment by Buyer to any Affiliate of Buyer, neither this Agreement nor any of the rights, interests or obligations hereunder shall be

assigned by any party, nor is this Agreement intended to confer upon any other person except the parties hereto any rights or remedies hereunder.

11.7    **Governing Law**. This Agreement shall be governed by the laws of the State of Illinois as to all matters including, but not limited to, matters of validity, construction, effect, performance and remedies, and, as partial consideration for the other party's execution and performance hereunder each party waives personal service of any and all process upon it, to the extent permitted by law, and consents that all such service of process be made by upon such party at the address and in the manner set forth in Section 11.5 of this Agreement and service so made shall be deemed to be completed upon the earlier of actual receipt or three (3) days after the same shall have been posted to such party's address.

11.8    **Binding Effect and Benefit**. The provisions hereof shall be binding upon, and shall inure to the benefit of, the parties, and their respective heirs, executors, administrators, its successors, and assigns.

11.9    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.10 **Severability**. Whenever possible, each of the provisions of this Agreement shall be construed and interpreted in such a manner as to be effective and valid under applicable law. If any provisions of this Agreement or the application of any provision of this Agreement to any party or circumstance shall be prohibited by, or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision, any

44

other provision of this Agreement, or the application of such provision to other parties or circumstances.

11.11 **Interpretation**. The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

*[INTENTIONAL SHORT PAGE; THE NEXT PAGE IS THE SIGNATURE PAGE]*

45

**IN WITNESS WHEREOF**, Seller and Buyer have caused this Agreement to be executed by their duly authorized officers.

RainMaker Financial Group, Inc., an Illinois corporation

By: _Richard F Beston Jr._
            President

Attest: _____
           Secretary

_____
           John B. Stacks

X:\wp51\Beston\Mt Pure\PurchAgRev.010510.Rev.doc

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed by their duly authorized officers.

RainMaker Financial Group, Inc., an Illinois corporation

By: _____
              President

Attest: _____
              Secretary

              John B. Stacks

X:\wp51\Beston\Mt Pure\PurchAgRev.010510.Rev.doc

## MEMBERSHIP INTEREST PURCHASE AGREEMENT
## LIST OF SCHEDULES AND EXHIBITS

| | |
|---|---|
| Exhibit 1.5 | Employment Agreement between Mountain Pure LLC and John B. Stacks |
| Schedule 4.4 | Governmental Authorization and Compliance |
| Schedule 4.5 | Capitalization |
| Schedule 4.8 | Real and Personal Property Leases |
| Schedule 4.9 | Material Contracts |
| Schedule 4.10 | Intellectual Property |
| Schedule 4.14 | Tangible Assets |
| Schedule 4.16 | Litigation |
| Schedule 4.18 | Current Effective Policies of Insurance/Owner or Insured |
| Exhibit 6.12 | Operating Agreement of Mountain Pure Holdings, LLC |

**Effect of Schedules:** Seller has used its best efforts to accurately reflect information requested by Buyer on the various schedules attached hereto. To the extent Seller has inadvertently failed to disclose any item on a specific schedule, and such item has been specifically identified on another schedule, the parties hereto acknowledge and agree that Seller shall have substantially complied with the disclosure requirements of the schedules.

**EXHIBIT 1.5**
**TO**
**MEMBERSHIP INTEREST PURCHASE AGREEMENT**


**Employment Agreement**


(See attached)

**SCHEDULE 4.4**
**TO**
**MEMBERSHIP INTEREST PURCHASE AGREEMENT**


<u>Governmental Authorizations and Compliance</u>


1. Oklahoma Department of Health
2. Arkansas Department of Health—Soft Drink/Water/Ice Mfg
3. Arkansas Department of Health—Milk Single Service Mfg
4. Arkansas Sales Tax Permit
5. City of Little Rock—Business License
6. Mississippi State Department of Health—Bottled Water Permit
7. Texas Department of State Health Services—Food Mfg
8. Texas Department of State Health Services—Bottled and Vended Water Operator #106
9. Texas Department of State Health Services—Bottled and Vended Water Operator #107
10. Texas Department of Licensing and Regulation—Boiler Certificate of Operation
11. Texas Sales and Use Tax Resale Certificate
12. City of Little Rock – Sales Tax Permit/Exemption
13. Mississippi – Sales Tax Permit/Exemption
14. Little Rock Wastewater Fact Sheet and Discharge Permit



**PERMIT**

**ISSUED FOR:**

OKLAHOMA STATE DEPARTMENT OF HEALTH
1000 NORTHEAST 10TH STREET
OKLAHOMA CITY, OKLAHOMA 73117-1299
(405) 271-5243

FACILITY NUMBER
90 - 9280

| | RECEIPT NUMBER | FEE |
|---|---|---|
| 45  Z    FOOD MANUFACTURERS -BOTTLED WATER<br>MOUNTAIN PURE WATER CO<br>6921 INTERSTATE 30<br>LITTLE ROCK, OK 72209 | REPRINTED | $250.00 |

**PERMIT MUST BE POSTED**

FACILITY NAME:

MOUNTAIN PURE WATER CO
6921 INTERSTATE 30
LITTLEROCK, AR 72209

DATE ISSUED    7/2/2009

EXPIRATION DATE:  7/2/2010

**PERMIT NOT TRANSFERABLE**

OWNER/LESSEE NAME:

JOHN STACKS

Terry Cline, Ph.D.
Commissioner





**ARKANSAS DEPARTMENT OF HEALTH**
**Soft Drink/Water/Ice Mfg**
**4815 W Markham St, Slot H-29**
**Little Rock, AR 72205**

Fiscal Year
*N/A

Permit No. 405-1520
Receipt No. 15719095
Date          06/09/2009
Amount     $35.00
Check No.   102193

ESTABLISHMENT  Soft Drink/Water/Ice Manufactu    EXPIRES  3/31/2010

**County:** Pulaski
This permit shall not be deemed a property or vested right, is not
transferable or assignable, and may be revoked at any time pursuant
to the law.

MOUNTAIN PURE WATER
6921 I-30

LITTLE ROCK                    AR    72209

MOUNTAIN PURE WATER
6921 I-30

LITTLE ROCK                    AR    72209



**Fiscal Year**
**\*N/A**

Milk Single Service Manufact.
15 W Markham St, Slot H-29
Little Rock, AR 72205

ESTABLISHMENT [Single Service- Plant Permit]    EXPIRES 12/31/2009

**County:** Pulaski

This license is renewable annually and may be revoked for failure to
comply with the Rules and Regulations for Grade "A" Milk for
Pasteurization pursuant to Arkansas Statue annotated 82-914(31).

| Permit No. | 05-500 |
|---|---|
| Receipt No. | 15501724 |
| Date | 02/25/2009 |
| Amount | $295.00 |
| Check No. | 101317 |

MOUNTAIN PURE LLC
6921 I 30
PLASTICS DIVISION
LITTLE ROCK          AR     72209

MOUNTAIN PURE LLC
6921 I 30
PLASTICS DIVISION
LITTLE ROCK          AR     72209

---

**Fiscal Year**
**\*N/A**





**ARKANSAS DEPARTMENT OF HEALTH**
**Milk Single Service Manufact.**
**4815 W Markham St, Slot H-29**
**Little Rock, AR 72205**

ESTABLISHMENT [Single Service- Plant Permit]    EXPIRES 12/31/2009

**County:** Pulaski

This license is renewable annually and may be revoked for failure to
comply with the Rules and Regulations for Grade "A" Milk for
Pasteurization pursuant to Arkansas Statue annotated 82-914(31).

| Permit No. | 05-500 |
|---|---|
| Receipt No. | 15802810 |
| Date | 07/17/2009 |
| Amount | $105.00 |
| Check No. | 102409 |

MOUNTAIN PURE LLC
6921 I 30
PLASTICS DIVISION
LITTLE ROCK          AR     72209

MOUNTAIN PURE LLC
6921 I 30
PLASTICS DIVISION
LITTLE ROCK          AR     72209



# City of Little Rock
## Treasury Management Division

100 City Hall
500 West Markham St
Little Rock, AR 72201

Phone: (501) 371-4566
Fax: (501) 371-4569

## 2010     Business License     2010

License is   STACKS, JOHN--MAMAGINA PARTNER     License Number: BL00062277
Granted To:   MOUNTAIN PURE, LLC
    6921 INTERSTATE 30
    LITTLE ROCK AR 72209

License   MOUNTAIN PURE, LLC
Address   6921 INTERSTATE 30
    LITTLE ROCK AR 72209

Account Number: BL130392        Payment Number:   B4429/102944

| Classification | Description of Business | Amount |
|---|---|---|
| 080.1 | DAIRIES/MILK DISTRIBUTORS,INVENTORY | 2,912.07 |

In the City of Little Rock, County of Pulaski, State of Arkansas,
For 12 months from the 1st day of   JANUARY, 2010     TOTAL $ 2,912.07

Given under my hand this the   5th   day of   NOVEMBER, 2009

Scott E. Massanelli, Treasury Manager     By:     *Demietria Keels*

### INFORMATION OF IMPORTANCE TO HOLDER OF THIS ORIGINAL LICENSE:

This License:   1. Does not authorize a business to operate in conflict with the laws of the City of Little Rock (inclusive of zoning regulations) or the State of Arkansas.
    2. Must be posted in a conspicuous place at the business location being licensed.
    3. Is NOT transferable with respect to location, business classification, or ownership. Change in location, classification or ownership will necessitate a new license.

# Mississippi State Department of Health
## BOTTLED WATER PERMIT

### Permit Number  64-FWP-191

THIS IS TO CERTIFY THAT: **Mountain Pure LLC**

ADDRESS: **130 Coby Drive, Magee, MS  39111**

is hereby granted permission to open and operate under and in accordance with the regulations of the Mississippi State Department of Health a BOTTLING PROCESSING FACILITY FOR PRODUCTS TO BE SOLD AND DISTRIBUTED IN MISSISSIPPI and is subject to the rules and regulations of the Mississippi State Department of Health.

In accepting this permit the holder agrees to permit samples of products to be taken for analysis by representatives of the Mississippi State Department of Health at all times and further agrees to permit an inspection of their facilities or premises whenever such inspection shall be deemed necessary by the Mississippi State Department of Health.

This permit is good until revoked by the proper authority or until expiration, and supersedes any permit previously issued by this department.  It is not transferable and must be kept posted in a conspicuous place on the premises for which it is issued.

Expiration Date:  **December 31, 2009**     Health Authority _____

Mississippi State Department of Health                Revised 3-22-2000                        Form No. 387



# TEXAS DEPARTMENT OF STATE HEALTH SERVICES
## REGULATORY LICENSING UNIT

# MOUNTAIN PURE TEXAS LLC

777 WILLOW CREEK DR
PALESTINE, TX 75801

## FOOD MANUFACTURER

Pursuant to Health and Safety Code Chapter 431 (Texas Food, Drug, and Cosmetic Act) and Chapter 25 (1) of the Texas Administrative Code, and in compliance with the Rules and regulations as adopted thereunder, the licensee shall be subject to all applicable rules and authorization of the Texas Department of State Health Services. You are hereby permitted in effect for the above licensee. You are hereby authorized to engage in the following activities.

LICENSE #: 0101903

EXPIRES: January 31, 2010

Commissioner




# TEXAS DEPARTMENT OF STATE HEALTH SERVICES
## REGULATORY LICENSING UNIT

# MOUNTAIN PURE TEXAS LLC
### 477 WILLOW CREEK DR
### PALESTINE, TX 75801

*Pursuant to Health and Safety Code Chapter 431 (Food, Drug, Device, and Cosmetic Act) and Title 25 of the Texas Administrative Code, and in reliance on statements and representations made by licensee, the licensee shall be subject to all applicable rules, regulations and orders of the Texas Department of State Health Services now or hereafter in effect. The above licensee is authorized to engage in the following activities:*

### FOOD MANUFACTURER

LICENSE #: 0101901

EXPIRES: January 31, 2010

Commissioner




# TEXAS DEPARTMENT OF STATE HEALTH SERVICES
## REGULATORY LICENSING UNIT

## Certificate of Competency

# THOMAS GIBSON

*Pursuant to Health and Safety Code Chapter 341 (Regulation of Bottled and Vended Drinking Water) and Title 25 of the Texas Administrative Code, and in reliance on statements and representations made by the applicant, the licensee shall be subject to all applicable rules, regulations and orders of the Texas Department of State Health Services now or hereafter in effect. The above certificate holder is authorized to operate:*

### Bottled and Vended Water Operator

License #: BVW0000-05
Expires: February 28, 2011



# TEXAS DEPARTMENT OF STATE HEALTH SERVICES
## REGULATORY LICENSING UNIT

# Certificate of Competency

## STEVEN M SOILEAU

*Pursuant to Health and Safety Code Chapter 341 (Regulation of Bottled and Vended Drinking Water) and Title 25 of the Texas Administrative Code, and in reliance on statements and representations made by the applicant, the licensee shall be subject to all applicable rules, regulations and orders of the Texas Department of State Health Services now or hereafter in effect. The above certificate holder is authorized to engage in*

**Bottled and Vended Water Operator**

License #  BVW1000107
Expires:  February 09, 2011

_____
Commissioner

# TEXAS DEPARTMENT OF LICENSING AND REGULATION

## BOILER CERTIFICATE OF OPERATION

| | | | | CERTIFICATE NUMBER |
|---|---|---|---|---|
| | | | | 200905190081 |

| TEXAS BOILER NUMBER | NATIONAL BOARD# | PRESSURE ALLOWED | S/SR VALVE PSI |
|---|---|---|---|
| 125129 | 006059 | 000150 | 000150 |

| | MFR. SERIAL# | | MFR. | INSP. TYPE |
|---|---|---|---|---|
| | 6059 | 1472 | WILLIAMS DAVIS | I |

| INSPECTION DATE | CERTIFICATE EXPIRATION DATE |
|---|---|
| 03/04/2009 | 03/04/2010 |

The described boiler is authorized to operate until the expiration date shown unless sooner withdrawn or revoked for cause.

LOCATION

MOUNTAIN PURE WATER LLC

777 WILLOW CREEK DRIVE

PALESTINE  TX 75801

_Anthony Jones_

CHIEF INSPECTOR

NOTICE - This certificate must be placed under glass in a conspicuous place on or near the boiler for which it is issued. Failure to meet this requirement will cause the boiler to be reinspected and the full inspection fee charged.

---

THIS IS YOUR PROOF OF INSPECTION ONLY

THIS IS NOT A CERTIFICATE OF OPERATION

AN INVOICE WILL FOLLOW FOR THE CERTIFICATE/INSPECTION FEE.

TEXAS BOILER # _125129_

| INSPECTION DATE | VIOLATIONS NOTED? | INSPECTING ORGANIZATION | INSPECTOR NUMBER |
|---|---|---|---|
| 3/4/09 | YES  (NO) | TDLR | 1623 |

TDLR FORM 015BLR 4/98



# TEXAS DEPARTMENT OF LICENSING AND REGULATION

### Compliance Division/BOILER PROGRAM

*P.O. Box 12157    Austin, Texas 78711    (512)463-2904    (800)722-7843    FAX (512)463-1376*
*Email Address: boilers@license.state.tx.us    Internet Address: www.license.state.tx.us*

In the event of a boiler accident, the following is provided to ensure timely reporting of any boiler incident:

Boiler Rules

65.50 (f) Boiler accidents.

(1) In case of a serious accident, such as an explosion, the <u>owner/operator</u> shall immediately notify the chief inspector (notification information provided below) and authorized inspector. Neither the boiler nor any of the parts thereof shall be removed or disturbed, except for the purpose of saving human life or preventing further damage, before an inspection and investigation has been made by the chief inspector, deputy inspector, or authorized inspector. The authorized inspector shall notify the chief inspector before beginning an inspection and investigation of serious boiler accidents.

(2) To the extent necessary to conduct an inspection and subsequent investigation of a boiler accident, the owner/operator shall provide the chief inspector or deputy inspector free access to the boiler and accident area. The owner/operator shall provide the chief inspector or deputy inspector and authorized inspector with fragments, parts, appurtenances, documents, and records necessary to conduct an investigation of the accident.

(3) The chief inspector shall investigate, or cause to be investigated, each boiler accident to the extent necessary to reasonably determine the cause of the boiler accident.

Anthony Jones, Chief Boiler Inspector
Texas Department of Licensing & Regulation
Compliance Division/ Boiler Program
P. O. Box 12157
Austin, Texas 78711
(512)463-2904 or (800)722-7843

# Post this letter in a conspicuous place under glass in the Control Room /Station or Manager/Supervisor's Office.



01-339
(Rev. 9-07/6)

# TEXAS SALES AND USE TAX RESALE CERTIFICATE

Name of purchaser, firm or agency as shown on permit
**Mountain Pure Texas LLC**

Phone (Area code and number)
**(903) 723-1362**

Address (Street & number, P.O. Box or Route number)
**777 Willow Creen Drive**

City, State, ZIP code
**Palestine    TX    75801**

Texas Sales and Use Tax Permit Number (must contain 11 digits)
**3 2 0 3 1 7 4 6 9 4 7**

Out-of-state retailer's registration number or Federal Taxpayers Registry (RFC) number for retailers based in Mexico
_____ (Retailers based in Mexico must also provide a copy of their Mexico registration form to the seller.)

---

I, the purchaser named above, claim the right to make a non-taxable purchase (for resale of the taxable items described below or on the attached order or invoice) from:

Seller: _____

Street address: _____

City, State, ZIP code: _____

Description of items to be purchased on the attached order or invoice:
**Items used in the Bottling and Packaging of Water for Resale**

Description of the type of business activity generally engaged in or type of items normally sold by the purchaser:
**Water Bottler**

The taxable items described above, or on the attached order or invoice, will be resold, rented or leased by me within the geographical limits of the United States of America, its territories and possessions or within the geographical limits of the United Mexican States, in their present form or attached to other taxable items to be sold.

I understand that if I make any use of the items other than retention, demonstration or display while holding them for sale, lease or rental, I must pay sales tax on the items at the time of use based upon either the purchase price or the fair market rental value for the period of time used.

I understand that it is a criminal offense to give a resale certificate to the seller for taxable items that I know, at the time of purchase, are purchased for use rather than for the purpose of resale, lease or rental, and depending on the amount of tax evaded, the offense may range from a Class C misdemeanor to a felony of the second degree.

| sign here ▶ | Purchaser *(signature)* | Title **Acctne** | Date **11-6-9** |
|---|---|---|---|

This certificate should be furnished to the supplier. Do not send the completed certificate to the Comptroller of Public Accounts.

## LITTLE ROCK WASTEWATER
### INDUSTRIAL WASTEWATER DISCHARGE PERMIT FACT SHEET

| | |
|---|---|
| Industry Name: | Mountain Pure LLC |
| Mailing Address: | 6921 Interstate 30<br>Little Rock, Arkansas  72209 |
| Facility Location: | 6921 Interstate 30 |
| Contact Person: | Tracy Bush |
| Title: | Vice President of Operations |
| Telephone Number: | (501) 568-3540 |
| Emergency Number: | (501) 529-3831 |
| Other Contact(s) | Wade Althen, Chief Financial Officer |
| Signatory Authority: | John B. Stacks |
| Title: | President |
| Parent Company: | Mountain Pure Water |
| CEO: | John B. Stacks |
| Mailing Address: | 6921 Interstate 30<br>Little Rock, AR  72209 |
| Telephone Number: | (501) 568-3540 |

Environmental Permits Held:

1.    LRW Industrial Wastewater Discharge Permit S-65

Mountain Pure LLC is engaged in the production processes for bottle water and juices. Major processes at the facility include the following:

     1.    Water Processing and Bottling
     2.    Fruit Drink Pasteurization and Bottling
     3.    Plastic Jug and Bottle Blow Molding

Industrial wastewater discharges are generated from the equipment and floor cleaning water, alkaline and acid cleaning rinse water, ozonated water and product line flushing water.

Mountain Pure LLC is classified by Little Rock Wastewater (LRW) as a Significant Industrial User, as defined by 40 CFR 403.3(t), due to the discharge of approximately 35,000 gallons per day of process wastewater. The wastewater discharge from Mountain Pure Water is subject to extra strength surcharge for BOD/COD, TSS, O&G and pH in accordance with City of Little Rock Sewer Rate Ordinance No. 19,647.

LITTLE ROCK WASTEWATER
INDUSTRIAL WASTEWATER DISCHARGE PERMIT
MOUNTAIN PURE LLC

The facility is located at 6921 Interstate 30, and discharges process wastewater through a private sampling port and into the Little Rock Wastewater collection system at Map Page 8P, Manhole 023. This discharge is designated as outfall 01 for this facility.

Outfall 01 from Mountain Pure Water flows via a 24" Main, 26" Main, and 54" Main to the Arch Street Pump Station. The wastewater then flows through a 42" Main to the College Pump Station and then to the Fourche Creek Wastewater Treatment Plant. Based on the average discharge flow of 35,000 gallons per day from Mountain Pure LLC, discharge travel times to the Fourche Creek Wastewater Treatment Plant are presented below:

- Three (3) hour and forty (40) minutes travel time based on a high flow condition in the Little Rock Wastewater collection system.

- Eight (8) hours and Thirty (30) minutes travel time based on a low flow condition in the Little Rock Wastewater collection system.

The information on travel time of industrial wastewater discharges from the above facility is presented to demonstrate the need for prompt reporting of spills, slug loads, or violations of pretreatment standards as addressed in Part II, Section D of this permit. Failure to promptly report spills, slug loads, or effluent violations as required by the permit will result in LRW seeking enforcement action against the facility.

Mountain Pure LLC has submitted a Spill/Slug Control Plan that has been approved on November 20, 2007 and on file with LRW. The enclosed Permit S-65 requires that Mountain Pure Water adheres to the requirements and conditions of the Plan.

The information included in this fact sheet has been obtained from the industrial users' permit renewal application, historical data, Little Rock Wastewater data, and information taken during inspections. This information has been used in preparing the attached industrial discharge permit for the facility listed above.

December 21, 2007

## LITTLE ROCK WASTEWATER
### INDUSTRIAL WASTEWATER DISCHARGE PERMIT

PERMIT NUMBER: S-65

AUTHORIZATION TO DISCHARGE INDUSTRIAL PROCESS FLOW TO THE CITY OF LITTLE ROCK WASTEWATER

In accordance with the provisions of City of Little Rock's General Ordinance 17,965, and Pretreatment Ordinance 17,966, Environmental Protection Agency Regulation 40 CFR 403 (General Pretreatment Regulations), and any applicable provisions of Federal or State of Arkansas Law, the following facility,

> Mountain Pure LLC
> 6921 Interstate 30
> Little Rock, AR 72209

is authorized to discharge industrial wastewater to the City of Little Rock Sanitary Sewer System as described below:

> Outfall 01 – Total flow wastewater into Little Rock Wastewater collection system, map page 8P, manhole 023.

All wastewater discharges must be in accordance with effluent limitations, monitoring requirements, and other conditions set forth in Parts I, II, and III hereof.

This permit is granted in accordance with the application filed on November 27, 2007 with the Environmental Assessment Division of Little Rock Wastewater, and in conformity with plans, specifications, and/or other data submitted in support of the application.

This permit shall become effective on January 1, 2008.

This permit and the authorization to discharge shall expire on midnight, December 31, 2010.

Signed this 21st day of December, 2007

*Stanley Suel*

Stanley B. Suel, Director
Environmental Assessment Division
Little Rock Wastewater

P. 5

50`    907-6054

M`ntain Pure Water

Jan 19 2010 2:56PM

Mountain Pure Water LLC
Permit Issued: December 21, 2007
Revision 0
Part I - Page 1 of 2

PART I
PERMIT REQUIREMENTS

SECTION A.  EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS:  OUTFALL 01 - Discharge to Little Rock Wastewater at map page 8P, manhole number 023.  Sampling point is private sampling parshall flume located at the southeast corner of the facility.

During the period beginning on the effective date of this permit and lasting through the date of expiration, the permittee is authorized to discharge from outfall 01 - Samples taken in compliance with the monitoring requirements specified below shall be taken at the following location(s): Total flow sampling point. Such discharge shall be limited as specified below (see notes 1 and 2 below):

| Effluent Characteristics | Discharge Limitations | | Monitoring Requirements | |
| | Monthly Average | Daily Max | Measurement Frequency | Sample Type |
| --- | --- | --- | --- | --- |
| Flow[3] | Report Only | Report Only | Daily | Totalized Meter |
| pH | | ≥5.0 S.U. and ≤ 12.0 S.U. | 2/Year[4] | Grab[4] |

Notes:
1.  All sampling and analysis conducted to fulfill the requirements under this section shall be conducted during normal work cycles.
2.  All samples analyzed to fulfill the requirements must be performed in accordance with the latest approved method listed in 40 CFR, Part 136. If performed by an outside laboratory (or contract laboratory) shall be performed by a laboratory certified for that analysis by the Arkansas Department of Environmental Quality in accordance with the latest approved methods in 40 CFR Part 136. If an approved method is not contained in 40 CFR Part 136, contact Little Rock Wastewater (LRW) for method selection guidance.
3.  Flow will be obtained from Little Rock Wastewater's Finance and Accounting Division based on water consumption for billing purposes unless this facility utilizes a sewer meter.  In which case, the sewer meter reading will be reported to Little Rock Wastewater according to part II Section D (7) of this permit. The average daily flow (gpd) will be calculated based on either water consumption or sewer meter totalizer readings.
4.  Little Rock Wastewater will monitor the facility discharge for compliance in accordance with 40 CFR part 403.12 (h) a minimum of twice per year for pollutants "reasonably expected to be present".  Sampling for metals shall be four-part composite at a minimum.

Mountain Pure Water LLC
Permit Issued:  December 21, 2007
Revision 0
Part I - Page 2 of 2

## SECTION B.  SCHEDULE OF COMPLIANCE

The permittee shall achieve compliance with the effluent limitations specified in Section I.A. of this permit in accordance to the following schedule.

Compliance with effluent limitations is required on the effective date of the permit.

## PART II - GENERAL CONDITIONS

### SECTION A - SPILL AND SLUG CONTROL

The permittee shall adhere to the accidental spill prevention plan submitted to LRW. Emergency Notification signs shall be posted where indicated in the plan (City of Little Rock's Pretreatment Use Ordinance 17,966 Section 6.7). See Attachment No. 1 the end of this permit for notification procedures.

### SECTION B - BYPASS PROHIBITED

Bypass means the intentional diversion of wastestreams from any portion of an Industrial User's treatment facility (40CFR 403.17(a)(1)). Bypass notification and prohibition provisions are listed below:

1.    If, for any reason, the permittee knows in advance that a bypass of treatment system operations will occur, the permittee shall notify LRW, if possible, at least ten (10) days before the anticipated bypass.

2.    If the bypass is not anticipated, the permittee shall notify LRW orally within 24 hours of becoming aware of the bypass (40 CFR 403.17).

3.    Within five (5) days of the permittee becoming aware of any bypass, the permittee shall submit a written report to LRW describing the bypass, its cause, duration, including exact dates and times (or, if it has not been corrected, how long it is expected to continue), and the steps taken or planned to reduce, eliminate, and prevent reoccurrence of the bypass. LRW may waive the written report on a case by case basis if the oral report has been received within 24 hours (40 CFR 403.17).

4.    Bypass is prohibited. LRW may take enforcement action against the permittee for a bypass unless:

      A.    The bypass is unavoidable to prevent loss of life, personal injury or severe property damage or no feasible alternative exists (40 CFR 403.17).
      B.    There is no feasible alternative to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal period of equipment downtime.
      C.    The permittee submitted notices as required under Section B.1-3 above.

5.    LRW may approve an anticipated bypass, after considering its adverse effects, if LRW determines it will meet the three conditions listed in paragraph B.4.

The permittee may allow any bypass to occur which does not cause permit limits or requirements to be violated, but only if it is for essential maintenance to assure efficient operation. Controlled bypass for essential maintenance that do not cause violations of limits or requirements are not subject to the provisions listed above.

### SECTION C - OPERATION AND MAINTENANCE OF POLLUTION CONTROLS

The permittee shall continuously maintain any effluent treatment devices or systems in satisfactory operating condition in accordance with the City of Little Rock's Pretreatment Ordinance 17,966, Sections 3.1-3.3. Maintenance and calibrating records for these devices or systems shall be retained and available for inspection.

Sewer meters or other effluent flow measurement devices used for reporting flow shall be calibrated and maintained to insure the accuracy of the measurements are within the maximum deviation of less than ±10% from the discharge rates. The permittee shall have the effluent flow meter checked and/or calibrated a minimum of once per year by a factory trained representative and retain on file proof of this check or calibration.

## SECTION D - REPORTING REQUIREMENTS

1.   The permittee shall notify LRW **IMMEDIATELY** of any accidental spill, slug discharge, or upset of the wastewater pretreatment system. A slug discharge includes a spill, upset, or any non-routine discharge which could cause a violation of Part I.A discharge limitations or a violation of prohibited discharge standards (listed in Industrial Wastewater Discharge Permit Part III Standard Conditions, item N). The notification shall include the location of the discharge, type of waste, concentration and volume of the waste, and corrective actions taken. The notification shall be made in accordance to the Notification Procedures in Attachment No. 1 of this permit. Attachment No. 1 (or facsimile thereof) is suitable for posting at locations as necessary to ensure that appropriate personnel are aware of the notification procedures required by Little Rock Wastewater and this permit.

2.   Within five (5) days of the initial notification of item 1 above, the permittee will submit a detailed written report describing the cause and its impact on the permittee's compliance status; the duration and extent of the noncompliance, including quantities and concentrations, dates and times of the noncompliance, and if the noncompliance is continuing, when compliance is expected to occur, and all steps taken or to be taken to prevent reoccurrence (City of Little Rock's Pretreatment Ordinance 17,966, Section 6.7).

3.   The permittee shall notify LRW prior to the introduction of new wastewater or pollutants, any substantial change in the volume or characteristic of the wastewater being discharged to the sanitary sewer, or any new construction or process modifications involving plumbing changes. This notification shall be written and the permittee must receive Utility approval before changes occur.

4.   The permittee shall submit monitoring reports for the parameters requiring self monitoring listed in Part I, Section A of this Permit. All monitoring reports are due by the last day of the month following the month in which the sample is collected. If the permittee monitors any pollutant more frequently than required by Part I, Section A of this Permit, the results of such monitoring must be included in the reports required by this Permit (40CFR403.12.g.5).

5.   The permittee shall notify LRW of any violations of the pretreatment standards specified in Part I, Section A of this Permit. If sampling performed by the permittee indicates a violation, the permittee shall notify the Environmental Assessment Division by telephone within 24 hours of becoming aware of the violation (40CFR403.12.g.2).

6.   Recording of Results.
     For each measurement or sample taken pursuant to the requirements of this permit, the User shall record the following information:

     A.   The exact place, date, and time of sampling or measurement;
     B.   The person(s) doing the sampling or measurement;
     C.   The dates and time the analyses were performed;
     D.   The person(s) who performed the analyses;
     E.   The preservation methods used if applicable;
     F.   The analytical techniques or methods used; and
     G.   The results of all required analyses.

7.   All written reports required by this permit will be submitted to the following address:

                    Little Rock Wastewater
                    Environmental Assessment Division
                    1001 Temple Street
                    Little Rock, AR. 72202
                    Attn.: Pretreatment Supervisor

8.   Sewer Metering

General Conditions - SIU/Other, Version No. 6
Part II - Page 3 of 3

A.    Reporting - If the permittee has a sewer meter, the permittee shall submit the sewer meter readings for
billing by the fifth (5th) day of each month. The permittee shall use the Sewer Meter Reporting Form
supplied by LRW. All sewer meter reports shall be sent to the address listed below.

Little Rock Wastewater
Environmental Assessment Division
1001 Temple Street
Little Rock, AR 72202
Attn.: Pretreatment Supervisor

B.    Modifications to Existing Installations- The permittee shall notify the Environmental Assessment
Division in writing and obtain approval prior to making any modifications to sewer meter, including
pipe changes, new meter installations, new flow monitoring equipment, or meter change outs.

9.    Diversion Metering

A.    Reporting - The permittee shall report diversion meter readings by the fifth (5th) day of each
month to receive credit for waters that are not discharged to the sanitary sewer. The permittee
shall use the Diversion Meter Reporting Form supplied by LRW. All diversion meter reports shall
be sent to the address listed below:

Little Rock Wastewater
Finance and Administration Division
PO Box 45090
Little Rock, AR 72214
Attn: Finance and Administration

B.    Modification to Existing Installations - The permittee shall notify the Environmental Assessment
Division in writing and shall obtain approval prior to making any modifications to diversion
metering, including piping changes, new meter installations, or meter change outs.

SECTION E.–ADDITIONAL CHARGES AND FEES

The permittee may be subject to additional sewer charges as provided for in the City of Little Rock's Sewer Rate
Ordinance No. 19,647, and any future amendments thereto. Further, the Manager of the Little Rock Wastewater
Utility may collect fees under the City of Little Rock's Pretreatment Ordinance No. 17,966.

Version Date: 02/01/07

## PART III - STANDARD CONDITIONS

A.    The permittee shall comply with all provisions of the City of Little Rock's General Ordinance 17,965 and Pretreatment Ordinance 17,966.

B.    Rights of Entry - The permittee shall allow duly authorized representatives of LRW bearing proper credentials and identification to enter the premises at reasonable hours for the purpose of inspecting, sampling, or records inspection. Reasonable hours are considered anytime the Permittee is operating any process that results in the discharge of wastewater to the sanitary sewer (City of Little Rock's Pretreatment Ordinance 17,966, Section 7.1).

C.    Records Retention - The permittee shall retain all records relative to monitoring, analysis, and operations of any process or treatment system which results in the discharge of wastewater to the sanitary sewer for a minimum of three (3) years (40CFR403.12 (I)).

D.    Dilution - The permittee shall not increase the use of potable or process waters or, in any way, attempt to dilute a discharge as a partial or complete substitute for adequate treatment to achieve compliance with the limitations contained in Section 1 of this permit (City of Little Rock's Pretreatment Ordinance 17,966, Section 2.6).

E.    Signatory Requirements - All reports required by this permit shall be signed by the highest ranking executive officer who maintains an office at the facility, or his designee. Where the signatory responsibilities have been delegated, a letter signed by the highest ranking executive officer stating that this responsibility has been delegated and to whom it has been delegated must be submitted to LRW (40CFR403.12(I)).

F.    Nontransferability - This permit is issued to a specific permittee for a specific operation and is not assignable to another discharger or transferable to any other location without the prior written approval of LRW.

G.    Permit Modification

      1.    The terms and conditions of this permit are subject to modification by LRW at any time in response to changes in the City of Little Rock's General Ordinance 17,965 or Pretreatment Ordinance 17,966, modification or promulgation of any federal regulation including promulgation of new Categorical Pretreatment Standards, State of Arkansas Regulation, and/or issuance of special or administrative orders.

      2.    Any permit modifications which result in new conditions or limitations will include a reasonable time schedule for compliance, if necessary.

H.    Permit Revocation - This permit may be revoked by LRW if it is determined that the permittee has violated any provision of this permit, City of Little Rock's General Ordinance 17,965 and Pretreatment Ordinance 17,966, State of Arkansas regulations, or EPA regulations. Additionally, falsification or intentional misrepresentation of data or statements pertaining to the permit application or any report required by this permit shall be cause for permit revocation.

I.    Penalties - Failure to resolve any violation of this permit, City of Little Rock's General Ordinance 17,965 or Pretreatment Ordinance 17,966, State of Arkansas regulation, or EPA regulation may result in LRW seeking administrative, civil, or criminal fines and penalties in an amount not to exceed $1000.00 per violation as outlined in the City of Little Rock's General Ordinance 17,965, Section 9 and Pretreatment Ordinance 17,966 Sections 10 and 11. In the case of monthly or other long term average discharge limits, fines shall be assessed for each day during the period of violation. Each day of a continuing violation shall be deemed a separate violation.

J.    Severability - The provisions of this permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstance, is held invalid, the application of such provision to other circumstances, and the remainder of this permit shall not be affected thereby.

Standard Conditions, Version No. 4
Part III - Page 1 of 4

K.      Property Rights - The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any invasion of personal rights, nor any infringement of federal, state, or local regulation.

L.      Proper Disposal of Pretreatment Sludge and Spent Chemicals - The permittee shall dispose of any sludge or spent chemicals in accordance with Section 405 of the Clean Water Act and Subtitles C and D of the Resource Conservation and Recovery Act (40CFR403.8(f)(2)(iii)).

M.      Confidentiality - All reports and data related to the requirements of this permit shall be available for public inspection at the Little Rock Wastewater, 11 Clearwater Drive except for that information that is deemed confidential in accordance with the provision of the City of Little Rock's Pretreatment Ordinance 17,966 Section 8.

N.      Prohibited Discharge Standards

        1.      General Prohibitions. No user shall introduce or cause to be introduced into the POTW any pollutant or wastewater which causes pass through or interference or in any way contaminates the POTW biosolids, scum, or residues to such a level as to render them unacceptable for economical reuse or reclamation. These general prohibitions apply to all users of the POTW whether or not they are subject to categorical pretreatment standards or any other National, State, or local pretreatment standards or requirements.

        2.      Specific Prohibitions. No user shall introduce or cause to be introduced into the POTW the following pollutants, substances, or wastewater:

                2.1     Liquids, solids, or gases which by reason of their nature and quantity are, or may be, sufficient either alone or by interaction with other substances to cause a fire or explosion hazard or be injurious in any other way to the POTW or the operation of the POTW. Such materials include, but are not limited to, gasoline, diesel, benzene, naphtha, fuel oils, kerosene, toluene, xylene, ethers, alcohols, ketones, aldehydes, peroxides, chlorates, perchlorates, bromates, carbides, hydrides, or sulfides, or any wastestream with a closed cup flash point of less than 140 degrees Fahrenheit or 60 degrees Centigrade using the test methods specified in 40 CFR 261.21;

                2.2     Water or wastes having a pH lower than 5.0 S.U. or greater than 12.0 S.U. or having any other corrosive property capable of causing damage or a hazard to the structures, equipment, and personnel of the POTW. In no case shall waters or wastes be discharged at such a flow rate and/or pH which will cause the influent at the POTW treatment plant to be lower than 6.0 S.U. or greater than 9.0 S.U.;

                2.3     Solid or viscous substances in quantities or of such size capable of creating a stoppage, plugging, breakage, or any reduction in sewer capacity or any other damage to the POTW such as, but not limited to, ashes, cinders, sand, plastic, wood, un-ground garbage, whole blood, hair and fleshings, entrails, and paper dishes, cups, milk containers, etc. Any additional sewer or sewerage maintenance expenses caused by such a discharge, or any other expenses attributable thereto will be charged to the User by LRW. Any refusal to pay the additional maintenance expense duly authorized by the Manager shall constitute a violation of the provisions contained herein;

                2.4     Pollutants, including oxygen-demanding pollutants (BOD, COD, etc.), released in a discharge at a flow rate and/or pollutant concentration which, either singly or by interaction with other pollutants, will cause interference, upset, or loss of efficiency at POTW. In no case shall a slug load have a flow rate or contain a concentration or quantity of pollutants that exceed for any time period longer than fifteen (15) minutes more than five (5) times the average twenty-four (24) hour concentration, quantity, or flow during normal operation of the discharger;

Version Date: 02/01/07

2.5     Waters, wastes, or vapors discharged at such a volume and/or temperature which will
        inhibit biological activity in the treatment plant resulting in interference, but in no case any
        such waters or wastes which will cause the POTW influent or pumping station wetwell
        temperature to exceed 104°F (40.0°C). Any liquid or vapor having a temperature higher
        than 130° F (54.4° C) at the point of discharge;

2.6     Petroleum oil, non-biodegradable oil, or products of mineral oil origin, in amounts
        that will cause interference or pass through;

2.7     Waters or wastes containing toxic or poisonous solids, liquids, or gases, or oxygen
        demanding wastes, in sufficient quantity, either singly or by interaction with other wastes to
        injure or cause interference with any sewage treatment process, to contaminate the POTW
        sludges, scum, or residue to such a level to render them unacceptable for economical reuse
        or reclamation, to pass through the POTW and cause a violation of the POTW's NPDES
        Permit or create a toxic effect in the receiving stream, to cause a public nuisance, or to
        constitute a hazard or an acute health or safety problem to the POTW workers or the public;

2.8     Noxious or malodorous liquids, gases, solids, or other wastewater which, either singly or by
        interaction with other wastes, are sufficient to create a public nuisance or a hazard to life, or
        to prevent entry into the sewers for maintenance or repair;

2.9     Wastewater which imparts color which cannot be removed by the treatment process, such
        as, but not limited to, dye wastes and vegetable tanning solutions, which consequently
        imparts color to the treatment plant's effluent, thereby violating LRW's NPDES permit;

2.10    Unusual concentrations of inert suspended solids such as, but not limited to, Fuller earth,
        lime slurries and lime residues, or dissolved solids such as, but not limited to, sodium
        chloride and sodium sulfate.

2.11    Wastewater containing any radioactive wastes or isotopes except in compliance with
        applicable State or Federal regulations;

2.12    Storm water, surface water, ground water, artesian well water, roof runoff, subsurface
        drainage, swimming pool drainage, condensate, de-ionized water, non-contact cooling
        water, and unpolluted wastewater, unless specifically authorized by the Manager;

2.13    Sludges, screenings, or other residues from the pretreatment of industrial wastes;

2.14    Medical wastes, except as specifically authorized by the Manager in a wastewater discharge
        permit;

2.15    Wastewater causing, alone or in conjunction with other sources, the treatment plant's
        effluent to fail a toxicity test;

2.16    Detergents, surfactant, or other substances which may cause excessive foaming in the
        POTW; or

2.17    Wastewater causing two successive readings on an explosion hazard meter at the point of
        discharge into the POTW, or at any point in the POTW, of more than 10% or any single
        reading over 20% of the Lower Explosive Limit of the meter.

2.18    Hauled or trucked liquid wastes, except at the specific discharge point(s) designated by
        LRW;

Pollutants, substances, or wastewater prohibited by this section shall not be processed or stored in such a manner that they could be discharged to the POTW

O.    National Categorical Pretreatment Standards

   1.    The categorical pretreatment standards found at 40 CFR Chapter I, Subchapter N, Parts 405-411 are hereby incorporated. Those standards, if more stringent than the limitations imposed by the latest approved "Technically Based Local Limits Development Document" for sources in that sub-category, shall supersede the limitations imposed by the Local Limits.

   2.    Where a categorical pretreatment standard is expressed only in terms of either the mass or the concentration of a pollutant in wastewater, the Manager may impose equivalent concentration or mass limits in accordance with 40 CFR 403.6(c).

   3.    When wastewater subject to a categorical pretreatment standard is mixed with wastewater not regulated by the same standard, the Manager shall impose an alternate limit using the combined wastestream formula in 40 CFR 403.6(e).

P.    State Pretreatment Standards - State pretreatment standards located in Section 4 of Regulation No. 6 : Regulations for State Administration of the National Pollutant Discharge Elimination System for a particular industrial sub-category, if more stringent than the requirements of this Ordinance, shall supersede the requirements of this Ordinance, are hereby incorporated by reference and will be imposed where applicable and shall include, but is not limited to, discharge limitations and reporting requirements. This shall include those regulations currently promulgated or which will be promulgated in the future including any amendments, and shall be recognized as part of this Ordinance.

Q.    Local Limits

   1.    No person shall discharge any waters or wastes at a concentration that would exceed the concentration of pollutants, including but not limited to, those identified in the "Technically Based Local Limits Development Document", and adopted by the Manager of the Little Rock Wastewater and approved by the Arkansas Department of Pollution Control and Ecology and the Little Rock Sanitary Sewer Committee.

   2.    LRW will develop and assign specific discharge permit limitations for pollutants for permitted users based on criteria approved by the Manager. The specific permit limits shall ensure that local limit pollutant concentrations will protect the wastewater treatment plant from upset. The Local Limits shall apply to the total flow or total discharge from the Industrial Users. In developing specific permit limits, the Manager may impose mass limitations in addition to, or in place of, specific concentration-based limits. In addition, LRW may develop specific discharge limitations for any other toxic pollutants which the Manager of LRW may determine to be of sufficient quantity to cause POTW interference and/or pass through, endanger the health and safety of the POTW personnel or the public health, cause a POTW permit violation or render the POTW sludges unacceptable for economic reuse or reclamation.

## ATTACHMENT No. 1

## LITTLE ROCK WASTEWATER

### SPILL AND SLUG NOTIFICATION PROCEDURES

In the event of a spill or slug load that is discharged into the sanitary sewer from your facility, the following **IMMEDIATE NOTIFICATION** procedures listed below must be followed in accordance with City of Little Rock Pretreatment Use Ordinance 17,966 Section 6.7. A slug discharge includes a spill, upset, or any non-routine discharge which could cause a violation of Part I.A discharge limitations or a violation of prohibited discharge standards (listed in Industrial Wastewater Discharge Permit Part III Standard Conditions, item N).

**To report a discharge occurrence dial the telephone number sequence listed below until contact is made.**

| | For occurrences during normal working hours (7:30 a.m. to 4:00 p.m.) | | | For occurrences after normal working hours (4:00 p.m. to 7:30 a.m.), weekends and holidays. | |
|---|---|---|---|---|---|
| 1. | Environmental Assessment Division (EAD) Pretreatment Supervisor | (501) 688-1547 (501) 688-1532 (501) 231-3024 (501) 681-3028 | 1. | Pretreatment Supervisor | (501) 231-3024 (501) 681-3028 |
| 2. | EAD Industrial Inspector | (501) 688-1528 (501) 688-1529 (501) 688-1527 (501) 688-1541 | 2. | After Hours EAD Emergency Beeper* | (501) 373-7953 |
| 3. | Fourche Creek WWTP | (501) 541-3559 | 3. | Fourche Creek WWTP | (501) 541-3559 |
| 4. | Adams Field WWTP | (501) 413-7381 | 4. | Adams Field WWTP | (501) 413-7381 |
| 5. | EAD Director | (501) 590-0932 | 5. | EAD Director | (501) 590-0932 |

\* Emergency Beeper- Please carefully enter the return telephone number and an LRW staff member should contact you. If the LRW staff member has not made contact within 30 minutes – proceed with steps 3-5 until contact is made.

To assist you in reporting the necessary information, please have the following available:

        A.      Date and time of the incident.
        B.      The location of the incident (your plant name and address).
        C.      The type of waste involved - try to be specific.
        D.      The pollutant concentration - if known.
        E.      The volume of the discharge.
        F.      The duration of the discharge.
        G.      Any corrective actions taken at your facility.

Display or post this Attachment in areas so that the notification procedures will be readily accessible. Immediate Notification allows LRW to assess the flow quantity, pollutants of concern, concentrations, and loading rates to make adjustment in the wastewater treatment system when necessary.

**SCHEDULE 4.5**
**TO**
**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

**Capitalization**

Seller is the owner of 100% of the outstanding membership interest in the Companies. There are no capital unit certificates issued in any of the Companies. *, except CAPITAL UNITS*

*ISSUED to John STACKS*

## SCHEDULE 4.8
## TO
## MEMBERSHIP INTEREST PURCHASE AGREEMENT

### Real and Personal Property Leases

1. 1999 Volvo DS VVN VIN# 4VG7DEJJ6XN781Z63 leased from Arkansas Transportation, Inc.

2. ~~2008 Peterbilt 389 VIN# INPXD49X78D753001 leased from Arkansas Transportation, Inc.~~ *LEASE NOT RENEWED*

3. 2007 Peterbilt 379 VIN# 1XP5DB9X87N691117 leased from Arkansas Transportation, Inc.

4. 1999 Volvo DS VVN VIN# 4VG7DBRJ5XN780933 leased from Arkansas Transportation, Inc.

5. 1999 Volvo VIN# 4VG7DERJ2XN781247 leased from Arkansas Transportation, Inc.

6. Postage Meter Lease (month to month)

## AUTOMOBILE LEASE

This agreement made and entered this 30th day of _OCT_, 2003, by and between Arkansas Transportation, Inc. ("Lessor") and Mountain Pure, LLC ("Lessee")

### WITNESSETH:

WHEREAS, Lessor is an owner of one _1999 Volvo. DS   VVN_ , Vin #_4V670ETT6XN781263_ ; and,

WHEREAS, Lessor wishes to lease and Lessee wishes to rent Lessor's interest in said vehicle.

NOW THEREFORE, in consideration of the mutual promises herein contained and for other good and valuable consideration, the parties agree as follows:

1.     Lessee shall rent and Lessor shall let all of Lessor's interest in the above described vehicle.

2.     The terms of the lease shall be for successive periods of (1 ½) one and one half years, which shall automatically renew, unless notice of non-renewal is received, in writing, not less than thirty (30) days prior to the expiration of the current term.

3.     The rental rate shall be adjusted by and between the parties from time to time by mutual agreement , but shall never be less than Lessee fully performing the obligations herein contained as hereinafter set forth, and shall be paid in increments as may be from time to time established.

4.     Lessee shall assess the personal property and pay all county taxes levied thereon.  Lessee shall maintain insurance in an amount as required by law and any lienholder, and shall maintain the monthly payments established for the purchase thereof.

5.     Lessee may, in any given tax year, take all allowable deductions for tax purposes, including depreciation, and shall keep the vehicle properly licensed..

6.     Lessee shall keep all such property insured against peril of any kind in an amount sufficient to fully protect Lessor in the event of loss or damage from any cause and shall hold Lessor harmless from any loss or damage to said property.

In witness whereof the parties set their hands the day and year 1st above written.

Arkansas Transportation, Inc                Mountain Pure, LLC
by                                           by _____  Sec.
Lessor                                       Lessee

## BILL OF SALE

KNOW ALL BY THESE PRESENTS:

That, Mountain Pure, LLC, the undersigned, Grantor, a business entity organized and existing under the laws of the State of Arkansas, for and in consideration of the sum of $ *Twenty Thousand Eight Hundred Seventy* *50* Dollars ($ *20,877,50* ) and other good and valuable consideration the receipt of which is acknowledged, hereby grants, bargains, sells, transfers, and delivers unto Arkansas Transportation, Inc. Grantee and unto the grantee's, successors and assigns, the following described goods and chattels:

1. *1999 Volvo, D5, VIN, Vin# 4VE7DEJJ6XN781263*

To have and to hold all such goods and chattels forever. And the Grantor hereby covenants with the Grantee that the Grantor is the lawful owner of such goods and chattels; that such are free from all encumbrances, unless noted on the title thereof; that the Grantor has the lawful right to sell such goods and chattels by this instrument; and that the Grantor will warrant and defend the same against the lawful claims and demands of all persons whomsoever.

IN WITNESS WHEREOF, the grantor has hereunto set his hand and seal this 30 day of *October*, 2003.

Mountain Pure, LLC
by *J. Cowch* Sec.
authorized officer

SUBSCRIBED and SWORN to before me a Notary Public this 30 day of *October* 2003.

*Marilyn J. Causey*
Notary Public

My Commission Expires:
8-05-2008

#21

## VEHICLE LEASE

This agreement made and entered into this 23 day of MAY, 2007, by and between Arkansas Transportation, Inc. ("Lessor") and Mountain Pure, LLC ("Lessee"):

WHEREAS, Lessor is an owner of one 2008 Peterbilt 389 Identification Number 1NPXD49X78D753001 ; and

WHEREAS, Lessor wished to lease and Lessee wished to rent Lessor's interest in said vehicle;

NOW THEREFORE, in consideration of the mutual promises herein contained and for other good and valuable consideration, the parties agree as follows:

1.  Lessee shall rent and Lessor shall let all of Lessor's interest in the above described vehicle;

2.  The terms of the lease shall be for successive periods of (1 ½) one and one half years, which shall automatically renew, unless notice of non-renewal is received, in writing, not less than thirty days prior to the expiration of the current term;

3.  The rental rate shall be adjusted by and between the parties from time to time by mutual agreement, but shall never be less than Lessee bully performing the obligations herein contained as hereinafter set forth, and shall be paid in increments as may be from time to time established;

4.  Lessee shall assess the personal property and pay all county taxes levied thereon. Lessee shall maintain insurance in an amount as required by law and any lienholder, and shall maintain the monthly payments established for the purchase thereof;

5.  Lessee shall keep the vehicle properly licensed; and

6.  Lessee shall keep all such property insured against peril of any kind in an amount sufficient to fully protect Lessor in the event of loss or damage from any cause and shall hold Lessor harmless from any loss or damage to said property.

In witness whereof the parties set their hands the day and year 1st written above.

*NOT RENEWED*

Arkansas Transportation, Inc.

By: _____
Lessor

Mountain Pure, LLC

By: _____
Lessee

#227

This agreement made and entered into this 23 · day of MAY, 2007 by and between Arkansas Transportation, Inc. ("Lessor") and Mountain Pure, LLC ("Lessee"):

WHEREAS, Lessor is an owner of one 2007 PETERBILT 379 Identification Number 1XP5DB9X87N691117 ; and

WHEREAS, Lessor wished to lease and Lessee wished to rent Lessor's interest in said vehicle;

NOW THEREFORE, in consideration of the mutual promises herein contained and for other good and valuable consideration, the parties agree as follows:

1.    Lessee shall rent and Lessor shall let all of Lessor's interest in the above described vehicle;

2.    The terms of the lease shall be for successive periods of (1 ½) one and one half years, which shall automatically renew, unless notice of non-renewal is received, in writing, not less than thirty days prior to the expiration of the current term;

3.    The rental rate shall be adjusted by and between the parties from time to time by mutual agreement, but shall never be less than Lessee bully performing the obligations herein contained as hereinafter set forth, and shall be paid in increments as may be from time to time established;

4.    Lessee shall assess the personal property and pay all county taxes levied thereon. Lessee shall maintain insurance in an amount as required by law and any lienholder, and shall maintain the monthly payments established for the purchase thereof;

5.    Lessee shall keep the vehicle properly licensed; and

6.    Lessee shall keep all such property insured against peril of any kind in an amount sufficient to fully protect Lessor in the event of loss or damage from any cause and shall hold Lessor harmless from any loss or damage to said property.

In witness whereof the parties set their hands the day and year 1st written above.

Arkansas Transportation, Inc.                    Mountain Pure. LLC

By: _____               By: _____
Lessor                                             Lessee

## AUTOMOBILE LEASE

This agreement made and entered this _30_ day of _Oct_ , 2003, by and between Arkansas Transportation, Inc. ("Lessor") and Mountain Pure, LLC ("Lessee")

### WITNESSETH:

WHEREAS, Lessor is an owner of one _1999_ , _Volvo, 05, WN_ , Vin # _4V6 7D8R J5XN7RD 933_ ; and,

WHEREAS, Lessor wishes to lease and Lessee wishes to rent Lessor's interest in said vehicle.

NOW THEREFORE, in consideration of the mutual promises herein contained and for other good and valuable consideration, the parties agree as follows:

1.    Lessee shall rent and Lessor shall let all of Lessor's interest in the above described vehicle.

2.    The terms of the lease shall be for successive periods of (1 ½) one and one half years, which shall automatically renew, unless notice of non-renewal is received, in writing, not less than thirty (30) days prior to the expiration of the current term.

3.    The rental rate shall be adjusted by and between the parties from time to time by mutual agreement , but shall never be less than Lessee fully performing the obligations herein contained as hereinafter set forth, and shall be paid in increments as may be from time to time established.

4.    Lessee shall assess the personal property and pay all county taxes levied thereon. Lessee shall maintain insurance in an amount as required by law and any lienholder, and shall maintain the monthly payments established for the purchase thereof.

5.    Lessee may, in any given tax year, take all allowable deductions for tax purposes, including depreciation, and shall keep the vehicle properly licensed..

6.    Lessee shall keep all such property insured against peril of any kind in an amount sufficient to fully protect Lessor in the event of loss or damage from any cause and shall hold Lessor harmless from any loss or damage to said property.

In witness whereof the parties set their hands the day and year 1st above written.

Arkansas Transportation, Inc
by _____ Pres,
Lessor

Mountain Pure, LLC
by _____
Lessee

## VEHICLE LEASE

This agreement made and entered into this 30th day of October, 2003, by and between Arkansas Transportation, Inc. ("Lessor") and Mountain Pure, LLC ("Lessee"):

WHEREAS, Lessor is an owner of one 1999 Volvo, Vehicle Identification Number 4VG7DERJ2XN781247; and

WHEREAS, Lessor wished to lease and Lessee wished to rent Lessor's interest in said vehicle;

NOW THEREFORE, in consideration of the mutual promises herein contained and for other good and valuable consideration, the parties agree as follows:

1. Lessee shall rent and Lessor shall let all of Lessor's interest in the above described vehicle;

2. The terms of the lease shall be for successive periods of (1 ½) one and one half years, which shall automatically renew, unless notice of non-renewal is received, in writing, not less than thirty days prior to the expiration of the current term;

3. The rental rate shall be adjusted by and between the parties from time to time by mutual agreement, but shall never be less than Lessee bully performing the obligations herein contained as hereinafter set forth, and shall be paid in increments as may be from time to time established;

4. Lessee shall assess the personal property and pay all county taxes levied thereon. Lessee shall maintain insurance in an amount as required by law and any lienholder, and shall maintain the monthly payments established for the purchase thereof;

5. Lessee shall keep the vehicle properly licensed; and

6. Lessee shall keep all such property insured against peril of any kind in an amount sufficient to fully protect Lessor in the event of loss or damage from any cause and shall hold Lessor harmless from any loss or damage to said property.

In witness whereof the parties set their hands the day and year 1st written above.

Arkansas Transportation, Inc.

By: _____
Lessor

Mountain Pure, LLC

By: _____
Lessee

**SCHEDULE 4.9**
**TO**
**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

<u>**Material Contracts**</u>

1. Tax Abatement Agreement with City of Palestine, TX
2. Incentive Performance Agreement with Palestine Economic Development Corp.
3. Tax Abatement Agreement with Anderson County, TX
4. Water Purchase Agreement with Glenn Clark and Artesian Wells (Mississippi); $42,000/mo *2,000 per mo.* for 7 years.
5. MASS 200 Software & Maintenance Agreement
6. EDI Electronic Ordering Software and Maintenance Agreement
7. Mt. Ida, Arkansas Spring Lease - $1,250/mo. Not currently used in Business
8. Supply Agreement with International Paper for supply of cardboard boxes—See Item 3 on Schedule 4.16.
9. Customer Agreements
   - Nevada Water, Las Vegas (Sonic)
   - Brown Bottling, Jackson, MS (Pepsi)
10. Broker/Commission Agreements
    - TopCo (Co-packing)
    - ShurFine
    - J. Dall Thomas & Company
    - Dear and Associates
    - Marketing Management Incorporated for sales to AWG
    - Daymond Worldwide—Rep at Topco
11. Electricity Sales Agreement with Reliant Energy Texas Retail, LLC
12. CHEP Pallet Agreement –See Item 5 on Schedule 4.16
13. PECO Pallet, Inc. Fixed Cost Agreement for pallet rental
14. Miscellaneous
    - Miscellaneous License Agreements reflected on Schedule 4.14
    - Membership in AllStar (buying cooperative); Annual membership
    - Fire Alarm Monitoring
    - Roll Off Container agreement with Waste Management
    - Sonitrol Secuity and Alarm agreement
    - Non-Disclosure and Non-Competition Agreement with Clear Mountain Refreshment Service, LLC
    - US Food Service Vendor Agreement
    - Supplier Agreement with Federated Foods, Inc.
    - Product and Packaging Agreement with Western Family Foods, Inc.
    - Topco Product Supplier Agreement
    - Various software and maintenance contracts

**SCHEDULE 4.10**
**TO**
**MEMBERSHIP INTEREST PURCHASE AGREEMENT**


<u>**Intellectual Property**</u>

<u>Registered Trademarks:</u>
  1. Mountain Pure (& design)
  2. RealPure--lapsed


<u>Pending Trademarks:</u>
  1. Mountain Pure
  2. U-Go!
  3. Up Roar
  4. RealPure

<u>Unregistered Trademarks:</u>
  1. Ucatan


IP Counsel – Joe Calhoun (Little Rock, AR (501) 374-1700)

**SCHEDULE 4.14**
**TO**
**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

**<u>Tangible Assets</u>**

(See attached)

## Vehicle List

| Year | Make | Model | Desc. | Color | Driver | Purch. Date | Vin # | Unit # | Ownership | Insurance |
|------|------|-------|-------|-------|--------|------------|-------|--------|-----------|-----------|
| 2007 | Chevy | Tahoe | SUV | White | John | 2007 | 3GGEK14VX7G161389 | | Mt Pure | Harleysville |
| 2002 | Dodge | Caravan | Van | Gold | Tommy | 2008 | 1B4GP443X2B641117 | | Mt Pure | |
| 2007 | Toyota | Highlander | SUV | Black | Dian | 2007 | JTEDPZ1A470131924 | | Mt Pure | |
| 2004 | Toyota | Highlander | SUV | Gold | Kim P. | 2009 | | | Mt Pure | |
| 2002 | Ford | 350 | Van | White | JW | 2003 | 1FTSS34F92HA93527 | | Mt Pure | Harleysville |
| 2004 | Dodge | Caravan | Van | Grey | Sheila | 2007 | | | Mt Pure | Harleysville |
| 1993 | Ford | Crown Vic | Car | Beige | Little Rock | 2007 | | | John | Harleysville |
| 1999 | Ford | Explorer | SUV | Red | Texas | 2007 | 1FMZU32P2XZB42519 | | Mt Pure | Harleysville |
| )9 | Volvo | 610VN | TT | White | Mississippi | 2001 | 4VG7DEJJ2XN781258 | 42 | Mt Pure | Harleysville |
| 1997 | Stoughton | Van Road | Trailer | White | Mississippi | 2001 | 1DW1A5320VS101010 | 3180 | Mt Pure | Harleysville |
| 1997 | Stoughton | Van Road | Trailer | White | Texas | 2001 | 1DW1A5322VS101011 | 3181 | Mt Pure | Harleysville |
| 1997 | Stoughton | Van Road | Trailer | White | Mississippi | 2001 | 1DW1A5327VS101022 | 3192 | Mt Pure | Harleysville |
| 1997 | Stoughton | Van Road | Trailer | White | Texas | 2001 | 1DW1A5320VS101024 | 3194 | Mt Pure | Harleysville |
| 1997 | Utility | Van Road | Trailer | White | Texas | 2001 | 1UYVS2532VP263413 | 3208 | Mt Pure | Harleysville |
| 1989 | Strickland | Van Storage | Trailer | White | Jim | 2002 | 1S12E8483KG313623 | 48360 | Mt Pure | Harleysville |
| 1989 | Strickland | Van Storage | Trailer | White | Jim | 2002 | 1S12E9538KG316414 | 53704 | Mt Pure | Harleysville |
| 1991 | Strickland | Van Storage | Trailer | White | Jim | 2002 | 1S12E953XME332404 | 53754 | Mt Pure | Harleysville |
| 1993 | Walbash | Van Storage | Trailer | Orange | Jim | 2004 | 1JJV532Y5PL184962 | 97245 | Mt Pure | Harleysville |
| 1993 | Walbash | Van Storage | Trailer | Orange | Jim | 2004 | 1JJV532Y6PL189944 | 99207 | Mt Pure | Harleysville |
| 1993 | Walbash | Van Storage | Trailer | Orange | Jim | 2004 | 1JJV532Y8PL190965 | 76241 | Mt Pure | Harleysville |
| 1993 | Walbash | Van Storage | Trailer | Orange | Jim | 2004 | 1JJV532Y1PL190550 | 99813 | Mt Pure | Harleysville |
| 1993 | Walbash | Van Storage | Trailer | Orange | Jim | 2004 | 1JJV532Y2PL191089 | 76365 | Mt Pure | Harleysville |
| 04 | Walbash | Van | Trailer | White | Jim | 2004 | 1JJV532U0RL229841 | | Mt Pure | Harleysville |
| 2000 | Great Dane | Van | Trailer | White | Jim | 2004 | 1GRAA062XYB102650 | | Mt Pure | Harleysville |
| 1995 | Great Dane | Van Road | Trailer | White | Texas | 2004 | 1GRAA0624SB007704 | 15532 | Mt Pure | Harleysville |
| 1994 | Great Dane | Van Road | Trailer | White | Jim | 2004 | 1GRAA0626RB199203 | | Mt Pure | Harleysville |
| | 53' Davidson | Van | Trailer | White | Mississippi | | 1L01A5323R1111520 | 718 | Mt Pure | Harleysville |
| | 53' Davidson | Van | Trailer | White | Mississippi | | 1L01A5328R1111528 | 726 | Mt Pure | Harleysville |
| | 53' Davidson | Van | Trailer | White | Mississippi | | 1L01A5325S1115705 | 857 | Mt Pure | Harleysville |
| | 53' Davidson | Van | Trailer | White | Mississippi | | 1L1A532951115707 | 859 | Mt Pure | Harleysville |
| | 53' Davidson | Van | Trailer | White | Mississippi | | 1L01A5320S1115708 | 860 | Mt Pure | Harleysville |
| | 53' Davidson | Van | Trailer | White | Mississippi | | 1L01A5322S1115709 | 861 | Mt Pure | Harleysville |
| | Fruehauf | Van | Trailer | White | Mississippi | | 2V04820H13017066 | | | |
| | 53' Davidson | Van | Trailer | White | Little Rock | | | | Mt Pure | Harleysville |
| | 53' Davidson | Van | Trailer | White | Little Rock | | | | Mt Pure | Harleysville |

FBS Excl

Exclude FBS

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 53' Davidson | Van | Trailer | White | Little Rock | | | | Mt Pure | Harleysville |
| | 53' Davidson | Van | Trailer | White | Little Rock | | | | Mt Pure | Harleysville |
| | 53' Davidson | Van | Trailer | White | Little Rock | | | | Mt Pure | Harleysville |
| | 53' Davidson | Van | Trailer | White | Little Rock | | | | Mt Pure | Harleysville |
| 1995 | Ottawa | Spotter | Truck | White | Little Rock | 11VAA13E6SA000067 | | | | |
| | Ottawa | Spotter | Truck | white | Mississippi | | | | | |
| 2001 | Sterling | Box Van | Truck | Green | Mississippi | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

## Mountain Pure Arkansas Fixed Asset Listing

150-200 – Equipment                                                           1/31/2010

| Dept | Number | Description | Purch Date | Purch Price | Life | Cur Depr Exp | Book Value |
|------|--------|-------------|-----------|-------------|------|--------------|------------|
| 82 | 1 | 3/1 GAL LINE | 11/1/2001 | 47,974.71 | 15 | 266.53 | 21,588.29 |
| 82 | 2 | 1 GAL Conveyer | 6/1/2001 | 58,196.71 | 15 | 297.88 | 22,638.60 |
| 82 | 4 | HAMRICK CAASE PACKER | 2/1/2001 | 77,500.00 | 15 | 430.56 | 30,999.62 |
| 73 | 5 | 16 OZ FILLER | 9/1/2001 | 22,089.44 | 15 | 122.72 | 9,694.73 |
| 80 | 6 | PET CONVEYORS | 12/1/2000 | 352,075.65 | 15 | 1,955.98 | 136,917.95 |
| 81 | 7 | 16 OZ FILLER ROOM | 9/1/2001 | 7,531.75 | 15 | 41.84 | 3,305.86 |
| 82 | 8 | ALVEY PALLETIZER | 3/1/2001 | 456,825.05 | 15 | 2,537.92 | 185,267.68 |
| 0 | 10 | ITI PRINTER | 2/1/2001 | 33,028.96 | 15 | 183.49 | 13,211.94 |
| 80 | 11 | PAKTEC PRINTERS | 8/1/2000 | 15,755.00 | 15 | 87.53 | 5,776.64 |
| 80 | 12 | PAKTEC PRINTER - MARKSMAN | 8/1/2000 | 16,596.00 | 15 | 92.20 | 6,085.20 |
| 72 | 13 | DISTILLER | 3/1/2001 | 180,000.00 | 15 | 800.62 | 58,445.42 |
| 82 | 14 | PEARSON TOP SEALER | 2/1/2001 | 31,833.00 | 15 | 176.85 | 12,733.20 |
| 2 | 15 | CIRCULATING FANS | 9/1/2001 | 6,530.99 | 15 | 36.28 | 2,866.66 |
| 82 | 16 | PALLET STABILIZER KIT | 8/1/2000 | 5,484.00 | 15 | 30.47 | 2,010.52 |
| 0 | 17 | SWF CASE ERECTOR | 2/1/2001 | 63,553.00 | 15 | 353.07 | 25,421.39 |
| 51 | 18 | SPRINGS EQUIPMENT | 2/1/2000 | 25,000.00 | 15 | 138.89 | 8,333.24 |
| 52 | 19 | GALLON BLOW MOLDS | 12/1/2001 | 2,194,543.00 | 15 | 12,191.91 | 999,735.91 |
| 130 | 20 | 500 GALLON DIESEL TANK | 12/1/2001 | 3,018.86 | 15 | 16.77 | 1,375.38 |
| 2 | 21 | SECURITY SYSTEM - EXXIS | 6/1/2002 | 6,359.00 | 15 | 35.33 | 3,108.66 |
| 71 | 22 | WASTEWATER PROJECT | 12/1/2002 | 14,618.19 | 15 | 81.21 | 7,634.13 |
| 82 | 23 | FEDERAL FILLER - GAL JUICE LIN | 6/1/2002 | 24,653.67 | 15 | 136.96 | 12,053.32 |
| 82 | 24 | GAL WATER CONVEYOR | 6/1/2002 | 21,309.10 | 15 | 118.38 | 10,418.11 |
| 83 | 25 | GAL JUICE CONVEYOR | 6/1/2002 | 19,424.18 | 15 | 107.91 | 9,496.45 |
| 85 | 26 | .5 GAL JUICE CONVEYOR | 6/1/2002 | 56,851.77 | 15 | 315.84 | 27,794.47 |
| 52 | 27 | REFRIGERATION/COOLING SYSTEM | 6/1/2002 | 98,829.00 | 15 | 549.05 | 48,316.40 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2 | 28 | MISC EQUIP | 6/1/2002 | 21,385.89 | 15 | 118.81 | 10,455.37 |
| 52 | 29 | 2.5 GALLON BLOW MOLDS | 12/1/2002 | 587,975.26 | 15 | 3,267.13 | 307,110.68 |
| 84 | 30 | 2.5 GALLON CASER | 12/1/2002 | 21,234.82 | 15 | 117.97 | 11,089.40 |
| 84 | 31 | 2.5 GALLON CONVEYOR | 12/1/2002 | 69,351.85 | 15 | 385.29 | 36,216.91 |
| 84 | 32 | 2.5 GALLON GLUE GUN | 12/1/2002 | 10,078.98 | 15 | 55.99 | 5,263.84 |
| 84 | 33 | 2.5 GALLON FILLER | 12/1/2002 | 16,447.52 | 1 | - | 15,350.96 |
| 80 | 35 | PET WATER LINE | 10/1/2002 | 6,846.59 | 15 | 38.04 | 3,499.07 |
| 0 | 37 | ICE MACHINES | 5/1/2002 | 5,000.00 | 15 | 27.78 | 2,416.46 |
| 130 | 85 | WHSE RACKS | 12/1/2002 | 27,944.17 | 15 | 155.06 | 14,576.01 |
| 82 | 86 | COMPARATOR | 3/1/2003 | 9,840.92 | 15 | 54.67 | 5,303.31 |
| 84 | 92 | CODAJET 6000 CODER | 10/15/2003 | 4,995.00 | 15 | 27.75 | 2,886.00 |
| 82 | 93 | SIDE PANEL LABELING SYSTEM | 8/22/2003 | 10,832.43 | 15 | 60.18 | 6,138.39 |
| 82 | 94 | SIDE PANEL LABELING SYS | 9/10/2003 | 10,744.98 | 15 | 59.69 | 6,148.85 |
| 0 | 95 | DIXIE NARCO VENDING MACHINE | 8/28/2003 | 5,000.00 | 15 | 27.78 | 2,833.16 |
| 0 | 96 | DIXIE NARCO VENDING MACHINE | 8/28/2003 | 5,000.00 | 15 | 27.78 | 2,833.16 |
| 84 | 97 | CODAJET 6K CODER W REMOTE HEAD | 8/14/2003 | 5,595.25 | 15 | 31.08 | 3,171.01 |
| 85 | 98 | CODAJET 6000 CODER | 10/15/2003 | 4,995.00 | 15 | 27.75 | 2,886.00 |
| 73 | 100 | LIQUID SUGAR TANK | 7/24/2003 | 950.00 | 15 | - | 950.00 |
| 83 | 101 | QUADREL Q 60 UPGRADE | 7/8/2003 | 1,500.00 | 15 | 8.33 | 841.93 |
| 84 | 106 | 2.5 G FILLER/CAPPER | 12/1/2003 | 48,179.65 | 15 | 267.66 | 28,372.81 |
| 2 | 107 | AMMONIA SYSTEM | 7/11/2003 | 10,682.64 | 15 | 59.35 | 5,993.99 |
| 83 | 114 | LABELING EQUIPMENT | 4/2/2004 | 11,014.74 | 15 | 61.19 | 6,731.44 |
| 2 | 117 | SME800 MIST ELIMINATOR | 2/16/2004 | 3,497.68 | 15 | 19.43 | 2,098.72 |
| 2 | 118 | DRYER AND DRAIN | 1/27/2004 | 9,767.71 | 15 | 54.27 | 5,806.00 |
| 84 | 119 | DEIONIZER | 2/4/2004 | 900.00 | 15 | 5.00 | 540.00 |
| 61 | 130 | Stainless Steel Tables | 8/5/2004 | 770.00 | 15 | 4.28 | 487.52 |
| 73 | 132 | Fructose Tank | 9/1/2004 | 16,800.53 | 15 | 93.34 | 10,733.43 |
| 59 | 134 | AP5.4 Thermal Label Printer | 11/23/2004 | 2,585.00 | 5 | - | - |

| 85 | 137 | Box Line | 1/1/2005 | 69,937.50 | 15 | 388.54 | 46,236.56 |
| 52 | 138 | 1/2 Gallon Blowmold | 1/1/2005 | 68,742.10 | 15 | 381.90 | 45,446.20 |
| 82 | 141 | Production Molds | 3/7/2005 | 35,300.00 | 5 | 588.33 | 588.53 |
| 61 | 143 | Spray Gun | 4/4/2005 | 895.87 | 15 | 4.98 | 607.03 |
| 61 | 144 | Level Transmitter | 4/1/2005 | 1,910.01 | 15 | 10.61 | 1,294.63 |
| 130 | 151 | 53' Dry Bed Trailer | 8/16/2005 | 2,700.00 | 5 | 45.00 | 270.00 |
| 52 | 158 | 1/2 Gallon Blowmold | 9/1/2005 | 204,264.67 | 15 | 1,134.80 | 144,120.27 |
| 52 | 159 | 1/2 Gallon Molds - Round | 9/1/2005 | 26,708.20 | 5 | 445.14 | 3,115.78 |
| 52 | 161 | Rotary Molding System | 9/1/2005 | 1,296,064.68 | 15 | 7,200.36 | 914,445.60 |
| 2 | 162 | Air Compressor | 9/1/2005 | 164,174.19 | 15 | 912.08 | 115,833.95 |
| 81 | 168 | Focus S25 Laser | 10/1/2005 | 25,670.50 | 15 | 142.61 | 18,254.78 |
| 84 | 169 | Niagara Molds | 10/1/2005 | 17,350.00 | 5 | 289.17 | 2,313.16 |
| 52 | 170 | Wentworth Molds | 12/1/2005 | 32,870.00 | 15 | 182.61 | 23,739.50 |
| 81 | 171 | PET Conveyor System | 12/1/2005 | 140,682.90 | 15 | 781.57 | 101,604.40 |
| 82 | 174 | Case Erector | 12/1/2005 | 54,000.00 | 15 | 300.00 | 39,000.00 |
| 60 | 179 | Heaters | 1/23/2006 | 3,824.35 | 15 | 21.25 | 2,783.10 |
| 60 | 180 | Satto Label Printers | 2/2/2006 | 1,036.78 | 5 | 17.28 | 207.34 |
| 82 | 181 | Camera for Labeler 1 Gal line | 3/13/2006 | 3,097.56 | 15 | 17.21 | 2,288.69 |
| 59 | 182 | AP5.4 Thermal Label Printer | 4/12/2006 | 2,681.94 | 5 | 44.70 | 625.74 |
| 72 | 183 | Alfa Laval Distiller | 4/1/2006 | 45,580.00 | 15 | 253.22 | 33,931.88 |
| 81 | 186 | Air Conditioning PET Line | 4/27/2006 | 1,925.00 | 15 | 10.69 | 1,433.26 |
| 81 | 187 | Skid Mounted Tank | 4/27/2006 | 385.00 | 15 | 2.14 | 286.56 |
| 61 | 188 | Lathe | 4/27/2006 | 2,420.00 | 15 | 13.44 | 1,801.76 |
| 0 | 192 | Depalletizer, PET Bottle | 10/30/2007 | 30,000.00 | 15 | 166.67 | 25,333.24 |
| 59 | 193 | Pallets, Black Plastic | 8/31/2006 | 8,380.95 | 5 | 139.68 | 2,514.39 |
| 59 | 194 | Top Frames, Black Plastic | 8/31/2006 | 2,752.00 | 5 | 45.87 | 825.46 |
| 83 | 196 | Ozone Filling Contact Tank | 6/30/2006 | 830.00 | 15 | 4.61 | 627.16 |
| 81 | 197 | UV Light | 6/30/2006 | 7,052.20 | 15 | 39.18 | 5,328.28 |

| 82 | 198 | Printer, PakTec, Bottle 3x1 | 6/30/2006 | 12,125.00 | 5 | 202.08 | 3,233.48 |
|---|---|---|---|---|---|---|---|
| 81 | 199 | Filter Housing, PET (both) | 6/30/2006 | 1,821.96 | 15 | 10.12 | 1,376.68 |
| 81 | 200 | Filter Housing, PET (both) | 6/30/2006 | 1,821.96 | 15 | 10.12 | 1,376.68 |
| 82 | 201 | Filter Housing, 3 x 1 | 4/30/2006 | 1,821.97 | 15 | 10.12 | 1,356.45 |
| 83 | 202 | Printer, PakTec, Bottle, 6x1 | 7/31/2006 | 9,325.00 | 5 | 155.42 | 2,641.94 |
| 2 | 203 | Sink, Multi-Station Hand Sink | 10/31/2006 | 2,824.10 | 15 | 15.69 | 2,196.50 |
| 82 | 204 | Printer, FoxJet, box, 3x1 | 8/31/2006 | 31,158.13 | 5 | 519.30 | 9,347.53 |
| 120 | 206 | PC, Dell Dimensions | 6/30/2006 | 576.25 | 5 | 9.60 | 153.85 |
| 2 | 210 | Automatic Sprinkler System | 11/30/2006 | 13,608.00 | 5 | 226.80 | 4,762.80 |
| 59 | 211 | Pallets, Black Plastic | 11/30/2006 | 33,196.92 | 5 | 553.28 | 11,619.00 |
| 59 | 212 | Top Frames, Black Plastic | 11/30/2006 | 11,070.80 | 5 | 184.51 | 3,874.91 |
| 61 | 218 | Plasma Cutter | 1/1/2006 | 1,858.81 | 5 | 30.98 | 340.79 |
| 61 | 219 | Welder | 1/1/2006 | 1,881.86 | 5 | 31.36 | 345.22 |
| 81 | 220 | Conveyer, PET Palletizer | 6/30/2006 | 5,183.00 | 15 | 28.79 | 3,916.24 |
| 81 | 223 | Electrical-New PET Filling Rm | 6/30/2006 | 6,649.20 | 7 | 79.16 | 3,166.16 |
| 81 | 224 | Air Conveyor - PET | 6/30/2006 | 57,642.32 | 15 | 320.24 | 43,551.76 |
| 81 | 225 | Trine Labeler | 6/30/2006 | 56,964.48 | 15 | 316.47 | 43,039.80 |
| 81 | 227 | Accumulation Table-PET | 6/30/2006 | 5,098.79 | 15 | 28.33 | 3,852.27 |
| 2 | 229 | Bannister | 3/26/2006 | 200.00 | 15 | 1.11 | 147.83 |
| 81 | 230 | UV Light - New PET | 6/30/2006 | 665.36 | 15 | 3.70 | 502.56 |
| 130 | 231 | Storage Racks - Warehouse | 5/31/2006 | 3,085.00 | 15 | 17.14 | 2,313.70 |
| 71 | 232 | Pump - New Waterline | 6/30/2006 | 1,630.98 | 5 | 27.18 | 435.06 |
| 70 | 233 | Pump-New Waterline | 6/30/2006 | 1,630.98 | 5 | 27.18 | 435.06 |
| 72 | 234 | Pump-New Water Line | 6/30/2006 | 1,630.99 | 5 | 27.18 | 435.07 |
| 71 | 235 | Pump-New Water Line | 6/30/2006 | 1,332.84 | 5 | 22.21 | 355.60 |
| 71 | 236 | Pump-New Water line | 6/30/2006 | 1,332.84 | 5 | 22.21 | 355.60 |
| 52 | 237 | Silo, Resin | 6/30/2006 | 28,582.36 | 15 | 158.79 | 21,595.60 |
| 81 | 238 | Filler, PET (new line) | 6/30/2006 | 178,720.77 | 15 | 992.89 | 135,033.61 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 59 | 239 | Palletizer, PET Bottle | 6/30/2006 | 191,156.72 | 15 | 1,061.98 | 144,429.60 |
| 72 | 240 | Silo Installation, Spr & Dist | 6/30/2006 | 11,308.16 | 15 | 62.82 | 8,544.08 |
| 72 | 241 | Variable Frequency Drive | 6/30/2006 | 1,062.10 | 5 | 17.70 | 283.30 |
| 71 | 242 | Motor, 7.5 HP | 6/30/2006 | 1,070.21 | 5 | 17.84 | 285.25 |
| 71 | 243 | Drive, 3 HP | 6/30/2006 | 1,082.79 | 5 | 18.05 | 288.59 |
| 100 | 246 | Sinage, Silo | 6/30/2006 | 1,506.79 | 5 | 25.11 | 401.95 |
| 81 | 247 | Conveyor, PET | 6/30/2006 | 5,820.00 | 15 | 32.33 | 4,397.48 |
| 81 | 248 | Palletizer, PET (finished) | 6/30/2006 | 73,172.22 | 15 | 406.51 | 55,285.78 |
| 81 | 250 | Caser, Dorell | 6/30/2006 | 154,039.40 | 15 | 855.77 | 116,385.52 |
| 52 | 251 | Piping, Blowmold (air) | 6/30/2006 | 2,948.75 | 15 | 16.38 | 2,228.03 |
| 81 | 252 | Piping, PET (pre-filling) | 6/30/2006 | 19,974.90 | 15 | 110.97 | 15,092.22 |
| 84 | 253 | 2 1/2 Gal Conveyors | 6/1/2001 | 38,797.81 | 15 | 215.54 | 16,381.65 |
| 82 | 254 | Ozonator | 3/1/2001 | 20,000.00 | 15 | 111.11 | 8,111.23 |
| 82 | 255 | Carbon Towers | 3/1/2001 | 237,742.69 | 15 | 1,320.79 | 96,418.16 |
| 52 | 257 | Injection Molding for Preforms | 6/30/2007 | 1,200,000.00 | 15 | 6,936.42 | 1,026,589.50 |
| 81 | 258 | Tray-Shrink Wrapper Machine | 6/1/2007 | 230,000.00 | 15 | 1,277.78 | 189,111.04 |
| 0 | 259 | Fogg Filler | 6/30/2007 | 41,400.00 | 15 | 239.31 | 35,417.25 |
| 0 | 260 | Cap Chute for 26 MM Sport Cap | 6/30/2007 | 5,440.00 | 15 | 31.45 | 4,653.75 |
| 72 | 261 | Distiller, MECO | 6/30/2007 | 30,000.00 | 15 | 173.41 | 25,664.75 |
| 100 | 262 | Label Plates | 3/31/2007 | 6,467.35 | 7 | 76.99 | 3,772.70 |
| 81 | 263 | Utility Cart | 3/31/2007 | 668.25 | 5 | 11.14 | 278.35 |
| 62 | 264 | Turbidimeter | 6/1/2007 | 1,897.17 | 5 | 31.62 | 885.33 |
| 70 | 265 | Pump, Silo | 6/30/2007 | 1,351.28 | 5 | 22.52 | 630.64 |
| 100 | 266 | Label Plates | 6/30/2007 | 13,161.28 | 5 | 219.35 | 6,142.08 |
| 130 | 267 | Pallets, Black Plastic | 5/1/2007 | 30,460.00 | 5 | 507.67 | 13,706.89 |
| 82 | 268 | Stretch Wrapper, Lantech | 6/1/2007 | 61,020.00 | 15 | 339.00 | 50,172.00 |
| 52 | 271 | Air Conveyor | 6/30/2007 | 67,400.00 | 15 | 389.60 | 57,660.00 |
| 81 | 272 | Touchscreen | 6/1/2007 | 1,735.72 | 5 | 28.93 | 809.96 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 80 | 273 | Alcoa Capper for 28 mm | 6/30/2007 | 11,177.00 | 0 | - | 11,177.00 |
| 52 | 274 | Silo, Preform | 3/27/2007 | 225,000.00 | 15 | 1,323.53 | 191,911.75 |
| 52 | 275 | Air Conveyor | 4/17/2007 | 33,463.76 | 15 | 195.69 | 28,571.51 |
| 0 | 276 | Conveyor | 6/30/2007 | 8,666.67 | 15 | 50.10 | 7,414.17 |
| 81 | 277 | Parts, change for Labeler | 6/1/2007 | 13,081.00 | 5 | 218.02 | 6,104.36 |
| 1 | 278 | Chiller Unit | 5/1/2007 | 13,367.70 | 7 | 159.14 | 8,116.08 |
| 81 | 279 | PET Rennovation | 6/1/2007 | 43,339.56 | 7 | 515.95 | 26,829.16 |
| 1 | 280 | CIP Upgrade | 5/1/2007 | 7,292.20 | 5 | 121.54 | 3,281.38 |
| 2 | 281 | Air Dryer | 5/1/2007 | 11,621.07 | 7 | 138.35 | 7,055.52 |
| 0 | 287 | Air Tamp II Applicator | 6/30/2007 | 3,196.00 | 7 | 41.51 | 2,158.25 |
| 130 | 288 | R-U-R Drive In Racks | 6/30/2007 | 2,766.00 | 5 | 46.10 | 1,290.80 |
| 82 | 289 | Label Plates | 6/30/2007 | 523.00 | 5 | 8.72 | 243.96 |
| 51 | 290 | Elec Power Installation | 6/30/2007 | 1,692.00 | 5 | 28.20 | 789.60 |
| 80 | 291 | Pet Bottling Line | 6/30/2007 | 109,080.00 | 5 | 1,818.00 | 50,904.00 |
| 0 | 292 | 1000 Gallon Storage Tank | 6/30/2007 | 4,307.00 | 5 | 81.26 | 2,275.50 |
| 70 | 294 | Carbon Tower | 6/30/2007 | 15,582.00 | 5 | 259.70 | 7,271.60 |
| 80 | 295 | Alcoa Capper | 6/30/2007 | 41,265.00 | 5 | 687.75 | 19,257.00 |
| 73 | 296 | Flav Water HTST (Pasturizer) | 6/30/2007 | 20,138.00 | 5 | 335.63 | 9,397.84 |
| 70 | 297 | CIP System | 6/30/2007 | 66,157.00 | 5 | 1,102.62 | 30,873.16 |
| 130 | 298 | Warehouse Racks | 6/30/2007 | 26,602.00 | 5 | 443.37 | 12,414.16 |
| 85 | 299 | Caser | 6/30/2007 | 33,928.00 | 5 | 565.47 | 15,832.96 |
| 51 | 300 | Silo, Spring | 6/30/2007 | 21,903.00 | 5 | 365.05 | 10,221.40 | *PBS Exclude* |
| 51 | 301 | Silo, springs | 6/30/2007 | 19,055.00 | 5 | 317.58 | 8,892.44 | *PBS Exclude* |
| 82 | 302 | Fogg Filler | 6/30/2007 | 71,209.00 | 5 | 1,186.82 | 33,230.76 |
| 0 | 304 | Sleeve Labeling System | 6/30/2007 | 541.00 | 0 | - | 541.00 |
| 83 | 305 | Bliss Cases & Separators | 6/30/2007 | 499.00 | 5 | 8.32 | 232.76 |
| 83 | 306 | Conveyors | 6/30/2007 | 2,928.00 | 5 | 48.80 | 1,366.40 |
| 84 | 307 | Conveyors | 6/30/2007 | 76.00 | 5 | 1.27 | 35.36 |

*Concrete Encased – Part of Real Estate* (handwritten annotation by rows 300–301)

| 130 | 308 | Baler, vertical, cardboard | 6/30/2007 | 1,959.00 | 5 | 32.65 | 914.20 |
| 70 | 309 | Anthrafileter | 6/30/2007 | 2,307.00 | 5 | 38.45 | 1,076.60 |
| 70 | 310 | Heat Exchanger | 6/30/2007 | 930.00 | 5 | 15.50 | 434.00 |
| 72 | 311 | Silo, Water | 6/30/2007 | 7,170.00 | 5 | 119.50 | 3,346.00 |
| 81 | 312 | Conveyors | 6/30/2007 | 105,546.00 | 5 | 1,759.10 | 49,254.80 |
| 80 | 313 | AMCO Star Wheel | 6/30/2007 | 2,103.00 | 5 | 35.05 | 981.40 |
| 0 | 318 | Box Former, Smurfit Stone | 6/30/2007 | 17,208.44 | 0 | - | 17,208.44 |
| 70 | 324 | Reverse Osmosis Machine | 12/31/2007 | 63,800.00 | 15 | 356.42 | 54,889.50 |
| 130 | 325 | Fork Lift Chargers | 7/31/2007 | 1,487.91 | 5 | 24.80 | 719.11 |
| 130 | 326 | Fork Lift Chargers | 7/31/2007 | 1,487.91 | 5 | 24.80 | 719.11 |
| 130 | 328 | Battery, Fork Lift | 7/31/2007 | 5,658.35 | 5 | 94.31 | 2,734.74 |
| 130 | 329 | Battery, Forklift | 7/31/2007 | 5,658.34 | 5 | 94.31 | 2,734.73 |
| 60 | 331 | Ceiling Fan | 7/26/2007 | 2,320.15 | 15 | 12.89 | 1,920.56 |
| 82 | 332 | Thrmal Label Printer | 7/16/2007 | 2,622.01 | 15 | 14.57 | 2,170.34 |
| 82 | 333 | Scrubber | 8/24/2007 | 9,542.92 | 15 | 53.02 | 7,952.32 |
| 70 | 335 | Air Conditioner | 8/24/2007 | 11,905.09 | 15 | 66.14 | 9,920.89 |
| 70 | 336 | Pump | 8/31/2007 | 2,130.60 | 15 | 11.84 | 1,775.40 |
| 0 | 337 | Pump | 8/31/2007 | 3,884.45 | 15 | 22.20 | 3,329.45 |
| 81 | 338 | Chucks for Fogg Filler | 9/14/2007 | 8,094.00 | 15 | 44.97 | 6,789.87 |
| 81 | 339 | Case Erector | 10/31/2007 | 80,000.00 | 15 | 444.44 | 67,555.68 |
| 51 | 340 | Well (I-30 site) | 12/31/2007 | 9,165.00 | 15 | 51.20 | 7,885.00 |
| 81 | 341 | Ozone Machine | 12/1/2007 | 37,844.10 | 15 | 210.25 | 32,377.60 |
| 130 | 342 | Air Compressor | 12/13/2007 | 950.00 | 15 | 5.28 | 812.72 |
| 82 | 343 | 3 x 1 Line Modification | 12/26/2007 | 63,500.00 | 15 | 352.78 | 54,327.72 |
| 81 | 344 | Dapal Installation | 10/31/2007 | 106,488.94 | 15 | 591.61 | 89,923.86 |
| 52 | 355 | Nestal Installation | 6/1/2008 | 295,400.16 | 15 | 1,641.11 | 262,577.96 |
| 81 | 356 | R O Installation | 1/31/2008 | 106,492.14 | 15 | 591.62 | 91,701.64 |
| 70 | 357 | Natural Spring Well | 9/30/2008 | 110,693.52 | 15 | 614.96 | 100,239.20 |

| 84 | 358 | 2.5 Line Rework | 1/31/2008 | 1,769.52 | 15 | 9.83 | 1,523.77 |
| 81 | 359 | Pet Line Reconfig | 6/30/2008 | 41,047.40 | 15 | 228.04 | 36,486.60 |
| 81 | 360 | PET 2 Conveyor | 6/30/2008 | 32,990.73 | 15 | 183.28 | 29,325.13 |
| 82 | 361 | 3 X 1 Line Reconfig | 4/30/2008 | 24,188.42 | 15 | 134.38 | 21,232.06 |
| 83 | 362 | 6 X 1 Line Top Sealer | 5/31/2008 | 5,624.40 | 15 | 31.25 | 4,968.15 |
| 2 | 363 | Colling for Filler Room | 10/2/2008 | 17,918.11 | 15 | 99.55 | 16,325.31 |
| 130 | 364 | Plastic Pallets Top Form 600 | 6/5/2008 | 12,318.00 | 5 | 205.30 | 8,212.00 |
| 52 | 369 | SIG Blowmold | 3/14/2008 | 9,297.21 | 7 | 110.68 | 6,751.57 |
| 81 | 370 | PET LINE MOD | 8/31/2009 | 7,783.12 | 5 | 129.72 | 7,004.80 |
| 81 | 371 | PET LINE CONVEYOR MOD | 8/31/2009 | 2,930.22 | 5 | 48.84 | 2,637.18 |
| 81 | 376 | KRONES LABELER PET | 8/31/2009 | 74,664.99 | 15 | 414.81 | 72,176.13 |
| 52 | 377 | AIR COMPRESSOR MOD | 8/31/2009 | 1,777.87 | 5 | 29.63 | 1,600.09 |
| 60 | 378 | WATER DISPOSAL BLENDING | 8/31/2009 | 4,384.20 | 15 | 24.36 | 4,238.04 |
| 70 | 379 | NATURAL SPRING PLUMBING | 8/31/2009 | 13,475.96 | 15 | 74.87 | 13,026.74 |
| 2 | 16 | Stainless Steel Silo 1 Concret | 1/1/2009 | 19,218.70 | 15 | 106.77 | 17,830.69 |
| 2 | 17 | Stainless Steel Silo 2 Concret | 1/1/2009 | 19,218.70 | 15 | 106.77 | 17,830.69 |
| Asset Type Total | | | | 12,108,270.84 | | 77,665.82 | 7,521,741.94 |

150-300 -- Trucks, Autos, FL

| Dept | Number | Description | Purch Date | Purch Price | Life | Cur Depr Exp | Book Value |
|------|--------|-------------|------------|-------------|------|--------------|------------|
| 131 | 36 | Scissor Lift | 5/1/2002 | 9,329.69 | 15 | 51.83 | 4,509.50 |
| 133 | 62 | 1997 53' TRAILER #3205 | 2/1/2001 | 9,250.00 | 5 | - | - |
| 133 | 64 | 1997 53' TRAILER #3181 | 2/1/2001 | 8,850.00 | 5 | - | - |
| 133 | 65 | 1997 53' TRAILER #3192 | 2/1/2001 | 8,450.00 | 5 | - | - |
| 133 | 66 | 1997 53' TRAILER #3180 | 2/1/2001 | 8,250.00 | 5 | - | - |
| 133 | 67 | 1997 53' TRAILER #3194 | 2/1/2001 | 8,150.00 | 5 | - | - |
| 133 | 68 | 48' TRAILER #48360 | 2/1/2002 | 2,000.00 | .5 | - | - |
| 133 | 69 | 53' TRAILER #53704 | 2/1/2002 | 2,000.00 | 5 | - | - |
| 133 | 70 | 53' TRAILER #53754 | 2/1/2002 | 2,000.00 | 5 | - | - |

| 133 | 103 | TRAILER | | 10/10/2003 | 900.00 | 5 | - | | - |
|-----|-----|---------|---|-----------|--------|---|---|---|---|
| 130 | 104 | 2002 WHITE FORD VAN | | 9/16/2003 | 13,586.36 | 5 | - | | - |
| 130 | 109 | 1993 WABASH TRAILER | | 3/25/2004 | 4,250.00 | 5 | - | | - |
| 130 | 110 | 1993 WABASH TRAILER | - | 3/25/2004 | 4,250.00 | 5 | - | | - |
| 130 | 111 | 1993 WABASH TRAILER | | 3/25/2004 | 4,250.00 | 5 | - | | - |
| 130 | 112 | 1993 WABASH TRAILER | | 3/25/2004 | 4,250.00 | 5 | - | | - |
| 130 | 113 | 1993 WABASH TRAILER | | 3/25/2004 | 4,250.00 | 5 | - | | - |
| 131 | 120 | NISSAN FORKLIFT | | 1/23/2004 | 22,775.57 | 15 | 126.53 | 13,538.88 | |
| 131 | 121 | NISSAN FORKLIFT | | 1/23/2004 | 22,775.58 | 15 | 126.53 | 13,538.89 | |
| 130 | 127 | 1995 Great Dane 53'x102" Trlr | | 8/4/2004 | 6,500.00 | 5 | - | | - |
| 130 | 128 | 1994 Great Dane 53'x102" Trlr | | 8/4/2004 | 6,500.00 | 5 | - | | - |
| 131 | 145 | Nissan Forklift | | 4/8/2005 | 23,862.60 | 15 | 132.57 | 16,173.54 | |
| 131 | 146 | Nissan Forklift | | 4/8/2005 | 23,862.60 | 15 | 132.57 | 16,173.54 | |
| 130 | 147 | 1990 REFV Trailer | | 6/8/2005 | 1,800.00 | 5 | 30.00 | 120.00 | |
| 132 | 148 | 1999 OTTOWA SHUTTLE TRK | | 7/1/2005 | 7,000.00 | 5 | 116.67 | 583.15 | |
| 130 | 149 | 53' Dry Bed Trailer | | 8/16/2005 | 2,700.00 | 5 | 45.00 | 270.00 | |
| 130 | 150 | 53' Dry Bed Trailer | | 8/16/2005 | 2,700.00 | 5 | 45.00 | 270.00 | |
| 130 | 152 | 53' Dry Bed Trailer | | 8/16/2005 | 2,700.00 | 5 | 45.00 | 270.00 | |
| 130 | 153 | 53' Dry Bed Trailer | | 8/16/2005 | 3,200.00 | 5 | 53.33 | 320.18 | |
| 130 | 154 | 53' Dry Bed Trailer | | 8/16/2005 | 3,200.00 | 5 | 53.33 | 320.18 | |
| 131 | 178 | Caterpillar Forklift | | 1/1/2006 | 3,960.00 | 15 | 22.00 | 2,882.00 | |
| 131 | 190 | Forklift, Nissan | | 4/24/2006 | 18,190.00 | 15 | 101.06 | 13,541.24 | |
| 131 | 191 | Forklift, Nisson | | 4/24/2006 | 18,190.00 | 15 | 101.06 | 13,541.24 | |
| 131 | 214 | Scissor Lift | | 9/30/2006 | 9,047.50 | 5 | 150.79 | 2,865.11 | |
| 131 | 319 | Fork Lift, Nisson | | 6/30/2007 | 20,693.75 | 5 | 344.90 | 9,656.95 | |
| 131 | 320 | Fork Lift, Nisson | | 6/30/2007 | 20,693.75 | 5 | 344.90 | 9,656.95 | |
| 130 | 345 | Fork Lift, Nissan | | 6/30/2007 | 20,693.75 | 15 | 114.97 | 17,014.71 | |
| 130 | 346 | Fork Lift, Nissan | | 6/30/2007 | 20,693.75 | 15 | 114.97 | 17,014.71 | |

| Dept | Number | Description | Purch Date | Purch Price | Life | Cur Depr Exp | Book Value |
|------|--------|-------------|------------|-------------|------|--------------|------------|
| 100 | 347 | 2007 TOYOTA | 11/9/2007 | 22,399.59 | 5 | 373.33 | 12,319.68 |
| 150 | 348 | 2000 Dodge Caravan | 5/1/2007 | 5,000.00 | 3 | 138.89 | 416.63 |
| 130 | 365 | 95 Ottawa Yard Truck | 6/18/2008 | 11,312.00 | 5 | 188.53 | 7,541.40 |
| 100 | 380 | 2004 Toyota Highlander | 10/16/2009 | 14,300.00 | 5 | 238.33 | 13,346.68 |
| 131 | 381 | Forklift Batteries (2) | 1/31/2009 | 10,464.65 | 5 | 209.29 | 9,836.78 |
| Asset Type Total | | | | 419,231.14 | | 6,969.27 | 333,006.82 |

150-400 -- Furn, Computer, etc

| Dept | Number | Description | Purch Date | Purch Price | Life | Cur Depr Exp | Book Value |
|------|--------|-------------|------------|-------------|------|--------------|------------|
| 120 | 39 | OFFICE EQUIPMNT | 2/1/2001 | 7,829.48 | 5 | - | - |
| 120 | 40 | MISC OFFICE EQUIP | 6/1/2002 | 658.48 | 5 | - | - |
| 120 | 41 | MISC OFFICE EQUIP | 6/1/2002 | 432.32 | 5 | - | - |
| 120 | 42 | MISC OFFICE EQUIP | 6/1/2002 | 1,859.18 | 5 | - | - |
| 120 | 43 | COMPUTER | 9/1/2002 | 503.29 | 5 | - | - |
| 120 | 44 | MONITOR | 9/1/2002 | 298.54 | 5 | - | - |
| 120 | 45 | FURNITURE & FIXTURES | 2/1/2001 | 7,654.53 | 5 | - | - |
| 120 | 46 | MISC FURN & FIXTURES | 6/1/2002 | 751.26 | 5 | - | - |
| 120 | 47 | MISC FURN & FIXTURES | 7/1/2002 | 2,415.66 | 5 | - | - |
| 120 | 129 | S-CJ6 Printhead | 8/2/2004 | 1,300.00 | 5 | - | - |
| 120 | 131 | HP CLJ255ON Laserjet | 8/23/2004 | 698.00 | 5 | - | - |
| 120 | 139 | Desk & File Cabinet | 1/7/2005 | 650.95 | 5 | - | - |
| 60 | 140 | Laptop Computer (Edwards) | 1/14/2005 | 1,235.18 | 5 | - | - |
| 120 | 156 | Computer Eq BCI | 9/30/2005 | 861.56 | 5 | 14.36 | 100.48 |
| 120 | 157 | Computer Equipment | 9/30/2005 | 1,811.96 | 5 | 30.20 | 211.36 |
| 120 | 173 | File Cabinets | 12/7/2005 | 352.00 | 5 | 5.87 | 58.50 |
| 120 | 205 | Server, Dell | 6/30/2006 | 3,651.00 | 5 | 60.85 | 973.60 |
| 120 | 207 | PC, Dell Dimensions | 6/30/2006 | 576.25 | 5 | 9.60 | 153.85 |
| 61 | 208 | PC, Dell Dimensions | 6/30/2006 | 576.25 | 5 | 9.60 | 153.85 |

| Dept | Number | Description | Purch Date | Purch Price | Life | Cur Depr Exp | Book Value |
|---|---|---|---|---|---|---|---|
| 120 | 209 | Lap Top, Dell Inspiron | 8/31/2006 | 782.60 | 5 | 13.04 | 234.92 |
| 60 | 256 | Lap Top Computer | 3/31/2007 | 2,365.01 | 5 | 39.42 | 985.31 |
| 100 | 350 | Lap Top Computer | 9/26/2007 | 796.58 | 5 | 13.28 | 411.46 |
| 120 | 351 | Furniture, Acct Dept | 11/17/2007 | - | 5 | - | - |
| 120 | 351 | Desks, 2 | 11/17/2007 | 1,490.47 | 5 | 24.84 | 819.79 |
| 100 | 373 | SALES DESKTOP PC | 8/31/2009 | 1,095.18 | 5 | 18.25 | 985.68 |
| 120 | 374 | DESKTOP PC BANK | 8/31/2009 | 1,095.17 | 5 | 18.25 | 985.67 |
| 120 | 375 | A/C ACCOUNTING DEP | 8/31/2009 | 743.99 | 5 | 12.40 | 669.59 |
| 150 | 382 | Inspiron 6000 Computer | 12/28/2009 | 1,118.19 | 5 | 18.64 | 1,080.91 |
| Asset Type Total | | | | 43,603.08 | | 288.60 | 7,824.97 |

150-500 -- Software

| Dept | Number | Description | Purch Date | Purch Price | Life | Cur Depr Exp | Book Value |
|---|---|---|---|---|---|---|---|
| 120 | 38 | OTHER SYSTEM | 2/1/2002 | 14,597.06 | 15 | 81.10 | 6,811.57 |
| 120 | 88 | Millennium III | 8/1/2001 | 29,265.12 | 5 | - | - |
| 120 | 89 | EDI Data System | 8/1/2001 | 54,986.38 | 5 | - | - |
| 120 | 136 | Firewalls & Conversion | 12/17/2004 | 6,079.64 | 5 | - | - |
| 120 | 195 | MAS200 Software | 4/1/2006 | 6,104.18 | 5 | 101.74 | 1,424.14 |
| 120 | 216 | FireWall, Sonic | 10/31/2006 | 1,884.48 | 5 | 31.41 | 628.08 |
| 120 | 217 | MAPADOC EDI Software | 12/31/2006 | 12,077.60 | 5 | 201.29 | 4,428.58 |
| 120 | 283 | EDI System | 5/1/2007 | 9,351.75 | 5 | 155.86 | 4,208.37 |
| 120 | 284 | Qualedi | 5/1/2007 | 3,888.70 | 5 | 64.81 | 1,749.97 |
| 81 | 285 | Software, Case Palletizer | 6/1/2007 | 7,975.00 | 5 | 132.92 | 3,721.56 |
| 130 | 286 | Kellers Maint Manager | 5/1/2007 | 1,409.86 | 5 | 23.50 | 634.36 |
| 120 | 352 | Multi Company Module | 7/19/2007 | 1,263.93 | 5 | 21.07 | 610.76 |
| 120 | 353 | CHEP Program | 10/31/2007 | 4,687.50 | 5 | 78.13 | 2,499.86 |
| 120 | 366 | Paperless Office Journals | 2/15/2008 | 1,413.46 | 5 | 23.56 | 848.02 |
| 82 | 367 | K P software 3 x 1 Reconfig | 4/30/2008 | 1,925.43 | 5 | 32.09 | 1,219.45 |

| | | | |
|---|---|---|---|
| Asset Type Total | 156,910.09 | 947.48 | 28,784.72 |
| Total | 12,728,015.15 | 85,871.17 | 7,891,358.45 |

# Mountain Pure MS Fixed Asset Listing

150-200 -- Equipment

| Dept | Sec | Number | Description | Purch Date | Purch Price | Life | Cur i Exp |
|------|-----|--------|-------------|-----------|-------------|------|-----------|
| 130 | | 7 | Sato Sticker Printer | 2/8/2006 | 1,036.77 | 5 | |
| 82 | | 11 | ABC Topsealer | 1/1/2006 | 19,105.00 | 15 | |
| 80 | | 12 | Box Former | 1/1/2006 | 20,000.00 | 15 | |
| 80 | | 13 | Case Packer, Hamrick | 1/1/2006 | 25,636.65 | 15 | |
| 61 | | 14 | Equipment, Misc | 1/1/2006 | 5,135.20 | 5 | |
| 61 | | 15 | Misc Equipment Repairs | 1/1/2006 | 4,034.02 | 2 | |
| 80 | | 16 | Vent Tube, Filler | 1/1/2006 | 15,081.80 | 15 | |
| 61 | | 17 | Air Compressor | 1/1/2006 | 877.27 | 7 | |
| 82 | | 18 | Filler, 2 1/2 Gallon | 2/28/2006 | 74,132.49 | 15 | |
| 72 | | 19 | Distiller, Mueller | 2/28/2006 | 81,442.33 | 15 | |
| 80 | | 20 | Labeler, Trine 4500 Quick Chng | 1/1/2006 | 57,400.00 | 15 | |
| 81 | | 23 | Tray Wrapper, PMI | 1/1/2006 | 4,400.00 | 15 | |
| 80 | | 24 | Box compactor | 4/30/2006 | 1,600.00 | 15 | |
| 71 | | 25 | Taylor Control Cabainet | 2/28/2006 | 23,500.00 | 15 | |
| 52 | | 26 | Silo, Resin, Aluminum | 2/28/2006 | 19,759.69 | 15 | |
| 80 | | 27 | Case Sealer | 1/1/2006 | 17,965.00 | 15 | |
| 82 | | 28 | Case Packer | 1/1/2006 | 31,363.67 | 15 | |
| 72 | | 29 | Silo, Distiller | 2/28/2006 | 56,961.60 | 15 | |
| 1 | | 33 | Signage | 6/30/2006 | 793.94 | 7 | |
| 80 | | 34 | Printer, CodaJet 6000 Coder | 5/31/2006 | 5,594.16 | 15 | |
| 82 | | 35 | Printer, CodeJet 6000 | 5/31/2006 | 6,062.46 | 15 | |
| 2 | | 36 | Air Dryer | 6/30/2006 | 5,331.81 | 15 | |
| 82 | | 37 | Printer, VideoJet | 6/30/2006 | 22,620.49 | 5 | |
| 82 | | 38 | Printer Upgrade | 8/31/2006 | 1,206.40 | 5 | |
| 131 | | 40 | Lift Truck | 9/30/2006 | 8,750.00 | 7 | |
| 75 | | 58 | UV Light | 1/31/2006 | 1,753.27 | 15 | |
| 52 | | 59 | Pad, Resin Silo | 4/30/2006 | 2,503.80 | 15 | |
| 52 | | 60 | Silo, resin, small | 2/28/2006 | 4,280.13 | 15 | |
| 52 | | 61 | Silo, Resin (small) | 2/28/2006 | 4,280.14 | 15 | |
| 82 | | 62 | 2 1/2 Gallon SWF Box Former | 9/30/2006 | 20,000.00 | 15 | |
| 80 | | 63 | Top Sealer, ABC 3x1 | 9/30/2006 | 17,000.00 | 15 | |
| 82 | | 65 | Air Compressor | 4/30/2006 | 5,225.00 | 15 | |
| 130 | | 68 | Battery Charger | 4/30/2006 | 330 | 5 | |
| 130 | | 69 | Battery Charger | 4/30/2006 | 330 | 5 | |
| 61 | | 70 | Battery Charger | 4/30/2006 | 330 | 5 | |
| 71 | | 71 | Carbon Tower | 8/31/2006 | 4,650.45 | 15 | |
| 71 | | 72 | Carbon Tower | 8/31/2006 | 4,650.45 | 15 | |
| 71 | | 73 | Carbon Tower | 8/31/2006 | 4,650.45 | 15 | |
| 71 | | 74 | Carbon Tower | 8/31/2006 | 4,650.47 | 15 | |
| 80 | | 75 | Power Supply | 1/1/2007 | 1,641.81 | 5 | |
| 70 | | 76 | Divert Valve, 2" | 12/31/2006 | 1,045.16 | 5 | |
| 75 | | 77 | Pump & Motor | 1/31/2006 | 1,669.82 | 5 | |
| 75 | | 78 | Pump & Motor | 1/31/2006 | 1,669.79 | 5 | |

| 70 | 79 | Pump & Motor | 5/31/2006 | 1,685.09 | 5 | |
| 51 | 80 | Pump & Motor | 5/31/2006 | 1,685.09 | 5 | |
| 70 | 81 | Cartridge Filter | 1/1/2006 | 1,817.75 | 5 | |
| 70 | 82 | UV Light | 1/31/2006 | 7,174.35 | 15 | |
| 75 | 83 | UV Light | 1/31/2006 | 7,311.64 | 15 | |
| 72 | 84 | Carbon Tower | 10/31/2006 | 4,459.47 | 15 | |
| 75 | 85 | Bag Filter | 1/31/2006 | 1,451.25 | 5 | |
| 70 | 86 | Bag Filter | 1/31/2006 | 1,364.25 | 5 | |
| 75 | 87 | Bag Filter | 1/31/2006 | 1,364.25 | 5 | |
| 52 | 89 | Blow Mold Air Compressor | 6/30/2006 | 23,592.47 | 15 | |
| 75 | 91 | Abita Receiving Pump | 6/30/2006 | 11,192.07 | 15 | |
| 75 | 93 | Abita Piping | 6/30/2006 | 2,688.28 | 15 | |
| 80 | 94 | Palletizer, 1 Gal | 4/30/2006 | 238,123.50 | 15 | 1 |
| 2 | 95 | Electrical System | 11/30/2006 | 126,846.56 | 15 | |
| 82 | 96 | Conveyor, Box, 2 1/2 Gallon | 10/31/2006 | 27,835.73 | 15 | |
| 80 | 98 | Labler, 1 Gal | 3/31/2006 | 14,368.47 | 15 | |
| 80 | 99 | Conveyor, Case, 1 Gal | 4/30/2006 | 21,167.28 | 15 | |
| 72 | 100 | Distiller | 6/30/2006 | 158,800.00 | 15 | |
| 52 | 101 | Blowmold | 6/30/2006 | 583,625.00 | 15 | 3 |
| 52 | 102 | Blowmold | 9/30/2006 | 558,625.00 | 15 | 3 |
| 71 | 103 | City Water Installation | 11/30/2006 | 82,632.57 | 15 | |
| 52 | 104 | BlowMold Installation | 8/31/2006 | 10,896.30 | 15 | |
| 80 | 105 | Conveyor, Cable 1 Gal | 8/31/2006 | 60,899.00 | 15 | |
| 52 | 106 | Resin Silo Installation (small | 8/31/2006 | 2,833.18 | 15 | |
| 80 | 107 | Box Former, 1 Gal | 6/30/2006 | 60,536.43 | 15 | |
| 72 | 108 | Distiller Installation | 6/30/2006 | 30,816.01 | 15 | |
| 52 | 109 | Cooling System, Blowmold | 6/30/2006 | 79,363.99 | 15 | |
| 52 | 110 | Electric System, Blowmold | 6/30/2006 | 63,647.86 | 15 | |
| 52 | 111 | Pump | 3/31/2006 | 2,407.49 | 5 | |
| 71 | 112 | Bag Filter | 3/31/2006 | 1,379.06 | 5 | |
| 75 | 113 | Cartridge Filter | 3/31/2006 | 3,717.34 | 5 | |
| 80 | 114 | Conveyor, Cable | 3/31/2006 | 81,271.00 | 15 | |
| 80 | 115 | Conveyor, Table Top | 1/31/2006 | 10,955.80 | 15 | |
| 72 | 117 | Pump | 3/31/2006 | 419.06 | 5 | |
| 72 | 118 | Pump | 3/31/2006 | 486.47 | 5 | |
| 72 | 119 | Pump | 3/31/2006 | 486.48 | 5 | |
| 52 | 120 | Volumetric Blender | 3/31/2006 | 17,823.00 | 15 | |
| 52 | 121 | Grinder | 3/31/2006 | 22,455.00 | 15 | |
| 52 | 122 | Vacuum Loader | 3/31/2006 | 12,231.00 | 15 | |
| 59 | 123 | Bagging Machine | 3/31/2006 | 29,153.82 | 15 | |
| 71 | 124 | Bag Filter | 9/30/2006 | 1,712.38 | 5 | |
| 61 | 125 | Cut-Off Saw, 14" | 4/1/2006 | 76 | 5 | |
| 81 | 126 | Box Former | 4/1/2006 | 22,830.00 | 15 | |
| 61 | 127 | Drill, Pedistal, 15" 1 hp | 4/1/2006 | 101 | 5 | |
| 61 | 128 | Air Compressor, | 4/1/2006 | 178 | 5 | |
| 131 | 129 | Elec Die Lift | 4/1/2006 | 1,522.00 | 5 | |
| 131 | 130 | Elec Die Lift | 4/1/2006 | 1,522.00 | 5 | |
| 81 | 131 | Depalletizer | 4/1/2006 | 101,468.00 | 15 | |
| 81 | 132 | Conveyor | 4/1/2006 | 35,514.00 | 15 | |
| 81 | 133 | Filler | 4/1/2006 | 152,201.00 | 15 | |

| | | | | | |
|---|---|---|---|---|---|
| 81 | 134 | Conveyor | 4/1/2006 | 45,660.00 | 15 |
| 81 | 135 | Labeler | 4/1/2006 | 76,101.00 | 15 |
| 80 | 137 | Conveyor | 4/1/2006 | 25,367.00 | 15 |
| 80 | 138 | Filler | 4/1/2006 | 20,294.00 | 15 |
| 81 | 139 | Box Former | 4/1/2006 | 76,101.00 | 15 |
| 81 | 140 | Printer | 4/1/2006 | 1,522.00 | 15 |
| 81 | 141 | Glue Applicator | 4/1/2006 | 1,522.00 | 15 |
| 81 | 142 | Shrink Tunnel | 4/1/2006 | 76,101.00 | 15 |
| 81 | 143 | Conveyor | 4/1/2006 | 30,440.00 | 15 |
| 81 | 144 | Palletizzer | 4/1/2006 | 101,468.00 | 15 |
| 82 | 145 | Stretch Wrap Machine | 4/1/2006 | 25,367.00 | 15 |
| 82 | 147 | Box Taper | 4/1/2006 | 761 | 15 |
| 82 | 148 | Filler | 4/1/2006 | 76,101.00 | 15 |
| 82 | 149 | Conveyor | 4/1/2006 | 15,220.00 | 15 |
| 82 | 150 | Laabeler | 4/1/2006 | 4,059.00 | 15 |
| 81 | 151 | Tray Former | 4/1/2006 | 14,205.00 | 15 |
| 81 | 152 | Tray Packer | 4/1/2006 | 30,440.00 | 15 |
| 81 | 153 | Glue Applicator | 4/1/2006 | 1,015.00 | 15 |
| 82 | 154 | Conveyor | 4/1/2006 | 20,294.00 | 15 |
| 59 | 155 | Debagger | 4/1/2006 | 2,537.00 | 15 |
| 82 | 156 | Printer | 4/1/2006 | 507 | 5 |
| 82 | 157 | Printer | 4/1/2006 | 2,029.00 | 5 |
| 82 | 158 | Printer | 4/1/2006 | 2,029.00 | 5 |
| 82 | 159 | Stretch Wrapper | 4/1/2006 | 5,073.00 | 15 |
| 61 | 160 | Arc Welder | 4/1/2006 | 101 | 5 |
| 81 | 161 | Glue Applicator | 4/1/2006 | 1,015.00 | 15 |
| 61 | 162 | Arc Welder | 4/1/2006 | 76 | 5 |
| 82 | 163 | Labeler | 4/1/2006 | 7,103.00 | 15 |
| 53 | 164 | Storage Tank, Sugar | 4/1/2006 | 507 | 15 |
| 72 | 165 | Water Heater | 4/1/2006 | 1,268.00 | 15 |
| 2 | 166 | Air Compressor | 4/1/2006 | 5,073.00 | 15 |
| 70 | 167 | Tank, 500 Gallon SS | 4/1/2006 | 634 | 15 |
| 70 | 168 | Tank, 500 Gallon SS | 4/1/2006 | 634 | 15 |
| 71 | 169 | Ozone Generator | 4/1/2006 | 6,088.00 | 15 |
| 71 | 170 | Filter | 4/1/2006 | 7,610.00 | 15 |
| 71 | 171 | Disinfection Unit | 4/1/2006 | 2,537.00 | 15 |
| 71 | 172 | Deozonating Machine | 4/1/2006 | 2,537.00 | 15 |
| 71 | 173 | Mixing Tank, 500 Gallon | 4/1/2006 | 1,015.00 | 15 |
| 71 | 174 | Mixing Tank, 1,000 Gallon | 4/1/2006 | 1,015.00 | 15 |
| 71 | 175 | Tank, 1,400 Gallon | 4/1/2006 | 507 | 15 |
| 71 | 176 | Tank, 1,400 Gallon | 4/1/2006 | 507 | 15 |
| 71 | 177 | Tank, 5,600 Gallon | 4/1/2006 | 1,015.00 | 15 |
| 71 | 178 | Tank, 200 Gallon Portable | 4/1/2006 | 101 | 15 |
| 61 | 179 | Misc pumps, motors, | 4/1/2006 | 3,044.00 | 2 |
| 2 | 180 | PLC Control | 4/1/2006 | 4,059.00 | 15 |
| 82 | 181 | Stretch Wrapper | 4/1/2006 | 5,073.00 | 15 |
| 2 | 182 | Air Compressor | 4/1/2006 | 254 | 15 |
| 130 | 183 | Crane, Portable | 4/1/2006 | 254 | 15 |
| 2 | 184 | Chiller | 4/1/2006 | 2,537.00 | 15 |
| 2 | 185 | Chiller | 4/1/2006 | 2,537.00 | 15 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 | | 186 | Air Compressor | 4/1/2006 | 10,147.00 | 15 |
| 62 | | 187 | Incubator | 4/1/2006 | 254 | 15 |
| 2 | | 188 | Pump, Vacuum | 4/1/2006 | 101 | 15 |
| 62 | | 189 | PH Meter | 4/1/2006 | 25 | 2 |
| 62 | | 190 | Microscope | 4/1/2006 | 101 | 2 |
| 62 | | 191 | Turbidimeter | 4/1/2006 | 203 | 2 |
| 61 | | 192 | Torque Tester | 4/1/2006 | 89 | 5 |
| 62 | | 193 | Thermometer, Digital | 4/1/2006 | 30 | 2 |
| 62 | | 194 | Colorimeter, Pocket | 4/1/2006 | 36 | 2 |
| 62 | | 195 | Heater, Electric | 4/1/2006 | 63 | 2 |
| 62 | | 196 | Refractometer | 4/1/2006 | 101 | 2 |
| 62 | | 197 | Ph/Ion Meter | 4/1/2006 | 36 | 2 |
| 62 | | 198 | Balance, CS5000 | 4/1/2006 | 61 | 2 |
| 61 | | 199 | Fire Extinguishers, Ladders | 4/1/2006 | 1,776.00 | 5 |
| 130 | | 202 | Low-Lift Walkie | 4/1/2006 | 127 | 5 |
| 130 | | 203 | Low-Lift Walkie | 4/1/2006 | 304 | 5 |
| 52 | | 206 | Silo Patrol Controller | 2/1/2007 | 2,285.00 | 10 |
| 80 | | 207 | Hitachi Printer System | 5/1/2007 | 12,460.00 | 10 |
| 72 | | 208 | Softner, Distiller | 4/1/2007 | 9,160.11 | 10 |
| 82 | | 209 | Sales Tax on Equipment | 1/1/2007 | 38,547.00 | 15 |
| 80 | | 215 | FoxJet Printer | 5/1/2007 | 23,131.00 | 15 |
| 0 | | 217 | Conveyors | 6/30/2007 | 8,666.67 | 0 |
| 60 | | 223 | Floor Sweeper | 9/26/2007 | 6,670.00 | 5 |
| 52 | | 224 | Starwheel Bottle Turner | 8/10/2007 | 2,249.70 | 15 |
| 130 | | 227 | Transition Plates, Dock | 12/1/2007 | 962.75 | 5 |
| 130 | | 230 | Electric Pallet Jack | 6/3/2008 | 1,111.00 | 5 |

Asset Type
Total                                                    4,107,175.46       23

150-300 -- Trucks, Autos, Fork Lifts

| Dept | Sec | Number | Description | Purch Date | Purch Price | Life | Cur l Exp |
|---|---|---|---|---|---|---|---|
| | 133 | 10 | Volvo Tractor # 42 | 1/1/2006 | 1,877.62 | 5 | |
| | 131 | 31 | Forklift, Nisson | 4/30/2006 | 18,190.00 | 7 | |
| | 131 | 32 | Forklift, Nisson | 4/30/2006 | 18,190.00 | 7 | |
| | 131 | 41 | Fork Lift, Clark | 9/30/2006 | 8,750.00 | 7 | |
| | 130 | 44 | Trailer, Storage | 11/30/2006 | 3,000.00 | 10 | |
| | 130 | 45 | Trailer, Storage | 11/30/2006 | 3,000.00 | 10 | |
| | 130 | 46 | Trailer, Storage | 11/30/2006 | 4,000.00 | 10 | |
| | 130 | 47 | Trailer, Storage | 11/30/2006 | 4,000.00 | 10 | |
| | 130 | 48 | Trailer, Storage | 11/30/2006 | 4,000.00 | 10 | |
| | 130 | 49 | Trailer, Storage | 11/30/2006 | 4,000.00 | 10 | |
| | 131 | 57 | Fork Lift, Drexel | 1/31/2006 | 28,400.00 | 5 | |
| | 131 | 66 | Forklift, Hyster Electric | 4/30/2006 | 3,575.00 | 15 | |
| | 131 | 67 | Forklift, Hyster Electric | 4/30/2006 | 3,575.00 | 15 | |
| | 131 | 204 | Lift Truck | 4/1/2006 | 3,044.00 | 7 | |
| | 133 | 205 | Freightliner, 1990 | 4/1/2006 | 1,268.08 | 5 | |
| | 130 | 232 | 2000 Sterling Box Truck | 4/1/2008 | 11,000.00 | 5 | |

Asset Type
Total                                                    119,869.70       1

150-400 -- Furniture, etc

| Dept | Sec | Number | Description | Purch Date | Purch Price | Life | Cur I Exp |
|------|-----|--------|-------------|------------|-------------|------|-----------|
| | 120 | 2 | Furniture, Misc | 1/1/2006 | 1,100.00 | 5 | |
| | 120 | 3 | Celeron Computer | 4/30/2006 | 1,185.73 | 5 | |
| | 120 | 4 | Celeron Computer | 4/30/2006 | 1,185.73 | 5 | |
| | 120 | 5 | Celeron Computer | 4/30/2006 | 1,185.72 | 5 | |
| | 120 | 6 | Toshiba Laptop | 4/30/2006 | 2,048.58 | 5 | |
| | 120 | 9 | Furniture, Misc | 1/1/2006 | 720.89 | 5 | |
| | 120 | 52 | Computer, Desk Top, Dimension | 6/30/2006 | 576.25 | 5 | |
| | 120 | 53 | Computer, Desk Top, Dimension | 6/30/2006 | 576.25 | 5 | |
| | 120 | 54 | Computer, Desktop, Dimension | 6/30/2006 | 576.25 | 5 | |
| | 120 | 55 | Computer, Desk Top, Dimension | 6/30/2006 | 576.25 | 5 | |
| | 120 | 56 | Computer, Desk Top, Dimension | 6/30/2006 | 576.25 | 5 | |
| | 150 | 200 | Furniture & Office Machines | 4/1/2006 | 2,029.00 | 5 | |
| | 150 | 201 | Computers, Network | 4/1/2006 | 1,776.00 | 5 | |
| | 150 | 210 | Copier, Shart | 1/1/2007 | 2,969.25 | 5 | |
| | 150 | 211 | Terminal Server | 5/31/2007 | 2,875.63 | 5 | |
| | 150 | 225 | Fax Machine | 7/24/2007 | 395 | 5 | |
| Asset Type Total | | | | | 20,352.78 | | |

150-500 -- Software

| Dept | Sec | Number | Description | Purch Date | Purch Price | Life | Cur I Exp |
|------|-----|--------|-------------|------------|-------------|------|-----------|
| | 120 | 50 | MAS200 | 6/30/2006 | 6,104.17 | 5 | |
| | 120 | 51 | MAPADOC | 12/31/2006 | 12,077.60 | 5 | |
| | 120 | 216 | EDI System | 6/1/2007 | 8,197.70 | 5 | |
| | 120 | 218 | Qualedi | 5/1/2007 | 3,888.70 | 5 | |
| Asset Type Total | | | | | 30,268.17 | | |

| | | | | | | | |
|------|-----|--------|-------------|------------|-------------|------|-----------|
| Total | | | | | 4,277,666.11 | | 26 |

*Mississippi*

# V.I.N. & YEARS

DAVIDSON # 860 DATE 1-1995 VIN 1LO1A532OS1115708

DAVIDSON # 861 DATE 1-1995 VIN 1101A5322S1115709

FRUEHAUF #    DATE 4-1987 VIN 2V04820HB017066

EAGLE WING # 3208 DATE 2-1997 VIN *Excluded* ~~Removed~~    *Exchoded off*

1UYVS2532VP263413

EAGLE WING # 3194 DATE 1997 VIN 1DW1A5320VS101024

SPOT TRUCK 1999 VIN # 6187

BOX TRUCK 2001 VIN # 49HAAABV11HH54609

*Just in case*

# Mountain Pure Texas Fixed Asset Listing

## 150-200 -- Equipment

Concrete ) Debtor
Encased )
Part of Real Estate

| Dept | Sec | Number | Description | Purch Date | Purch Price | Life | Cur De Exp |
|------|-----|--------|-------------|------------|-------------|------|------------|
| 2 | | 4 | Chiller | 1/1/2009 | 97,664.50 | 15 | 5 |
| 72 | | 5 | Water Silo 1 | 1/1/2009 | 48,500.63 | 15 | 2 |
| 71 | | 6 | Water Silo 2 | 1/1/2009 | 45,802.10 | 15 | 2 |
| 51 | | 7 | Water Silo 3 | 1/1/2009 | 42,925.90 | 15 | 2 |
| 52 | | 8 | Resin Silo | 1/1/2009 | 24,482.29 | 15 | 1 |
| 72 | | 9 | Boiler | 1/1/2009 | 34,063.22 | 15 | 1 |
| 2 | | 10 | Flex RO | 1/1/2009 | 62,911.04 | 15 | 3 |
| 72 | | 11 | Distiller | 1/1/2009 | 67,255.99 | 15 | 3 |
| 2 | | 12 | CIP System | 1/1/2009 | 56,186.42 | 15 | 3 |
| 2 | | 13 | Water Softing System | 1/1/2009 | 2,998.96 | 15 | |
| 2 | | 14 | Heat Exchanger | 1/1/2009 | 2,971.21 | 15 | |
| 2 | | 15 | Ozone System | 1/1/2009 | 16,856.48 | 15 | |
| 52 | | 18 | Pet Blowmold Machine | 1/1/2009 | 729,492.66 | 15 | 4,0 |
| 52 | | 19 | South Blowmold | 1/1/2009 | 608,954.91 | 15 | 3,3 |
| 52 | | 20 | North Blowmold | 1/1/2009 | 608,507.32 | 15 | 3,3 |
| 52 | | 21 | Regrind Machine | 1/1/2009 | 38,015.71 | 15 | |
| 52 | | 22 | Grinder | 1/1/2009 | 23,057.84 | 15 | |
| 52 | | 23 | Vacum Pump | 1/1/2009 | 19,685.75 | 15 | 1 |
| 52 | | 24 | Cable Delivery System | 1/1/2009 | 206,532.36 | 15 | 1,1 |
| 52 | | 25 | Blowmold Control System | 1/1/2009 | 11,140.37 | 15 | |
| 52 | | 26 | Debagger Blowmold | 1/1/2009 | 20,394.72 | 15 | |
| 81 | | 27 | Pet Bottle Palletizer | 1/1/2009 | 134,745.42 | 15 | 7 |
| 81 | | 28 | Pet Line Depalletizer | 1/1/2009 | 102,573.82 | 15 | 5 |
| 81 | | 29 | Pet Line Drive | 1/1/2009 | 532.27 | 15 | |
| 81 | | 30 | Pet Line Labeler | 1/1/2009 | 50,644.88 | 15 | 2 |
| 81 | | 31 | Pet Line Filler | 1/1/2009 | 424,395.01 | 15 | 2,3 |
| 81 | | 32 | Pet Line Conveyor | 1/1/2009 | 543,768.84 | 15 | 3,0 |
| 81 | | 33 | Pet Line Printer | 1/1/2009 | 35,368.02 | 15 | 1 |
| 81 | | 34 | Pet Line Wrapper | 1/1/2009 | 289,999.72 | 15 | 1,6 |
| 81 | | 35 | Pet Line Wrapper 2 | 1/1/2009 | 155,128.75 | 15 | 8 |
| 81 | | 36 | Pet Line Palletizer | 1/1/2009 | 191,700.14 | 15 | 1,0 |
| 81 | | 37 | Pet Line Pallet Wrapper | 1/1/2009 | 63,659.25 | 15 | 3 |
| 82 | | 38 | One Gal Box Erector | 1/1/2009 | 44,776.38 | 15 | 2 |
| 82 | | 39 | One Gal Box Erector 2 | 1/1/2009 | 46,686.10 | 15 | 2 |
| 82 | | 40 | One Gal Caser | 1/1/2009 | 69,101.22 | 15 | |
| 82 | | 41 | One Gal Caser 2 | 1/1/2009 | 69,101.22 | 15 | |
| 82 | | 42 | One Gal Filler | 1/1/2009 | 64,539.87 | 15 | 3 |
| 82 | | 43 | One Gal Labeler | 1/1/2009 | 3,021.45 | 15 | |
| 82 | | 44 | One Gal Inkjet Printer | 1/1/2009 | 13,524.99 | 15 | |
| 82 | | 45 | One Gal Top Sealer | 1/1/2009 | 34,741.12 | 15 | 1 |
| 82 | | 46 | One Gal Top Sealer 2 | 1/1/2009 | 34,741.11 | 15 | 1 |
| 82 | | 47 | One gal Case Conveyor | 1/1/2009 | 16,485.09 | 15 | |
| 82 | | 48 | One Gal Box Printer | 1/1/2009 | 28,904.48 | 15 | 1 |

| Dept | Sec | Number | Description | Purch Date | Purch Price | Life | Cur De Exp |
|------|-----|--------|-------------|------------|-------------|------|-----------|
| | 82 | 49 | One Gal Palletizer | 1/1/2009 | 197,517.26 | 15 | 1,0! |
| | 82 | 50 | One Gal Wrapper | 1/1/2009 | 66,656.54 | 15 | 3: |
| | 2 | 51 | 2.5 Gal Palletizer | 1/1/2009 | 3,522.48 | 15 | |
| | 62 | 52 | Lab Trash Compactor | 1/1/2009 | 359.67 | 15 | |
| | 62 | 53 | Lab Test Equipment | 1/1/2009 | 2,217.46 | 15 | |
| | 2 | 65 | Floor Scrubber | 1/1/2009 | 1,300.00 | 15 | |
| | 70 - | 68 | Natural Spring Filter Equipmen | 1/1/2009 | 775.09 | 15 | |
| | 82 | 69 | 1 Gal Ultraviolet light | 1/1/2009 | 1,808.56 | 15 | |
| | 2 | 70 | 2.5 Gal Ultraviolet light | 1/1/2009 | 1,808.56 | 15 | |
| | 71 | 71 | Drinking Water Carbon Filters6 | 1/1/2009 | 2,519.09 | 15 | |
| | 2 | 77 | Air Compressor System | 1/1/2009 | 177,316.21 | 15 | 9! |
| | 2 | 78 | Levi Strauss Case Conveyor | 1/1/2009 | 9,195.22 | 15 | ! |
| | 62 | 79 | Lab Equipment | 1/1/2009 | 173.49 | 15 | |
| | 62 | 96 | Lab Equipment | 1/1/2009 | 4,107.51 | 15 | : |
| | 62 | 101 | CO2 Lab Equipment | 1/1/2009 | 434.69 | 15 | |
| | 52 | 110 | Resin Silo Installation | 1/1/2009 | 7,199.33 | 15 | |
| | 81 | 111 | Pet Line Equipment | 1/1/2009 | 78,580.51 | 15 | 4: |
| | 82 | 112 | 1 Gal Line Equipment | 1/1/2009 | 104,240.40 | 15 | 6: |
| | 2 | 113 | 2.5 Gal Line Equipment | 1/1/2009 | 54,349.20 | 15 | 3( |
| | 71 | 114 | Misc Drinking Line Equipment | 1/1/2009 | 985.55 | 15 | |
| | 130 | 115 | Pallet Racking | 1/1/2009 | 12,201.36 | 15 | ( |
| Asset Type Total | | | | | 5,913,807.71 | | 32,8! |

150-300 -- Trucks, Autos

| Dept | Sec | Number | Description | Purch Date | Purch Price | Life | Cur De Exp |
|------|-----|--------|-------------|------------|-------------|------|-----------|
| | 130 | 55 | Forklift charger 1 | 1/1/2009 | 5,658.34 | 5 | ! |
| | 130 | 56 | Forklift Charger 2 | 1/1/2009 | 5,658.35 | 5 | ! |
| | 130 | 57 | Forklift 3 | 1/1/2009 | 5,650.00 | 5 | ! |
| | 130 | 58 | Forklift 4 | 1/1/2009 | 5,763.00 | 5 | ! |
| | 130 | 59 | Scissorlift | 1/1/2009 | 3,010.00 | 5 | : |
| | 130 | 60 | Scissortail lift 1 | 1/1/2009 | 4,550.00 | 5 | : |
| | 130 | 61 | Scissortail lift 2 | 1/1/2009 | 4,550.00 | 5 | : |
| | 130 | 94 | Fork Lift Batteries (4) | 1/1/2009 | 21,545.75 | 5 | : |
| | 150 | 116 | Ford Explorer | 1/1/2009 | 5,600.00 | 5 | ! |
| | 130 | 119 | Trailer freight | 1/1/2009 | 4,050.00 | 5 | |
| | 130 | 124 | Fork Lift Mod | 1/1/2009 | 1,063.14 | 5 | |
| Asset Type Total | | | | | 67,098.58 | | 1,1: |

150-400 -- Furniture, Computer, Etc

| Dept | Sec | Number | Description | Purch Date | Purch Price | Life | Cur De Exp |
|------|-----|--------|-------------|------------|-------------|------|-----------|
| | 82 | 74 | Hitachi Inkjet Printer | 1/1/2009 | 0 | 5 | |
| | 130 | 75 | Dock Printer | 1/1/2009 | 3,623.27 | 5 | ( |
| | 1 | 98 | Phone System | 1/1/2009 | 10,553.11 | 5 | 1: |
| | 150 | 119 | Office Furnishings | 1/1/2009 | 990.27 | 5 | |
| | 60 | 121 | Computer interface | 1/1/2009 | 505.04 | 5 | |
| | 150 | 126 | Dell 5210 printer | 8/31/2009 | 945.13 | 5 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 150 | 127 | HP Elite Workstation | 8/31/2009 | 1,996.50 | 5 | |
| 150 | 128 | HP ELITE BOOK W/S | 8/31/2009 | 1,996.50 | 5 | |
| 150 | 129 | 3 HP DESKTOPS | 8/31/2009 | 2,910.53 | 5 | |
| Asset Type Total | | | | 23,520.35 | | 39 |
| | | | | 6,004,426.64 | | 34,36 |

## SCHEDULE 4.16
## TO
## MEMBERSHIP INTEREST PURCHASE AGREEMENT

### Litigation

1. Claim Against City of Little Rock—The Company claims that the City wrongfully collected sewage fees based on water the Company sold to customers and not used or consumed by the business. Potential recovery in the neighborhood of $300,000.

2. Some general matters pending with A/R litigation including Blue Springs Suit – Accounts receivable collection case of approximately $70,000.

3. Mediation held on January 8, 2010 with International Paper on faulty box strength issue. Company claimed credit for $192,000. Matter remains unresolved to date. IP has made settlement overture at appx. $96,000. Company has tendered settlement offer of $172,000.

4. Dorothy A. French vs. Mountain Pure MS, LLC pending in the Chancery Court Of Simpson County, Mississippi, Civil Action No. 2008-0531 P-1. Adjoining property owner claiming property damage; Insurance company is defending.

5. Dispute with Chep Pallet Company over approx. $113,000 of credits due to Company, no lawsuit pending, but Company may file. Most recent correspondence from Chep's counsel is attached.

6. Claim against Energy on "Wrong Grounding Transformer" approximately $100,000, Suit filed by us (LR, AR)

**SCHEDULE 4.18**
**TO**
**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

**Insurance**

1. Copies of all policies have been provided to Buyer during due diligence.

**EXHIBIT 6.12**
**TO**
**MEMBERSHIP INTEREST PURCHASE AGREEMENT**


<u>**Operating Agreement**</u>


(See attached)

# CONTRACT ASSIGNMENT

This Contract Assignment ("Assignment") is made as of the 24th day of February, 2010 by and between RainMaker Financial Group, Inc., an Illinois corporation ("Assignor"), and Bluejay Holdings, LLC, an Illinois limited liability company ("Assignee").

RECITALS:

A. Assignor is the purchaser of certain limited liability membership interests ("Interests") pursuant to a certain Membership Interest Purchase Agreement dated January 19, 2010 by and between John B. Stacks, as seller, and Assignor, as purchaser, as amended, a copy of which is attached hereto as Exhibit A ("Contract").

B. Assignor desires to assign its rights and delegate its obligations under the Contract to Assignee and Assignee desires to assume such rights and obligations thereunder.

In consideration of the foregoing, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1. **Assignment.** Assignor hereby transfers, conveys, assigns and sets over to Assignee all of Assignor's right, title and interest in, to and under the Contract.

2. **Acceptance and Assumption.** Assignee expressly accepts the assignment to it of Assignor's right, title and interest in, to and under the Contract and assumes and agrees to be bound by the Contract and to keep, perform and fulfill each and all of the covenants, agreements, terms, provisions, conditions and obligations required to be kept, performed and fulfilled by Assignor as and when the same are due.

3. **Indemnification.** Assignee agrees to protect, defend, indemnify and hold harmless Assignor, its legal representatives, successors and assigns from any and all losses, damages, expenses, fees (including, without limitation, reasonable attorneys' fees), court costs, suits, judgments, liability, claims and demands whatsoever in law or in equity, incurred or suffered by Assignor, its legal representatives, successors and assigns or any of them accruing under the Contract from and after the date hereof. Assignor agrees to protect, defend, indemnify and hold harmless Assignee, its legal representatives, successors and assigns from any and all losses, damages, expenses, fees (including, without limitation, reasonable attorneys' fees), court costs, suits, judgments, liability, claims and demands whatsoever in law or in equity, incurred or suffered by Assignee, its legal representatives, successors and assigns or any of them accruing under the Contract to the date hereof.

4. **Further Assurances.** Promptly upon request from time to time of the other party, each party shall do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, to or at the direction of such party, all further acts, transfers, assignments, powers and other documents and instruments as may be reasonably requested to give effect to the transactions contemplated hereby.

**EXHIBIT**

**B**

5.    **Successors and Assigns.** This Assignment shall bind the parties and their respective successors and assigns.

6.    **Counterparts.** This Assignment may be executed in any number of counterparts, each of which when executed and delivered shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures shall be treated the same as and shall have the same legal effect as original signatures for the purposes of this Assignment.

7.    **Governing Law.** This Assignment shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the choice of law principles.

IN WITNESS WHEREOF, the parties have executed this Assignment as of the date and year first set forth above.

Bluejay Holdings, LLC,                              RainMaker Financial Group, Inc.,
an Illinois limited liability company              an Illinois corporation

By: _____              By: _____
          Manager                                              President

X:\wp51\Beston\Mt Pure\ContractAssnmt.rtf

# AMENDMENT
# TO
## PURCHASE AND SALE AGREEMENT

**THIS AMENDMENT** (this "Amendment") to that certain Membership Interest Purchase dated January 19, 2010 (the "Agreement") by and among **John B. Stacks** (hereinafter referred to as "Seller"), **Bluejay Holdings, LLC,** an Illinois limited liability company, as assignee of **RainMaker Financial Group, Inc.,** an Illinois corporation, (hereinafter referred to as "Buyer"), and **Ten X Holdings, LLC,** an Illinois limited liability company ("TXH") who joins in this Amendment for purposes of Paragraph 7 below, is hereby executed to be effective as of the 26th day of February, 2010, by and among the undersigned parties.

For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the undersigned parties do hereby agree as follows:

1.     <u>Earnest Money Deposit</u>. As a condition to Seller's execution of this Amendment, Buyer shall deliver by wire transfer the earnest money deposit of Two Hundred Thousand Dollars ($200,000.00) to be deposited with Seller's legal counsel in such counsel's IOALTA trust account simultaneously with the delivery of the Amendment executed by Buyer and to be held in such account until Closing or return to Buyer as provided in Section 2.2 of the Agreement.

2.     **Post-Closing Payments and Purchases.** Section 2.3 of the Agreement is hereby amended by adding the following as a new subparagraph (f) at the end thereof:

> "(f) If the total gross sales of the Companies for the twelve month period beginning on April 1, 2010 and ending on March 31, 2011 (the "Measuring Period") are less than the Sales Threshold, the references to $20,000,000.00 and $14,800,000.00 in subparagraph (d) above shall each be reduced by an amount equal to the product of (i) $3,000,000.00, and (ii) quotient of: (y) the amount by which the Sales Threshold exceeds the actual total gross sales for the Measuring Period, and (z) $12,500,000.00.

> For example, if total gross sales for the Measuring Period were $20,000,000.00, the amount of the reduction would be $1,800,000.00 (($3M*($27.5M-$20M))/$12.5M) and each $1,000,000.00 of Post-Closing Payments would purchase 8.2418 units of the Post-Closing Purchased Units."

3.     <u>Capital Contribution</u>. Section 2.4 of the Agreement shall be amended by adding the following additional provisions at the end thereof:

> "Notwithstanding the above, of the approximate $2,600,000 reflected on the Companies' balance sheets as loans or other amounts due to Seller or affiliates of Seller (the "Due to Seller Amounts"), such amounts shall be handled as follows:



**EXHIBIT**

C

(a) From the capital contribution, $1,300,000.00 shall be paid to Seller (or the appropriate affiliate) in cash at Closing to be applied toward the Due to Seller Amounts; and

(b) the balance of the Due to Seller Amounts shall be converted to equity and credited to Seller's capital account subject to the following:

(i)      Such amount shall be treated as a preferred amount to be paid first from any authorized distributions to the members in their capacity as members;

(ii)     Such amount shall be paid to Seller simultaneously with and as part of any purchase of Seller's Remainder Interest; and

(iii)    Such amount would be counted toward any future capital calls due from Seller (at which point clause (i) above would no longer apply)."

4.      **Remainder Interests Options**.  If, within fifteen (15) months from the Closing Date, Buyer obtains more favorable financing for the indebtedness of the Companies listed on the attached **Exhibit A** and obtains the release of Seller from all personal guarantees of such indebtedness together with the release of any liens on any collateral of Seller securing such indebtedness, the Remainder Interests Options under Section 2.5 of the Agreement shall terminate.

5.      **Closing**.  Section 3.1 of the Agreement is hereby amended in its entirety to read as follows:

"3.1    **Time and Place of Closing**.  The Closing shall take place at the offices of Seller, 6921 Interstate 30, Little Rock, Arkansas 72209, at 11:00 A.M. Central Standard Time, on  or before March 19, 2010, or at such other time, date or place as may be mutually agreed by the parties ("Closing Date")."

6.      **Refinancing**.

(a) Buyer's obligation to close is subject to the restructuring of each of the loans listed on the attached **Exhibit A** in the manner therein designated or as may otherwise be mutually agreed between the parties.

(b)     If, within fifteen (15) months from the Closing Date, Buyer obtains more favorable financing for the indebtedness of the Companies listed on the attached **Exhibit A** and obtains the release of Seller from all personal guarantees of such indebtedness together with the release of any liens on any collateral of Seller securing such indebtedness, the following shall be substituted in lieu of Sections 2.3(a), (d) and (f) above:

2

X:\wp51\Benton\M\Pa\e\Amendment to Purchase Agreement.3.9.10.Clean.doc

"(a)    If the Business operations of the Companies following Closing achieve annual levels of earnings before interest, taxes, depreciation and amortization ("EBITDA") as determined pursuant to this Section 2.3, Buyer shall purchase up to an additional three hundred fifty (350) units (representing thirty-five percent (35%) of the Interests in the Companies) from Seller for the consideration and in the manner provided in this Section 2.3.  EBITDA shall be determined on an annual basis within sixty (60) days following the end of each fiscal year of the Companies' business operations. Except as mutually agreed by Buyer and Seller, for purposes of determining EBITDA, salaries and overhead charges (as a percent of gross sales) in excess of the amounts customarily incurred by the Companies consistent with past operating history and practices shall not be taken into account.  If EBITDA for any such year exceeds Four Million Five Hundred Thousand Dollars ($4,500,000.00) (the "EBITDA Threshold") and the total sales of the Companies equals or exceeds the Sales Threshold, Seller shall be entitled to receive and Buyer shall pay to Seller in cash an amount equal to fifty percent (50%) of the amount by which EBITDA exceeds the EBITDA Threshold (the "Post-Closing Payment").

(d)    For each One Million Dollars ($1,000,000.00) in cumulative Post-Closing Payments made to Seller, Seller shall convey to Buyer, 18.1347 units of the Remainder Interests until Seller has received Post-Closing Payments in the cumulative amount of Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00) in exchange for the Remainder Interests. Notwithstanding the foregoing, if Buyer, in its sole option, elects to waive the EBITDA Threshold and the Sales Threshold on a Post-Closing Payment by Post-Closing Payment basis, in any multiple of $1,000,000 as determined by Buyer, (hereinafter referred to as "Elective Payment") and pays to Seller the Elective Payment, Seller shall accept the Elective Payment as payment for the applicable amount of the Remainder Interests as if such payment was a Post–Closing Payment.    Should the cumulative amount of Post-Closing Payments and/or Elective Payments made within twenty-four (24) months after Closing equal or exceed Sixteen Million Three Hundred Thousand Dollars ($16,300,000.00), then Seller shall transfer to Buyer the balance of the Remainder Interest, and the Buyer shall be relieved of any obligation to make any additional Post-Closing Payment under this Section 2.3.

(f)    If the total gross sales of the Companies for the twelve month period beginning on April 1, 2010 and ending on the later of March 31, 2011 (the "Measuring Period") are less than the Sales Threshold, the references to Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00) and Sixteen Million Three Hundred Thousand Dollars ($16,300,000.00) in subparagraph (d) above shall each be reduced by an amount equal to the product of: (i) $3,000,000.00, and (ii) quotient of: (y)

3    X:\wp51\Besta\My Fyle\Amendment to Purchase Agreement 3.9.10.Clean.doc

the amount by which the Sales Threshold exceeds the actual total gross sales for the Measuring Period, and (z) $12,500,000.00.

For example, if total gross sales for the Measuring Period were $20,000,000.00, the amount of the reduction would be $1,800,000.00 (($3M*($27.5M-$20M))/$12.5M) and each $1,000,000.00 of Post-Closing Payments would purchase 20 units of the Post-Closing Purchased Units."

7.    **Indemnity Agreement.**  At Closing, Buyer, TXH, the Companies and Mountain Pure, Holdings, LLC will execute and deliver to Seller an Indemnity Agreement in the form attached in **Exhibit B** attached hereto.

8.    **No Other Outstanding Conditions.**  Other than the financing condition set forth above in Paragraph 6 above and the parties' acceptance and execution of the Closing deliveries identified on the Closing Checklist in the form attached in **Exhibit C** attached hereto, Buyer and Seller acknowledge and agree all outstanding conditions to their respective obligation to close the transaction have been performed, satisfied or waived.

9.    **Further Assurances.**  The parties agree that they will, at any time and from time to time after the Closing, upon the reasonable request of another party, do, execute, acknowledge, and deliver, or will cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, assumptions, transfers, conveyances, and assurances as may be reasonably required for the fulfillment and consummation of the terms and conditions of this Amendment.

10.    **Effective Date of Transfers.**  For all purposes of the Agreement, the effective date of the matters set forth in Paragraph 1.A and 1.B above shall be the Closing Date and all benefits and burdens of ownership shall be allocated to the parties accordingly.

11.    **Effect on Agreement.**  Except as specifically provided herein, all terms and provisions of the Agreement shall be unaffected by this Amendment and shall remain in full force and effect.

12.    **Counterparts and Facsimile Execution.**  This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute the same document. To facilitate the execution of this Amendment, the parties agree that the facsimile signature of a party shall be sufficient to bind that party to this Amendment with the original signature to be provided as promptly as possible following execution. The facsimile signature shall be binding to the same extent as an original signature, and no party shall have a defense that the facsimile signature was not authorized.

*[THE NEXT PAGE IS THE SIGNATURE PAGE]*

4

This Amendment is adopted and approved by the parties effective as of the date first set forth above.

**BUYER:**

**Bluejay Holdings, LLC,**
As Assignee of Rainmaker Financial Group, Inc.,
An Illinois corporation

By: _____

Title: _____

**SELLER:**

_____
John B. Stacks

**TXH:**
**TEN X HOLDINGS, LLC**
(for the purposes of Paragraph 7)

By: _____

Title: _____

5

X:\wp51\Bentley\M...\Amendment to Purchase Agreement.3.9.10.Clean.doc

## LIST OF SCHEDULES AND EXHIBITS

Exhibit A                    Schedule of Bank Loans

Exhibit B                    Indemnity Agreement

Exhibit C                    Closing Checklist

N:\wp51\Bestos\W\\Pure\Amendment to Purchase Agreement\9.10.docx

EXHIBIT A TO AMENDMENT
TO
MEMBERSHIP INTEREST PURCHASE AGREEMENT

MOUNTAIN PURE
Schedule of Bank Loans
Refinance Conditions

Appx. Closing
Date Balance

| Lender | Borrower | Loan # | Type/Amort | 1/31/10 Balances Amount | Buyer to Pay/Assume/Guarantee | Refinance/Restructure Terms |
|---|---|---|---|---|---|---|
| Metropolitan National Bank | MP | 115025421 | LOC | $ 1,011,513.70 | $ 1,000,000.00 | 1 year interest only; 5.125% |
| Metropolitan National Bank | MP | 115058249 | R/E | $ 3,589,830.01 | $ - | |
| Metropolitan National Bank | MP | 115099433 | Equipment | $ 5,997,780.60 | $ 7,249,602.00 | 2 years interest only;Covenants on dividend distributions only |
| Metropolitan National Bank | MP-MS | 115082662 | R/E | $ 3,654,145.37 | | 2 years interest only;Covenants on dividend distributions only |
| Metropolitan National Bank | MP-MS | 115082972 | LOC | $ 689,605.79 | $ 681,000.00 | 1 year interest only; 5.125% |
| Metropolitan National Bank | MP-MS | 115111345 | Equipment | $ 1,285,226.97 | $ 2,532,982.86 | 2 years interest only;Covenants on dividend distributions only |
| First Community Bank | MP-TX | 3013051 | Real Estate | $ 1,377,488.84 | | |
| First Community Bank | MP-TX | 3013049 | Real Estate | $ 1,460,571.40 | | |
| First Community Bank | MP-TX | 3014302 | A/R, Inv. & Equip | $ 1,422,711.95 | $ 3,291,531.57 | 15 months interest only;5 yr term; 7 yrs amort. |
| First Community Bank | MP-TX | 3010648 | Real Estate | $ 2,818,554.76 | | |
| SBA Loan | MP | #36704560-07 | Equipment | $ 524,504.34 | $ 524,504.34 | No change |
| GE Capital #1 | MP-MS | | Equipment | $ 545,463.44 | $ 545,463.44 | No change |
| GE Capital #1 | MP-MS | | Equipment | $ 331,910.73 | $ 331,910.73 | No change |
| Total GE | | | | | | |
| NBA | MP-TX | | Blow molds/Other | $ 1,419,180.93 | $ 1,419,180.93 | No change but 15 months interest only if possible |
| International Paper | MP | | Equipment | $ 423,824.11 | $ 423,824.11 | No change, but if possible move to First Community |
| Total | | | | | $ 18,000,000.00 | |




Mountain Pure Holdings                                                    Page 1 of 4
Purchase Agreement
Closing Checklist  AS OF MARCH 9, 2010

| Document Name | PA Reference | To be Provided By | Execution Copy Completed | Reviewed and approved by |
|---|---|---|---|---|
| Purchase Agreement | NA | NA | 1/18/2010 | |
| Seller Certificates and transfer powers duly executed by Seller in favor of Buyer and representing all of the Purchased Interests | 3.3 (a) | Stacks | Stacks and TV to provide; RD to review | |
| Seller Certificate of Good Standing for each of the Companies | 3.3(b) | Stacks | Received 2/23/2010; to be reviewed by RD | |
| Seller Resignations of existing managers and officers of each Company | 3.3(c) | Stacks | TV to prepare with RD review | |
| Evidence that Buyer has been designated as a named insured under Companies' liability insurance policies that are in force on the Closing Date | 3.3(e) | Stacks | Stacks and TV to provide info | |
| Consent of lessor under the Lease for the Premises, and any other lessor under any other Lease relating to any Company's assets or Business, duly executed by such lessor in favor of Buyer, to the extent required under any such Lease; | 3.3(f) | Stacks | Check on final status with RD, TV | |
| Employment Agreement of Stacks | 3.3 (g) | | Check on final status with RD, TV | |
| All Corporate, Tax, Financial and business Records of the Companies | 3.3(h) | Stacks | To be received at Closing.  Need a listing and location of Items from Stacks including all attorneys and cpa used by | |

Mountain Pure Holdings                                    Page 2 of 4
Purchase Agreement
Closing Checklist  AS OF MARCH 9, 2010

| Document Name | PA Reference | To be Provided By | Execution Copy Completed | Reviewed and approved by |
|---|---|---|---|---|
| | | | Companies | |
| Keys, passwords, protocols and other means of access to the Premises and Business assets of the Companies including, but not limited to, those related to all computer or other electronic media, storage, retrieval and security systems and devices. | 3.3(J) | Stacks | To be received at closing. Need a listing of Items from Stacks | |
| Operating Agreement | 3.3(k); 6.12 | | Check on final status with RD, TV | |
| Lease Agreements | 3.3(L) | | Check on final status with RD, TV | |
| Buyer Certified Corporate Resolution of the Shareholders and Directors of Buyer authorizing the purchase of Purchased Interests and related transactions contemplated hereby | 3.4(b) | TXH/BlueJay | RD to prepare for BJ; to be reviewed by TV for approval | |
| Certificate of Good Standing for Buyer | 3.4(c) | BlueJay | TXH done; BJ to be completed 2/26 | |
| Bank Refinance Agreements | 6.11 | Seller/Buyer/Bank | Not received | |
| Above Agreements in the name of new holding company or are freely assignable without permission of banks | 6.11 | Bank | To be reviewed by RD, JWB and DM | |
| Holding Company Formed | 6.12 | Stacks/Buyer | RD status | |
| Assignment of Interests to Holding Company | 6.12 | Stacks/Buyer | To be reviewed by RD | |
| Land and Debt transfer document (includes | 8.2(c) | Stacks | To be reviewed by RD | |

Mountain Pure Holdings                                                    Page 3 of 4
Purchase Agreement
Closing Checklist   AS OF MARCH 9, 2010

| Document Name | PA Reference | To be Provided By | Execution Copy Completed | Reviewed and approved by |
|---|---|---|---|---|
| release of Company by bank(s) for real estate portion of loans | | | | |
| Refinance of SBA Loan complies with 6.11 terms and conditions | 6.11 | Stacks | Need loan doc and refinance agreement | |
| Refinance of GE Loan complies with 6.11 terms and conditions | | Stacks | Need loan doc and refinance agreement | |
| Refinance of International Paper Loan complies with 6.11 terms and conditions | | Stacks | Need loan doc and refinance agreement | |
| Refinance of NBA Loan complies with 6.11 terms and conditions | | Stacks | Need loan doc and refinance agreement | |
| Schedule of Gov Authorization and Compliance | 4.4 | Stacks | 1/19/2010 | JWB |
| Schedule of Capitalization | 4.5 | Stacks | 1/19/2010 | JWB |
| Schedule of Real and Personal Property Leases | 4.8 | Stacks | 1/19/2010 | JWB |
| Schedule of Material Contracts (Note: schedule does not list any debt or loan agreements; SB picked up in Bank refinance of 18M in debt) | 4.9 | Stacks | Incomplete | |
| Schedule of Intellectual Property | 4.10 | Stacks | 1/19/2010 | JWB |
| Schedule of Tangible Assets | 4.14 | Stacks | Needs to be updated for new 2.7M purchases | |
| Schedule of Litigation | 4.16 | Stacks | 1/19/2010 | JWB |
| Schedule of Current Effective Policies of Insurance/Owner or | | Sacks | Has TXH/Bluejay been named as additional | |

Mountain Pure Holdings                                        Page 4 of 4
Purchase Agreement
Closing Checklist  AS OF MARCH 9, 2010

| Document Name | PA Reference | To be Provided By | Execution Copy Completed | Reviewed and approved by |
|---|---|---|---|---|

| Insured | | | Insured? | |
|---|---|---|---|---|
| Indemnity Agreement | Amendment to Purchase Agreement paragraph 7 | Stacks | Draft prepared by TV under review and comment by RD | |
| | | | | |

**CLOSING MEMORANDUM**
**FOR**
**MEMBERSHIP INTEREST PURCHASE AGREEMENT**
**REGARDING**
**MOUNTAIN PURE, LLC**
**MOUNTAIN PURE TX, L.L.C.**
**MOUNTAIN PURE MS, LLC**
**(collectively referred to hereafter as the "Companies")**

     The purpose of this Memorandum is to set forth the additional agreements between **JOHN B. STACKS**, an Arkansas resident (the "Seller"), and **BLUEJAY HOLDINGS, LLC**, an Illinois limited liability company, as assignee of **RainMaker Financial Group, Inc.**, an Illinois corporation (the "Buyer") and Ten X Holdings, LLC, an Illinois limited liability company ("TXH")with respect to certain matters in connection with Buyer's purchase of a sixty-five percent (65%) membership interest in the Companies pursuant to the Membership Interest Purchase Agreement dated January 19, 2010, between the parties (the "Agreement"), the Amendment to Membership Interest Purchase Agreement dated effective February 26, 2010 as well as Buyer's and Seller's subsequent formation of and contributions to **Mountain Pure Holdings, LLC**, a Delaware series limited liability company (the "Holding Company").

     1.    <u>Assignment and Transfer of Airplanes.</u>  There are currently two airplanes titled in the name of the Companies which were to be distributed to Seller (along with any indebtedness specifically secured thereby) prior to Closing.  To the extent such transfers are not complete prior to Closing, the parties agree to cooperate in completing any necessary steps and executing the necessary documents, including assignments, bills of sale or other documentation requested by the Federal Aviation Administration to complete the transfers to Seller or his assigns.

     2.    <u>Confidentiality.</u>  The parties acknowledge and agree that certain customers and vendors of the Companies do business with the Companies based on the relationships Seller has established with such customers and vendors.  In order to facilitate the retention of such customers and vendors following Closing, particularly through June 30, 2011, and as a material inducement for Seller remaining at risk on certain indebtedness of the Companies, Buyer agrees to keep the specific terms of this Agreement private and confidential and not disclose such terms except upon prior mutual agreement of the parties.  When making introductions of Buyer to customers and vendors, Seller will introduce Buyer as his new partner without reference to any change in ownership or control of the Companies. Any press releases or public announcements regarding the Agreement and the consummation of the same shall be subject to the prior review and approval of both parties.  In the event of a breach of this provision by the Buyer which results in the loss of key customers or vendors on or before June 30, 2011, the Sales Threshold in the Purchase Agreement shall be reduced dollar for dollar for the loss in sales from such customer. For this purpose, the lost sales shall be determined by multiplying average monthly sales from such customer for the twelve months preceding the loss of such customer by the number of months remaining to the end of the Measuring Period.

The provisions of this Paragraph 2 shall not prevent Buyer from disclosing such terms in confidence to those of its employees, agents and representatives who would require knowledge of such information for performance of their regular duties for Buyer, but such personnel shall also be bound to the same extent that Buyer is bound hereunder.

     3.    <u>Purchase Price Adjustment.</u>  Section 2.3(f) of the Amendment is amended to provided that the Measuring Period shall begin on April 1, 2010 and end on June 30, 2011.

     4.    <u>Promissory Note</u>.  Buyer's cash funding of the Purchase Price and the Capital Contribution pursuant to the Agreement, as amended, from it's lender shall take place no later than April 30, 2010. In the interim, Buyer and TXH shall deliver to Seller a Promissory Note dated March 26, 2010 in the amount of Five Million Seven Hundred Thousand Dollars ($5,700,000.00) and shall deliver to Mountain Pure Holdings, LLC a Promissory Note dated March 26, 2010 in the amount of Six Million and 00/100 Dollars both bearing interest at five and one-quarter percent (5.25 %) per annum payable not later than April 30, 2010, which Notes shall be in the forms attached hereto as Exhibit A (the "Notes").  In exchange for the delivery of the Notes, Seller shall convey a fifty percent (50%) interest in each of the

EXHIBIT A

Companies to Buyer.  Upon payment in full of the Notes on or before the April 30, 2010 maturity date, Seller shall deliver to Buyer certificates of membership units for one hundred fifty (150) additional units in the Companies representing an additional fifteen percent (15%) interest in the Companies at which time Buyer shall own six hundred fifty (650) membership units in each of the Companies representing sixty-five percent (65%) of the total outstanding membership units in the Companies.  Also upon delivery of the Notes to Seller, all of the closing documents, including bank loan documents and guarantees by the parties, shall be immediately in full force and effect, provided, payments under the Leases for the months of April, 2010 shall be deferred and paid on May 1, 2010 with the balance payable on June 1, 2010, and the salary that is due to John Stacks for the month of April, 2010, pursuant to the Employment Agreement, shall be deferred and paid on May1, 2010.  Pending payment in full of the Notes, all references in the Operating Agreement or any membership certificates to Seller owning six hundred fifty (650) units (or sixty-five (65%)) shall instead refer to five hundred (500) units (or fifty percent (50%)).

     **5.**     **Technical Correction to Operating Agreement.**  The parties agree that to the extent the put and call provisions of the Agreement and Amendment remain in effect, the exercise of such put or call rights shall be considered a permissible transfer under the Operating Agreement of Mountain Pure Holdings, LLC and shall not require the consent of any other party, including the other member(s) or the Board of Managers.

**[Intentional short page]**

**[The next page is the signature page]**

**IN WITNESS WHEREOF**, the parties have executed this Closing Memorandum as of this ___ day of March, 2010.

SELLER:                                              PURCHASER:

                                                    **BLUEJAY HOLDINGS, LLC**

_____                    By: _____
John B. Staeks

                                                    Title: _____

                                                    TXH:

                                                    **TEN X HOLDINGS, LLC**

                                                    By: _____

                                                    Title: _____

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " ACT"), OR UNDER ANY STATE SECURITIES LAWS.  IT IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED, SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT THERETO UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE MAKER THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT ANY APPLICABLE STATE SECURITIES LAWS.

# PROMISSORY NOTE

$5,700,000

Chicago, Illinois

March 26, 2010

FOR VALUE RECEIVED,  the undersigned, jointly and severally (herein after collectively referred to as "Maker"), promises to pay to the order of JOHN STACKS ("Payee"), having an address of __14340 Hwy 65 S, Damascus, AR 72039__ the principal sum of   FIVE MILLION SEVEN HUNDRED THOUSAND AND NO/100 DOLLARS ($5,700,000.00) (the "Principal Sum"), with interest (calculated on the basis set forth below) on the unpaid balance of such Principal Sum from the date hereof until paid in full, all in accordance with terms and provisions of this secured promissory note (the "Note").

This Note is made in conjunction with certain additional agreements between Payee as Seller and BLUEJAY HOLDINGS, LLC, an Illinois limited liability company, as assignee of RAINMAKER FINANCIAL GROUP, INC., an Illinois corporation as Buyer and TEN X HOLDINGS, LLC, an Illinois limited liability company with respect to certain matter in connection with Buyer's purchase of the membership interest in the Companies pursuant to the Membership Interest Purchase Agreement dated January 19, 2010, between the parties thereto (the "Agreement") , the Amendment to the Agreement dated February 26, 2010 and the Closing Memorandum For Membership Interest Purchase Agreement Regarding Mountain Pure, LLC, Mountain Pure TX, LLC and Mountain Pure MS, LLC (collectively the "Companies").

I.  Interest; Payment of Interest.

(A) Interest Rate.  Interest shall accrue on the Principal Sum at the rate of FIVE and ONE QUARTER PERCENT (5.25%) per annum (the "Interest Rate").  The amount of Interest payable under this Note shall be calculated on the basis of the actual number of days elapsed and a year consisting of 360 days.

Ten X Holdings, LLC
John Stacks
Note Payable

Page 1 of 4

EXHIBIT

tabbies

_E_

RFB

(B) **Interest Payments.**  Interest shall accrue on the Principal Sum and shall be paid in one lump sum payable commencing on the date first written above until April 30, 2010 (the "**Maturity Date**").

2. **Repayment of Principal.**

   (A) **Payments.**  Maker shall make payment to Payee of the Principal Sum under this Note on the Maturity Date.

   (B) **Optional Prepayment.**  Maker may prepay this Note in whole or in part at anytime and from time to time together with accrued interest on the amount prepaid without penalty.

3. **Payment; Default Rate; Application of Certain Monies.**

   (A) **Manner of Payment.** All payments of the Principal Sum, Interest and other amounts payable by the Maker under this Note shall be made in U.S. Dollars and in immediately available funds to the Payee at its address set forth above, or at such other place in the United States as Payee may from time to time designate in writing to Maker.

   (B) **Payment on a Non-Business Day.**  Whenever any payment to be made hereunder shall be stated to be due, or if any Maturity Date otherwise occurs, on a day which is not a Business Day, such payment shall be made, and the Maturity Date shall occur, on the next succeeding Business Day, and such extension of time shall be included in the computation of payment of interest.

4. **Definitions.**

   (A) All the agreements or instruments herein defined shall mean such agreements or instruments as the same may from time to time be supplemented or amended or the terms thereof waived or modified to the extent permitted by, and in accordance with, the terms thereof and of this Note.

   (B) "Dollars" or the sign $ shall mean dollars in the lawful currency of the United States of America.

   (C) "Interest" means interest accrued or accruing at the Interest Rate.

   (D) "Event of Default" means: (i) the failure by Maker to pay an obligation or liability under this Note within ten (10) days of the due date of any such payment in accordance with the terms hereof; (ii) the breach of any terms by Maker of this Note; (iii) assignment by Maker of its assets for the benefit of its creditors; or (iv)

*RFB*

a filing by or against Maker of a petition under the United States Bankruptcy Code or any analogous procedure in any other jurisdiction.

5.  **Additional Material Provisions.**

(A) **Notices.** All notices, demands, requests and other communications require hereunder shall be in writing and shall be deemed to have been given: (a) upon delivery, if personally delivered or sent by facsimile or email, subject to written confirmation of transmission; (b) three (3) days after deposit in the United States Mail when delivered postage prepaid, by certified or registered mail; or (c) one (1) business day after deposit with a nationally recognized overnight delivery service marked for delivery next business day, addressed to the party for whom it is intended, if to Payee, at his address set forth above, and if to Maker, at its address set forth in the Disclosure Statement.

(B) ~~Assignment and Assumption of Note. This Note may be fully assigned to and assumed by any entity that is an affiliate of the Maker, as such term is defined under the Act, in which case, Maker shall thereafter be fully and completely released of any further obligation under this Note, and Payee shall look only to such entity for satisfaction of the terms and conditions contained in this Note.~~   *RFB*

(C) **Waivers.** Maker waives presentment for payment, protest and demand, notice of protest, demand and dishonor and non-payment of this Note and agrees to pay all costs of collection when incurred, including, without limitation, reasonable attorneys' fees and expenses, and to perform and comply with each of the covenants, conditions, provisions and agreements contained in this Note and every instrument now or hereafter evidencing or securing this Note. No delay or omission on the part of the Payee in exercising any right under this Note shall operate to release, discharge, modify, change or affect the original liability under this Note, either in whole or in part, unless the Payee shall be party to such agreement.

(D) **Governing Law.** This Note will be governed by, and construed in accordance with, Illinois law (excluding the conflicts of law provisions), and the parties agree to the exclusive jurisdiction and venue of state or federal courts located in Chicago, Illinois.

(E) **Amendments and Waivers.** Any provision of this Note may be amended or waived if, but only if, such amendment or waiver is in writing and is signed and/or acknowledged by the Payee and the Maker.

(F) **Collection Costs and Attorneys' Fees.** In the event of any action or proceeding brought by Payee for collection and enforcement of this Note, Payee shall be entitled to recover from Maker all costs and expenses it incurs in enforcing its rights and remedies under this Note and in collecting all amounts due and owing

Ten X Holdings, LLC                                                                Page 3 of 4
John Stacks
Note Payable

*RFB*

hereunder, including without limitation its attorneys and court costs in such action or proceeding, including costs of appeal, if any, in such amount as the court may adjudge reasonable as attorneys' fees.

(G) **Severability of Provisions.** Any provision of this Note which is prohibited or unenforceable under applicable law shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or unenforceability of such provision in any other jurisdiction.

(H) **Headings.** The headings of the various sections and subsections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

**IN WITNESS WHEREOF,** the undersigned have executed this Note as of the day and year first above written.

**TEN X HOLDINGS, LLC**
**(an Illinois limited liability company)**

By: _____
    Richard F. Beston, Jr., a Manager

**BLUEJAY HOLDINGS, LLC**
**(an Illinois limited liability company)**

By: _____
    Richard F. Beston, Jr., a Manager